UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RUTH DUARTE,

                         Plaintiff,

            - against -                                    15-CV-6824 (PGG)

ST. BARNABAS HOSPITAL,

                         Defendant.

**DEFENDANT'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500

*Attorneys for Defendant St. Barnabas Hospital*

# TABLE OF CONTENTS

PAGE

PRELIMARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ................................................................................................3

A.   Duarte's Employment ................................................................................ 3

B.   Duarte's Performance and Disciplinary History ................................................7

    1.   Verbal Warning ................................................................................7
    2.   Written Warning ................................................................................8
    3.   Notice of Two-Day Suspension ............................................................8

C.   Termination of Duarte's Employment for Falsification of Patient Records .......... 9

ARGUMENT ................................................................................................10

POINT I   THE HOSPITAL IS ENTITLED TO SUMMARY JUDGMENT DISMISSING
    PLAINTIFF'S UNLAWFUL DISCIPLINE AND TERMINATION CLAIMS. .....10

A.   Duarte's Unlawful Discrimination and Termination Claims Are Barred
    By the Election of Remedies Provision Under New York Labor Law § 740. .................... 10

B.   There is No Evidence of Any Discriminatory or Retaliatory Adverse
    Actions Based on Duarte's Race, Gender or National Origin. ........................... 11

    1.   Duarte Cannot Establish a *Prima Facie* Case of  Gender,
        Race or National Origin Discrimination. ...................................... 12

C.   Duarte's Whistleblower Retaliation Claims Cannot Withstand Summary Judgment. ........ 12

D.   Duarte Was Disciplined and Terminated for Legitimate,
    Non-Discriminatory and Non-Retaliatory Reasons. ............................................. 15

POINT II   PLAINTIFF'S REMAINING DISCRIMINATION CLAIMS
    MUST BE DISMISSED. ........................................................................16

A.   Duarte's Gender Discrimination Claims Must Be Dismissed. ........................... 16

B.   Duarte's Remaining Race and National Origin Discrimination Claims
    Must Be Dismissed. ........................................................................ 16

POINT III   THE HOSPITAL IS ENTITLED TO SUMMARY JUDGMENT ON
    PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS. ...........................18

POINT IV   PLAINTIFF'S FLSA AND NYLL UNPAID WAGE AND OVERTIME
    PAY CLAIMS FAIL AS A MATTER OF LAW................................................20

A.   Duarte Cannot Maintain Individual FLSA and NYLL  Unpaid Wage and Overtime Claims
    In This Action. ........................................................................ 20

B.   Duarte's FLSA Claims are Preempted By the LMRA........................................ 21

C.   Duarte Is Not Entitled to Overtime Under the NYLL Because She
     Is an Exempt Employee Under the NYLL.................................................................. 21

D.   Duarte's FLSA and NYLL Unpaid Wage and Overtime Pay Claims Fail. ......................... 23

     1.   Alleged Work on Floating Holidays ............................................................... 23
     2.   Alleged Work After 5p.m. ............................................................................. 24
     3.   Alleged Work During Lunch Breaks ............................................................... 24

E.   Duarte Cannot Prove the Hospital Knew About Her Alleged
     Additional Work. ............................................................................................... 25


CONCLUSION.................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alfano v. Costello*,
    294 F.3d 365 (2d Cir. 2002)........................................................18

*Anderson v. Mt. Clemens Pottery Co.*,
    328 U.S. 680 (1946)..............................................................23

*Barry v. Town of Elma*,
    No. 02-CV-344, 2005 U.S. Dist. LEXIS 5548 (W.D.N.Y. Mar. 28, 2005)............................24

*Belton v. City of New York*,
    No. 12-CV-6346, 2014 U.S. Dist. LEXIS 136471 (S.D.N.Y. Sept. 26, 2014)................18, 19

*Campbell v. N.Y. City Transit Auth.*,
    93 F. Supp. 3d 148, 173 (E.D.N.Y. 2015) ......................................17, 18

*Cantave v. Uptown Communs. & Elec. Inc.*,
    No. 14-CV-1838, 2015 U.S. Dist. LEXIS 103159 (E.D.N.Y. Aug. 5, 2015)........................21

*Chao v. Gotham Registry, Inc.*,
    514 F.3d 280 (2d Cir. 2008)..................................................23, 25

*Chin v. Chinatown Manpower Project*,
    No. 11-CV-5270, 2014 U.S. Dist. LEXIS 72573 (S.D.N.Y. May 23, 2014) ........................13

*Concey v. N.Y. State Unified Court Sys.*,
    No. 08-CV-8858, 2011 U.S. Dist. LEXIS 113620 (S.D.N.Y. Sept. 30, 2011)......................20

*Cordell v. Verizon Commc'ns, Inc.*,
    331 F. App'x 56 (2d Cir. 2009) ................................................17

*EEOC v. Bloomberg L.P.*,
    967 F. Supp. 2d 816 (S.D.N.Y. 2013)..........................................15

*Gordon v. Kaleida Health*,
    299 F.R.D. 380 (W.D.N.Y. 2014)..............................................23, 25

*Grady v. Affiliated Cent., Inc.*,
    130 F.3d 553 (2d Cir. 1997)...................................................17

*Hernandez v. City of New York*,
    No. 11-CV-6644, 2014 U.S. Dist. LEXIS 180981 (S.D.N.Y. Nov. 24, 2014)......................11

*Hollander v. Am. Cyanamid Co.*,
    895 F.2d 80 (2d Cir. 1990)....................................................14

*Johnson v. Strive E. Harlem Emp't Grp.*,
    990 F. Supp. 2d 435 (S.D.N.Y. 2014).........................................19

*Joseph v. Owens & Minor Distrib.*,
    5 F. Supp. 3d 295, 317 (E.D.N.Y. 2014) ......................................11, 12

*Khansari v. St. Barnabas Hospital*,
    No. 15-CV-1803 (PGG)........................................................3, 20

*Knox v. Town of Southeast*,
   No. 11-CV-8763, 2014 U.S. Dist. LEXIS 45888 (S.D.N.Y. Mar. 31, 2014) ...................12, 17

*Kolesnikow v. Hudson Valley Hosp. Ctr.*,
   622 F. Supp. 2d 98 (S.D.N.Y. 2009)......................................................................................24

*Kuebel v. Black & Decker, Inc.*,
   643 F.3d 352 (2d Cir. 2011)..................................................................................................23

*Levine v. Unity Health Sys.*,
   847 F. Supp. 2d 507 (W.D.N.Y. 2012) .................................................................................23

*McDonnell-Douglas Corp. v. Green*,
   411 U.S. 792 (1973)..............................................................................................................11

*Melman v. Montefiore Med. Ctr.*,
   98 A.D.3d 107 (1st Dep't 2012) ...........................................................................................12

*Monterroso v. Sullivan & Cromwell, LLP*,
   591 F. Supp. 2d 567 (S.D.N.Y. 2008)..................................................................................18

*Nadkarni v. North Shore-Long Island Jewish Health Sys.*,
   No. 02-CV-5872, 2003 U.S. Dist. LEXIS 26552 (E.D.N.Y. July 31, 2003)..........................10

*O'Connor v. Bank of New York*,
   Index No. 0103217/2006, 2008 N.Y. Misc. LEXIS 8338 (Sup. Ct. N.Y. Cty.
   Feb. 28, 2008) ......................................................................................................................17

*Paul v. Lenox Hill Hosp.*,
   No. 13-CV-1566, 2016 U.S. Dist. LEXIS 16548 (E.D.N.Y. Jan. 15, 2016) .........................23

*Rinsler v. Sony Pictures Entm't Inc.*,
   No. 02-CV-4096, 2003 U.S. Dist. LEXIS 14754 (S.D.N.Y. Aug. 25, 2003).........................15

*Shiflett v. GE Fanuc Automation Corp.*,
   960 F. Supp. 1022 (W.D. Va. 1997) ....................................................................................20

*Thomas v. Apple-Metro, Inc.*,
   No. 14-CV-4120, 2015 U.S. Dist. LEXIS 14574 (S.D.N.Y. Feb. 5, 2015)...........................21

*Tse v. New York Univ.*,
   No. 10-CV-7207, 2013 U.S. Dist. LEXIS 134223 (S.D.N.Y. Sept. 19, 2013)......................20

*United States v. Brennan*,
   650 F.3d 65 (2d Cir. 2011)....................................................................................................11

*Williams v. New York City Hous. Auth.*,
   61 A.D.3d 62 (1st Dep't 2009) .............................................................................................19

**Statutes**

N.Y. Educ. Law § 7704 ...............................................................................................................22

N.Y. Lab. Law § 740 ...................................................................................................................13

N.Y. Lab. Law § 741 ...................................................................................................................13

**Other Authorities**

2012-11 N.Y. St. Reg. 20 (Mar. 14, 2012) ......................................................6

12 NYCRR § 142-2.2 ...............................................................................21

12 NYCRR § 142-2.14 ..............................................................................22

14 NYCRR § 599 .....................................................................................6

14 NYCRR § 599.3...................................................................................6

14 NYCRR § 599.10..........................................................................5, 6, 22

NYSED LMSW License Requirements at *www.op.nysed.gov/prof/sw/lmsw.htm* ......................22

U.S. Dep't of Labor, Wage & Hour Div., FLSA 2005-50, *https://www.dol.gov/
    whd/opinion/FLSA/2005/2005_11_04_50_FLSA.htm* (Nov. 4, 2005) ...................................23

PRELIMINARY STATEMENT

Plaintiff Ruth Duarte ("Duarte") is a former Clinician of Fordham Tremont Community Mental Health Center's Reverend David Casella Children's Services Program, which is affiliated with St. Barnabas Hospital ("Hospital" or "SBH"). Duarte, who commenced this action alleging that SBH discriminated and retaliated against her on the basis of gender, race, national origin and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"), Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"), and New York City Human Rights Law, N.Y. Admin. Code, § 8-101 *et seq.* ("NYCHRL"). She claims that the Hospital subjected her to a hostile work environment, disciplined her and terminated her employment after she complained about discrimination. Duarte also asserted claims for: (1) failure to pay her wages and overtime for hours worked over forty in a workweek and retaliation in violation of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"); (2) whistleblower retaliation in violation of New York Labor Law §§ 740/741; (3) discrimination and retaliation under the Family and Medical Leave Act ("FMLA")[1]; and (4) failure to provide a reasonable accommodation for her disability in violation of the ADA.[2]

SBH is entitled to summary judgment and the Complaint ("Complaint") should be dismissed in its entirety. Duarte's discrimination and retaliation claims are precluded by the election of remedies provision the New York Whistleblower Law. Further, the evidence

---

[1] Because Duarte did not oppose SBH's arguments for dismissal of Duarte's FMLA claims in her September 21 and October 20, 2016 letters (*see* Docket Nos. 41, 42), they should be dismissed as unopposed. These claims independently fail because Duarte's request for leave to "see" her ill brother is not covered protected activity under the FMLA and, in any event, her vacation request was approved, Duarte did go to see her brother, and Duarte was paid for that time. (Pl. 126:12-129:5).

[2] The Court has dismissed Plaintiff's failure to accommodate claims. (*See* Docket No. 45).

establishes that SBH had legitimate, non-discriminatory and non-retaliatory grounds to discipline Duarte and ultimately terminate her employment. Specifically, Duarte consistently failed to meet her required service commitments and failed to timely complete progress notes and treatment plan reviews. Duarte then falsified patient records by indicating in progress notes that she had met with two patients at specific times, when the undisputed record shows that she did not meet with the patients at the reported times. Duarte was unable to explain the discrepancies; instead, she changed the time on one of the notes, and it was *still* inaccurate. In sum, Duarte falsified records upon which the Hospital would have relied to obtain reimbursement for services provided – a serious offense that constitutes a crime under federal and state law and also gives rise to civil liability with significant penalties.

With respect to Duarte's §§ 740/741 claims, there is no evidence that she engaged in protected activity, nor is there evidence of a causal connection to any retaliatory acts. Despite allegations in the Complaint about Duarte submitting a written grievance that complained about fraudulent billing practices, she was unable to identify with any certainty either of two documents she produced, nor do they make any reference to fraudulent billing practices. In any event, the grievance was submitted to her Union by a co-worker at least *16 months* before Duarte's termination.

Duarte's claims of gender, race, national origin and disability discrimination and hostile work environment by her two supervisors, one of whom is female and both of whom are Hispanic, similarly have no support in the record. Duarte failed to adduce any admissible evidence of disparate treatment. Her hearing disability hostile work environment claim likewise fails. Not only is Duarte unable to identify a single, specific instance or the context in which any

-2-

alleged statements about her hearing disability were made, such comments are insufficient to establish a disability harassment claim as a matter of law under federal, state or local standards.

Finally, SBH is entitled to summary judgment on Duarte's claims for unpaid wages and overtime under the FLSA and the NYLL. Duarte cannot maintain these claims in this case because she recently opted in to an earlier-filed collective and class action lawsuit pending before this Court, *Khansari v. St. Barnabas Hospital*, No. 15-CV-1803 (PGG), in which a group of clinicians asserts virtually identical claims against SBH. Further, as a clinician, Duarte was a professional employee exempt from overtime under the NYLL. Duarte's entitlement to overtime was also a contractual term of the collective bargaining agreement between the Hospital and her union and is therefore preempted by the Labor Management Relations Act ("LMRA"). In any event, Duarte never worked more than forty hours in a week and has adduced no admissible evidence that SBH or her supervisors knew that Duarte performed work during her lunch hour. Absent any evidence of the Hospital's failure to properly pay Duarte, the Hospital is entitled to summary judgment on her wage and overtime claims.

STATEMENT OF FACTS

**A.     Duarte's Employment**

SBH is a New York not-for-profit community hospital located in the Bronx. The Hospital's Fordham-Tremont Community Mental Health Center is a community-based outpatient center that provides comprehensive behavioral treatment and preventive services to residents of Bronx, New York. The Reverend David Casella Children's Services Program ("DCCS") is the Mental Health Center program dedicated to providing mental health and case management

services to child and adolescent patients and their families. (Pl. 17:2-9).[3] At all relevant times, Edgardo Quinones was the DCCS Director and Milagros Arce was the Assistant Director. (Quinones 34:4-8; Pl. 13:3-6; Arce 62:24-63:6).[4] The Hospital required that clinicians working in DCCS have the following educational qualifications in order to work as a clinician: "MSW [Master in Social Work], LMSW [Licensed Master Social Worker] or LMSW eligible, Ph.D. in psychology with current license or current New York State Nurse license with an MS in psychiatric nursing required." (*See* Ex. 9).

Duarte was hired as a clinician in DCCS on July 9, 2007. (Pl. 16:17-25; Arce 42:10-17).[5] Duarte held a Master's Degree in Social Work. (Pl. 11:21-12:6; *see* Ex. 25). The terms and conditions of Duarte's employment (including wages and overtime) were set forth in the collective bargaining agreement ("CBA") between the Hospital and Duarte's union, 1199SEIU. (Pl. 20:21-24; Quinones 45:17-23).

As a clinician, Duarte treated patients and provided mental health services, treatment and therapy sessions to DCCS patients. (Pl. 17:5-9). When a patient was referred to Duarte, she conducted an intake, which included: interviewing the patient and gathering, analyzing and evaluating data collected relating to the patient's psychosocial problems, current mental status and functioning (referred to as a "biopsychosocial"); diagnosing the patient; and identifying and

---

[3] All references to the transcript of Plaintiff's deposition are referred to herein as "Pl. __." All references to the transcript of the deposition of Edgardo Quinones are referred to herein as "Quinones __." All references to the transcript of the deposition of Milagros Arce are referred to herein as "Arce __."

[4] Quinones and Arce are both Hispanic. (Pl. 13:11-14).

[5] Arce interviewed Duarte for the position and Quinones reviewed Duarte's resume and work experience. (Arce 40:23-41:5; Pl. 12:7-9; Quinones 32:13-33:23). Arce and Quinones jointly made the decision to recommend Duarte for hire to the Hospital's Human Resources Department. (Quinones 34:9-35:18; Arce 41:20-25; *see also* Pl. 12:19-22). Quinones informed Plaintiff that she was hired. (Pl. 12:14-18).

then providing the appropriate therapeutic services, whether on an individual, family or group basis. (Pl. 17:10-18; Arce 57:8-17). Duarte was also responsible for scheduling her own patient sessions and following up on scheduled appointments. (Arce 42:19-43:4, 56:25-57:7). Duarte's scheduled work hours were 9a.m. to 5p.m. on Monday, Tuesday, Wednesday and Friday and 11a.m. to 7p.m. on Thursday. (Pl. 17:19-18:2; Arce 47:12-16).

All clinicians have a target "level of service" of forty face-to-face patient contacts of at least thirty (30) minutes each week, which can include one-on-one patient therapy sessions; group therapy sessions; and meetings with a patient's family members with or without the patient ("family" or "collateral" session, respectively). (Pl. 35:9-23; Quinones 40:4-44:11, 46:16-19; Arce 28:10-29:22, 55:1-15). Levels of service are similar to a headcount:  each patient in the session counts as one contact; collateral sessions with a patient's family member without the patient also count as one contact. (Pl. 36:5-17). To achieve forty contacts per week, clinicians were expected to see eight patients per day.[6] (Quinones 56:2-5; Arce 55:16-20). Clinicians could satisfy the forty-contact requirement through any combination of sessions, provided the sessions were appropriate for and consistent with each patient's treatment goals. (Arce 29:23-30:1; Quinones 57:3-5).

Clinicians must timely and accurately document their activities in patient sessions in progress notes and formulate patient treatment plans. (Arce 27:22-28:9, 42:19-43:4). Progress notes summarize what services were provided during a patient session and provide an update on the patient's response and progress. (Quinones 57:10-14; Arce 27:22-28:6). *See also* 14 NYCRR

---

[6] Because of a "no-show" rate of about one-third, clinicians were expected to schedule twelve patients per day, with the expectation that only eight clients would show up. (Quinones 56:6-22; 57:6-9).

§ 599.10(k).[7] A progress note must be completed for every face-to-face contact with a patient. (Quinones 57:15-58:6; Arce 28:7-9). Progress notes must accurately reflect the services rendered, and related information, because they affect the patient's ongoing care and are relied upon by the Hospital's billing department to obtain payment for the clinician's services. (*See* Quinones 98:18-99:14, 100:21-102:21). Progress notes must be completed by noon the day after the clinician meets with the patient. (Pl. 140:2-4). After a clinician completes the progress notes, a licensed clinician must review and co-sign the notes to verify their accuracy. (Arce 26:16-27:1, 27:18-21; Quinones 116:22-117:2). As her direct supervisor, Arce co-signed Duarte's progress notes. (Pl. 13:7-10; Arce 118:7-16).

A treatment plan assesses the patient's needs and mental health status and determines what services may be provided. *See* 14 NYCRR § 599.10(b)-(h). Every 90 days, clinicians must review and update the treatment plan for each patient and create a treatment plan review ("TPR") based on their assessment, which contains the patient's diagnosis, summary of services, and goals and objectives for the patient. (Pl. 138:24-139:5; Arce 56:25-57:7, 108:5-18). *See also* 14 NYCRR § 599.10(i)-(j).[8] In performing her duties as a clinician, Duarte used her professional judgment. (*See* Arce 29:23-30:1, 42:19-43:4, 56:25-57:7; Quinones 57:3-5).

---

[7] N.Y. Comp. Codes R. & Regs. tit. 14 Part 599 ("14 NYCRR § 599" or "Part 599") are regulations promulgated under the New York Mental Hygiene Law which cover all mental health clinic treatment programs that are licensed by OMH. 14 NYCRR § 599.3. Part 599 defines services, financing and program rules for such programs and sets forth guidelines for patient records, including progress notes, treatment plans and TPRs. (*See* Quinones 100:9-17). Part 599 also identifies procedure codes for the services provided by clinicians. (Quinones 100:21-101:5). Part 599 was amended in 2012. (*See* Compl. ¶ 16; Arce 86:15-22). *See* 2012-11 N.Y. St. Reg. 20 (Mar. 14, 2012).

[8] Around June 2013, the Hospital implemented Electronic Medical Records ("EMR") software that permitted clinicians to (among other things) record progress notes, treatment plans and TPRs electronically. (Pl. 25:8-13; Quinones 53:22-54:25).

Duarte met with Arce for weekly supervision meetings in which they would discuss cases, identify patient issues and potential discharges, review levels of service, and review progress notes and TPRs to ensure they were properly completed. (Quinones 98:4-99:14). The topics discussed were summarized in a supervisory note completed by Arce, which Duarte reviewed and signed. (Quinones 99:15-21; Pl. 188:4-13; *see, e.g.*, Exs. 5, 7, 10, 11, 13).

**B.**      **Duarte's Performance and Disciplinary History**

Throughout her employment in DCCS, Duarte struggled to manage her caseload and to achieve her level of service commitment. Arce reviewed Duarte's levels of service on a weekly basis and discussed them with Duarte in supervision. For example, during a supervisory meeting on November 5, 2013, Duarte and Arce discussed Duarte's productivity. (Ex. 5). In order to help Duarte achieve her levels of service, Arce implemented an action plan that set forth various steps to increase her productivity. (Ex. 6). According to the plan, Duarte would: (1) schedule twelve patients per day (to account for the no-show rate); (2) receive more intake time to build up her case load; and (3) have her computer replaced so that Duarte could complete her paperwork more efficiently. (*Id.*) They would continue to review Duarte's productivity and progress towards achieving her levels of service in weekly supervision.  (*Id.*)

**1.**      **Verbal Warning**

In addition to discussing levels of service in the November 5, 2013 supervisory session, Duarte requested to take November 15, 2013 as a floating holiday. (*See* Ex. 5). One week later, Duarte requested that the floating holiday be changed to a sick day. (Pl. 116:15-117:2; Arce 70:10-20; *see* Ex. 7). Arce denied the request because Duarte had already received approval to take the day as a floating holiday, and Hospital policy is that sick days are to be used for illness, not for scheduled medical appointments. (Arce 70:21-71:11, 71:24-72:5, 99:13-15; Ex. 7). Duarte argued with Arce, raised her voice and responded with a comment to the effect of "one

day you will lose your power." (Arce 99:2-24; Pl. 118:3-9, 118:25-119:5). Arce told Duarte her comment was inappropriate; Duarte stormed out of Arce's office. (Pl. 119:6-9; Arce 99:25-100:4). As a result, Duarte received a verbal warning for insubordination on November 20, 2013. (Ex. 8).

### 2.    Written Warning

Duarte's levels of service continued to fall below the required forty contacts per week, and Arce continued to counsel Duarte about her levels of service in supervision. (*See* Exs. 10, 11). Arce also advised Duarte that she had eighteen late TPRs, at least four missing or incomplete progress notes and no documentation of follow up with several patients. (*See* Ex. 12). Despite this counseling, Duarte admitted in a February 19, 2014 supervisory meeting that she had neither reviewed paperwork for corrections nor followed up on patient referrals. (*See* Ex. 12). As a result, on March 5, 2014, Duarte received a written warning for poor work quality and for consistently not meeting her level of service commitment. (*Id.*)

### 3.    Notice of Two-Day Suspension

Despite repeated counseling and previous discipline about levels of service and proper and timely paperwork, Duarte's performance deficiencies persisted. By July 2014 Duarte had: (1) seven overdue TPRs; (2) five cases with no patient contact for over thirty days; and (3) seven outstanding cases in which she still had not made any patient contact. (*See* Ex. 14). Duarte's levels of service also had fallen below the expected level in every month since she was issued the March 2014 written warning. In addition, the Hospital received two written complaints from patients complaining that Duarte had been rude and demeaning toward them. (*Id.*) Duarte's inappropriate communication with staff and patients had previously been addressed in her 2013 annual performance evaluation. (*See* Ex. 9).

During a supervisory session on June 26, 2014, Duarte and Arce discussed a request Duarte had made to take July 7, 2014 off so that she could commemorate the anniversary of her brother's homicide. (Pl. 130:14-131:7; *see* Ex. 13). Arce denied the request due to lack of program coverage. (Arce 105:7-106:21). Duarte openly challenged Arce, stating that she would not come to work on July 7 even though her request had been denied, and then did not come to work on July 7. (*See* Ex. 14; Pl. 133:25-134:10). Duarte had previously called out sick five times in two months. (*See* Ex. 14).

As a result of these issues, on July 15, 2014, Duarte received a two-day suspension for insubordination, poor work quality, excessive absenteeism, failing to meet level of service requirements and inappropriate communication and behavior toward clients. (Ex. 14).

## C.   Termination of Duarte's Employment for Falsification of Patient Records

On July 31, 2014, Duarte submitted two sets of progress notes for Arce's signature that contained blatant discrepancies. (*See* Arce 118:7-119:20, 121:24-122:9; Pl. 164:12-165:19). In one set of progress notes, Duarte wrote that, on July 30, she met with Patient A at 9:00a.m. (*See* Ex. 15; Arce 122:6-9). The registration records, however, showed that Patient A did not arrive at DCCS until 10:14a.m. (*See* Ex. 16; Arce 121:24-122:9). In Patient B's progress note, Duarte wrote that she met with Patient B's family member for a thirty-minute one-on-one session at 10:30a.m. (*See* Ex. 18). Arce knew, however, that Duarte could not have met with Patient B's family member at 10:30a.m because Duarte had called Arce at approximately 10:40a.m, while seeing Patient A, to seek permission to meet with Patient A's family member. (Arce 118:7-119:20; *see* Pl. 164:12). Duarte then attended a staff meeting at 11:00a.m. (Arce 118:7-119:20).

Concerned that Duarte had falsified patient records, Arce provided Duarte an opportunity to explain the inconsistencies between the times recorded in the progress notes. (Arce 123:12-14, 123:21-124:8; *see* Ex. 19). Duarte was unable to explain either discrepancy (Arce 123:15-20);

instead, after the supervisory meeting, she unilaterally changed the time on the progress note for

Patient A to 9:30a.m, which still conflicted with the registration record. (Arce 123:6-11; *compare*

Ex. 17 *with* Ex. 16). After reviewing the facts, the Hospital terminated Duarte's employment

effective August 6, 2014 for falsifying patient records. (Ex. 20; Pl. 166:2-18, 168:20-23). Duarte

grieved her termination through her union; the grievance was denied and the termination upheld.

(*See* Ex. 21; Arce 126:17-19, Pl. 181:8-182:17).

## ARGUMENT

## POINT I

### THE HOSPITAL IS ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S UNLAWFUL DISCIPLINE AND TERMINATION CLAIMS.

**A.     Duarte's Unlawful Discrimination and Termination Claims Are Barred
         By the Election of Remedies Provision Under New York Labor Law § 740.**

Most of Duarte's claims for discrimination and retaliation are precluded by the election

of remedies provision in the New York State Whistleblower Law. Section 740(7) of the Labor

Law prohibits a party seeking redress pursuant to §§ 740/741, as Duarte does here, from

asserting similar claims in the same action. N.Y. Lab. Law § 740(7) ("the institution of an action

in accordance with [Section 740] shall be deemed a waiver of the rights and remedies available

under any other contract, collective bargaining agreement, law, rule or regulation or under the

common law."). Duarte's gender, race, and national origin discrimination and retaliation claims

largely arise out of the same alleged adverse employment actions (*i.e.*, higher case load,

disciplinary actions issued to Duarte and the termination of her employment). By bringing claims

pursuant to §§ 740/741, Duarte has irrevocably waived her right to pursue these claims under any

other statute. *Nadkarni v. North Shore-Long Island Jewish Health Sys.*, No. 02-CV-5872, 2003

U.S. Dist. LEXIS 26552, at *16 (E.D.N.Y. July 31, 2003) (dismissing the plaintiff's claims

under the ADA and NYSHRL because "[t]he facts surrounding her claims … are the exact same facts as those surrounding her claim for relief pursuant to [Section 740]" and were waived).

**B.      There is No Evidence of Any Discriminatory or Retaliatory Adverse Actions Based on Duarte's Race, Gender or National Origin.**

Even if they were not barred by the election of remedies, Duarte's discrimination and retaliation claims would fail. To assert a *prima facie* case of discrimination under Title VII, ADA and the NYSHRL, a plaintiff must demonstrate that: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011) (Title VII); *Joseph v. Owens & Minor Distrib.*, 5 F. Supp. 3d 295, 317 (E.D.N.Y. 2014), *aff'd*, 594 F. App'x 29 (2d Cir. 2015) (Title VII and NYSHRL); *Hernandez v. City of New York*, No. 11-CV-6644, 2014 U.S. Dist. LEXIS 180981, at *34 (S.D.N.Y. Nov. 24, 2014), *report & recomm. adopted*, 2015 U.S. Dist. LEXIS 7994 (S.D.N.Y. Jan. 23, 2015) (ADA).

Under the NYCHRL, a plaintiff must show differential treatment based on a discriminatory motive. *Joseph*, 5 F. Supp. 3d at 320-21 (citations omitted). A defendant can avoid liability if it proves that the conduct complained of "consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id.* at 321 (quoting *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 79 (1st Dep't 2009)).[9]

---

[9] Title VII, ADA and NYSHRL discrimination and retaliation claims are analyzed under the familiar *McDonnell Douglas* burden-shifting test. *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Brennan*, 650 F.3d at 93; *Joseph*, 5 F. Supp. 3d at 307-08, 315-16; *Hernandez*, 2014 U.S. Dist. LEXIS 180981, at *35. An action brought under the NYCHRL is analyzed both under the *McDonnell Douglas* framework and the 'mixed-motive' framework, which inquires into whether discrimination was a motivating factor in the adverse employment decision. *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 113 (1st Dep't 2012).

To the extent not precluded, Duarte's discrimination and retaliation claims must be dismissed because Duarte cannot establish that she was given a higher case load, disciplined or terminated because of her gender, race or national original or any protected activity.

>    **1.    Duarte Cannot Establish a *Prima Facie* Case of Gender, Race or National Origin Discrimination.**

Duarte's discrimination claims must be dismissed because there is no admissible evidence that she was subjected to any adverse action because of her gender, race or national origin. Duarte has no evidence that non-Hispanic employees had fewer patients than she did; rather, she merely speculates that this was "probably" the case. (Pl. 41:17-20). She was unable to identify the name of a single non-Hispanic employee who had a lower volume of patients. (Pl. 41:14-16, 41:21-24). Duarte testified that two male clinicians, Michael Martin and Michael Gonzalez (Hispanic), did *not* have fewer patients than she did and had the same level of service requirement. (Pl. 34:24-35:12, 43:24-25).[10] Duarte's "mere subjective belief that [s]he was discriminated against because of [her] race [and national origin] does not sustain a race [and national origin] discrimination claim." *Joseph*, 5 F. Supp. 3d at 309-10 (collecting cases). Absent any evidence giving rise to an inference of gender, race or national origin discrimination, Duarte's claims fail.

**C.    Duarte's Whistleblower Retaliation Claims Cannot Withstand Summary Judgment.**

Duarte's §§ 740/741 claims must be dismissed because there is no evidence that Duarte engaged in any protected activity, nor any evidence of a causal connection to any retaliatory acts.

---

[10] To the extent Duarte attempts to rely on statements by two co-workers that Katie Naab, a white female clinician was not disciplined for failing to timely contact patients (*see* Pl. 39:12-40:15, 148:23-150:9), this constitutes inadmissible hearsay. *Knox v. Town of Southeast*, No. 11-CV-8763, 2014 U.S. Dist. LEXIS 45888, at *45 (S.D.N.Y. Mar. 31, 2014) (Ramos, J.) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)), *aff'd*, 599 F. App'x 411 (2d Cir. 2015). In fact, Naab *was* ultimately disciplined. (Pl. 40:16-41:6).

Although a centerpiece of her Complaint is that she submitted a written grievance in "late 2013" with another employee complaining about fraudulent billing practices and unpaid overtime (Compl. ¶ 29), Duarte was unable to identify what the written grievance was, when it was submitted, by whom and to whom it was purportedly submitted. Instead, Duarte testified that: (1) she "is not sure" whether a memo dated December 11, 2012 is the grievance referenced in the Complaint (Ex. 23; Pl. 106:21-24); and (2) a grievance dated April 2013 "probably" is the grievance referenced in the Complaint (although this was obviously not "late 2013") (Ex. 24; Pl. 108:5-14). Duarte's uncertainty on this basic allegation casts serious doubt on her claim that she ever complained about billing practices at all.

Further, Duarte conceded that the December 2012 memo does not mention fraudulent billing practices or unpaid overtime.[11] (Pl. 107:22-108:4). In any event, complaining about fraudulent billing practices does not constitute protected activity within the meaning of NYLL §§ 740/741 because it neither creates a danger to public health or safety nor constitutes improper quality of patient care.[12] *See Chin v. Chinatown Manpower Project*, No. 11-CV-5270, 2014 U.S.

---

[11]  Significantly, the December 2012 memo and April 2013 grievance make no reference to unpaid work performed during Duarte's lunch hour. (*See* Exs. 23, 24).

[12]  An employee engages in protected activity under Section 740 if he or she: (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation that creates and presents a substantial and specific danger to the public health or safety or constitutes health care fraud; (b) provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation; or (c) objects to, or refuses to participate in any such violation. N.Y. Lab. Law § 740(2). Under Section 741, an employee engages in protected activity when he or she discloses or threatens to disclose to a supervisor or a public body, or objects to or refuses to participate, in an activity, policy or practice that the employee, in good faith, reasonably believes constitutes improper quality of patient care. N.Y. Lab. Law § 741(2). "Improper patient care" means "any practice, procedure, action or failure to act of an employer which violates any law, rule, regulation or declaratory ruling adopted pursuant to law [that] relates to matters which may present a substantial and specific danger to public health or safety or a significant threat to the health of a specific patient." N.Y. Lab. Law § 741(1)(d).

Dist. LEXIS 72573, at *35-36 (S.D.N.Y. May 23, 2014) (McMahon, C.J.) ("Plaintiff's allegations of fraudulent wrongdoing here do not create a 'substantial and specific danger to the public health or safety,' and so are not covered by New York's Whistleblower Act.") (citing *Remba v. Fed'n Emp't and Guidance Serv.*, 76 N.Y.2d 801 (1990) ("the conduct complained of – fraudulent billing – is not the type of violation which creates a 'substantial and specific danger to the public health or safety'")).

Additionally, there is no evidence that the Hospital was aware of either grievance. Duarte has no idea whether the December 2012 memo was ever submitted to Human Resources by her co-worker, RosaTorres. (Pl. 107:5-15). Duarte admitted that neither she nor Torres ever submitted the April 2013 grievance to the Human Resources. (Pl. 109:11-18). She further admitted that she never reported to anyone at the Hospital that she was instructed to falsify progress notes (Pl. 90:17-22); nor were Duarte's supervisors aware of any grievance regarding fraudulent billing (Pl. 111:25-112:8, 113:9-114:6; *see also* Pl. 141:8-142:6). Thus, Duarte cannot establish that she engaged in any protected activity of which the Hospital was aware.

Finally, even if Duarte could establish protected activity – which she has not – Duarte cannot show that the Hospital took any adverse action against her because of her purported complaints about billing practices or unpaid wages and overtime. As a threshold matter, she relies on nothing more than temporal proximity between her alleged complaints and her termination. Yet, there is no temporal proximity because Duarte's employment was terminated 20 months after the December 2012 memo and 16 months after the April 2013 grievance. Even if there were, temporal proximity alone is insufficient to withstand summary judgment. *See, e.g.*, *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (a three and one-half month lapse between a plaintiff's complaints and the alleged retaliatory act is insufficient to show

causal nexus); *Rinsler v. Sony Pictures Entm't Inc.*, No. 02-CV-4096, 2003 U.S. Dist. LEXIS 14754, at *34-35 (S.D.N.Y. Aug. 25, 2003) ("The almost six-month lag between [the protected activity] and the alleged retaliatory termination … is too temporally remote to support a retaliation claim.") (citation omitted).[13]   Moreover, Duarte cannot establish that the Hospital terminated her employment in retaliation for her complaints because Torres (whom Duarte identifies in the Complaint as her "co-objector"): (1) was  not disciplined for failing to meet levels of service, as Plaintiff was[14] (Pl. 123:23-124:6); and (2) currently remains employed with the Hospital.  (Pl. 146:4-6).

**D.     Duarte Was Disciplined and Terminated for Legitimate,
Non-Discriminatory and Non-Retaliatory Reasons.**

The Hospital has articulated legitimate, non-discriminatory and non-retaliatory reasons for disciplining Duarte and terminating her employment. Each of Duarte's disciplinary actions was based solely on Duarte's own poor performance and conduct:

- Verbal warning for insubordination, November 20, 2013. (Ex. 8).

- Written warning for poor work quality and failing to meet her expected levels of service, March 5, 2014. (Ex. 9).

- Two-day suspension for insubordination, poor work quality, excessive absenteeism, failing to meet level of service requirements and inappropriate communication and behavior toward clients, July 15, 2014. (Ex. 12).

- Termination for demonstrably and indisputably falsifying patient records, which undermined the care these pediatric patients required and the mission of DCCS and threatened the Hospital's standing with the Joint Commission. (Ex. 13).

Duarte admitted that she: (1) did not meet with Patient A at 9:00a.m. as indicated in the first

---

[13] *See also EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 859 n.30 (S.D.N.Y. 2013) (pretext not shown through mere temporal proximity where a negative performance review and reduction in compensation were not proven as discriminatory).

[14] Duarte admitted she did not always meet her 40-contact per week requirement. (Pl. 137:16-22).

progress note (Pl. 159:10-160:4); (2) changed the time from 9:00a.m. to 9:30a.m. for Patient A even though she is not sure whether she met Patient A at that time (Pl. 160:19-161:5, 161:21-162:4); and (3) tried to "fix" the time in Patient B's progress note by recording 10:30a.m., even though she does not recall whether she actually met with Patient B at 10:30a.m. (Pl. 163:21-164:11).

**POINT II**

**PLAINTIFF'S REMAINING DISCRIMINATION CLAIMS MUST BE DISMISSED.**

**A.     Duarte's Gender Discrimination Claims Must Be Dismissed.**

Duarte's gender discrimination claims are based on two allegations: (1) Duarte was assigned a higher case load than the two male clinicians working in DCCS, Michael Gonzalez and Michael Martin; and (2) female clinicians were forced to treat patients of both sexes while the male clinicians were only assigned male patients, resulting in a higher caseload for female clinicians (Pl. 33:2-34:21, 37:23-38:3). Duarte failed to present any evidence that any male employee had fewer patients than she did. (*See* Point I.B.1, *supra*). Further, Duarte testified that neither Quinones nor Arce ever made negative or offensive comments about women or the female gender. (Pl. 38:4-15). With no evidence whatsoever that she was treated differently or less favorably than male employees, Duarte's gender discrimination claims fail.

**B.     Duarte's Remaining Race and National Origin Discrimination Claims Must Be Dismissed.**

Duarte's "evidence" in support of her remaining claims of race and national origin discrimination constitutes inadmissible hearsay and, in any event, fails to constitute probative evidence of discriminatory animus.  Duarte claims, for example, that her vacation requests were "always a problem" or were denied, whereas non-Hispanic employees' vacation requests were "almost always granted." (Pl. 46:5-19). Duarte has no admissible evidence to support this

-16-

allegation. Rather, Duarte testified that she was "told" that Naab and Martin's vacation requests were always granted (Pl. 46:24-8), but this hearsay is inadmissible and she has offered no concrete, corroborating evidence to support her belief. *Knox*, 2014 U.S. Dist. LEXIS 45888, at *45-46. Further, while Duarte claims that non-Hispanic employees were allowed to take a laptop home to complete their work, she admitted that laptops were issued only to those clinicians who worked in a school-based program, which she did not, and clinicians were not permitted to take the laptops home. (Pl. 46:3-4, 45:10-46:4; Quinones 52:12-14, 52:17-52:25, 53:17-54:8, 55:15-18; Arce 72:21-73:7; 74:18-19).

Finally, Arce and Quinones, who are both Hispanic, recommended Duarte for hire (Arce 41:29-25; Quinones 34:5-35:18; *see* Pl. 12:19-22, 13:11-14), and thus, under the "same actor" doctrine, her allegations of discriminatory termination are substantially undermined. *See, e.g.*, *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (noting that "[w]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire"); *O'Connor v. Bank of New York*, Index No. 0103217/2006, 2008 N.Y. Misc. LEXIS 8338, at *22-23 (Sup. Ct. N.Y. Cty. Feb. 28, 2008) (dismissing NYCHRL claim, stating that "any inference of gender discrimination is further belied by the fact that the same actor … made all of the critical decisions regarding [plaintiff's] employment"); *see also Cordell v. Verizon Commc'ns, Inc.*, 331 F. App'x 56, 58 (2d Cir. 2009) (observing that the "same actor" principle "'remains a highly relevant factor in adjudicating a motion for summary judgment'") (citation omitted).

In sum, "[Duarte] has done no more than point to various ways in which she feels she was mistreated and argue that it must have been because of her sex or [national origin or race]. This is not sufficient to sustain a claim of discrimination." *Campbell v. N.Y. City Transit Auth.*,

93 F. Supp. 3d 148, 173 (E.D.N.Y. 2015), *aff'd*, No. 15-CV-1103, 2016 U.S. App. LEXIS 18556 (2d Cir. Oct. 17, 2016). Duarte's conclusory assertions and speculation are insufficient to withstand summary judgment. *See id.*; *see also Alfano v. Costello*, 294 F.3d 365, 377-78 (2d Cir. 2002) (a supervisor's formal counseling and unfairness that was facially sex-neutral could not support a harassment claim without evidence that it was motivated by the plaintiff's sex).

**POINT III**

**THE HOSPITAL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS.**

Duarte's attempt to establish hostile work environment claims under federal, state and city law on account of her race, national origin, gender and disability likewise fails. To establish a Title VII, NYSHRL and ADA hostile work environment claim, a plaintiff must show: "(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Belton v. City of New York*, No. 12-CV-6346, 2014 U.S. Dist. LEXIS 136471, at *21-22 (S.D.N.Y. Sept. 26, 2014), *aff'd*, 629 F. App'x 50 (2d Cir. 2015) (citation omitted) (Oetken, J.); *see also Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) (hostile work environment claims under the ADA are evaluated under the same standards as hostile work environment claims under Title VII).

"A plaintiff 'must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive.'" *McPherson*, 2011 U.S. Dist. LEXIS 108804, at *32 (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)). "Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such

-18-

an environment.'" *Id.* "'[I]ncidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* at *32-33 (citation omitted).[15]

Under the NYCHRL, Duarte must show "by a preponderance of the evidence that she has been treated less well than other employees because of [her membership in a particular protected category]." *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009).[16] The Hospital is not liable where, as here, "the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights or trivial inconveniences.'" *Belton*, 2014 U.S. Dist. LEXIS 136471, at *22-23 (quoting *Williams*, 61 A.D.3d at 80).

Duarte's allegations that she was subjected to a hostile work environment at the hands of Arce and Quinones based on her gender, race and national origin are without merit as the record contains no evidence that she was subjected to any discriminatory comments or conduct or treated "less well" because of her gender, race or national origin. Duarte failed to identify any material, relevant way in which she or any other female Hispanic employees were subjected to a hostile or abusive work environment based on gender, race or national origin. Duarte admitted that neither Quinones nor Arce ever made negative or offensive comments about her being female or Hispanic. (Pl. 38:7-15, 48:7-11, 49:12-15). Further, she admitted that all clinicians,

---

[15] In other words, "a plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'" *McPherson*, *2011 U.S. Dist. LEXIS 108804*, at *32-33 (internal quotation marks omitted). In assessing whether a plaintiff has met her burden, "courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Belton*, 2014 U.S. Dist. LEXIS 136471, at *22 (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2012)).

[16] The standard to prove harassment under the NYCHRL is the same as for discrimination. *See Johnson v. Strive E. Harlem Emp't Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (explaining that the NYCHRL does not have separate standards for discrimination and harassment claims).

regardless of gender, race or national origin, have the same levels of service expectations, and thus, she was not required to work harder than any other clinician. (*See* Pl. 35:5-12, 43:24-25).

With respect to alleged comments by Quinones about her hearing disability, Duarte was unable to identify a single, specific instance or the context in which Quinones made any of the alleged comments. (Pl. 64:12-65:10). Indeed, Duarte testified that over a period of seven years, Quinones made such comments in staff meetings less than ten times.  (Pl. 64:12-65:6, 66:12-17, 67:7-14). Duarte admitted that neither Arce nor anyone else at the Hospital ever made comments about Duarte's hearing disability. (Pl. 71:19-72:5). The alleged isolated comments by Quinones – even if they occurred, which the Hospital denies – were neither "severe or pervasive" to withstand summary judgment, *Concey v. N.Y. State Unified Court Sys.*, No. 08-CV-8858, 2011 U.S. Dist. LEXIS 113620, at *50-51 (S.D.N.Y. Sept. 30, 2011) (Gardephe, J.), nor rose above the level of "petty slights or trivial inconveniences." *Tse v. New York Univ.*, No. 10-CV-7207, 2013 U.S. Dist. LEXIS 134223, at *44-46 (S.D.N.Y. Sept. 19, 2013). *See also Shiflett v. GE Fanuc Automation Corp.*, 960 F. Supp. 1022, 1036 (W.D. Va. 1997) ("Even assuming, however, that the comments plaintiff attributes to [defendants] were actually made by them, and made with malice, the remarks were not so severe and pervasive as to alter plaintiff's work conditions.").

## POINT IV

### PLAINTIFF'S FLSA AND NYLL UNPAID WAGE AND OVERTIME PAY CLAIMS FAIL AS A MATTER OF LAW.

**A.      Duarte Cannot Maintain Individual FLSA and NYLL
          Unpaid Wage and Overtime Claims In This Action.**

Duarte currently is a party plaintiff in *Khansari v. St. Barnabas Hosp.*, No. 15-CV-1803 (PGG). (*See* Ex. 22). Although Duarte's counsel represented that Duarte would withdraw her consent and opt-out of *Khansari* (*see* Docket Nos. 41, 42), to date, she has failed to so. Because Duarte cannot maintain claims against the same employer for the same time period based on

virtually identical facts in two separate actions, her FLSA and NYLL claims in this action must be dismissed. *Thomas v. Apple-Metro, Inc.*, No. 14-CV-4120, 2015 U.S. Dist. LEXIS 14574, at *14 (S.D.N.Y. Feb. 5, 2015).

**B.     Duarte's FLSA Claims are Preempted By the LMRA.**

Duarte's terms and conditions of employment – including work hours and overtime – were governed by the CBA, which also contains a mandatory grievance and arbitration provision. (*See* Ex. 26; Quinones 45:21-23). Because Duarte did not work over forty hours in any workweek (*see, e.g.*, Pl. 148:14-17), she has no FLSA overtime claims; rather her claims are contractually based. She admitted she did not file any grievance regarding overtime. (Pl. 107:22-108:4; Exs. 23, 24). Duarte's FLSA claims should be dismissed for the additional reasons that they are preempted and precluded by the LMRA. *Cantave v. Uptown Communs. & Elec. Inc.*, No. 14-CV-1838, 2015 U.S. Dist. LEXIS 103159, at *13 (E.D.N.Y. Aug. 5, 2015).

**C.     Duarte Is Not Entitled to Overtime Under the NYLL Because She Is an Exempt Employee Under the NYLL.**

Section 142-2.2 of the Minimum Wage Order for Miscellaneous Industries and Occupations provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of Sections 7 and 13 of 29 U.S.C. § 201 *et seq.*, the [FLSA], as amended, …." 12 NYCRR § 142-2.2. This provision excludes from the definition of "employee" those individuals:

> (a) whose primary duty consists of the performance of work: requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes; … and

> (b) whose work requires the consistent exercise of discretion and judgment in its performance; ....

12 NYCRR § 142-2.14(c)(4)(iii).[17] As a clinician, Duarte fits within this exemption to overtime.

SBH required that Duarte have the following educational qualifications in order to work as a clinician: "MSW [Master in Social Work], LMSW [Licensed Master Social Worker] or LMSW eligible, Ph.D. in psychology with current license or current New York State Nurse license with an MS in psychiatric nursing required." (*See* Ex. 9).[18] Thus, the Hospital required that in order to work as a clinician Duarte held, at a minimum, a Master's Degree in Social Work, or MSW. Duarte had an MSW. (Pl. 11:21-12:6; *see* Ex. 25).

Duarte's primary duty consisted of the performance of work requiring knowledge of an advanced type in a field of learning customarily acquired by a prolonged course of specialized intellectual instruction and study, and the consistent exercise of discretion and judgment. Her primary duty was to treat patients and provide mental health services, treatment and therapy sessions to patients. (Pl. 17:5-9). This included: interviewing patients and gathering, analyzing and evaluating data collected relating to the patient's psychosocial problems, current mental status and functioning (referred to as a "biopsychosocial"); diagnosing the patient and identifying the appropriate therapy modalities; creating treatment plans, assessing the patient's progress and

---

[17] This "bona fide professional" exemption does not contain a salary basis or salary level requirement. 12 NYCRR § 142-2.14(c)(4)(iii).

[18] To be licensed as a LMSW, an individual must "have received an education, including a master's of social work degree from a program registered by the department, or determined by the department to be the substantial equivalent, in accordance with the commissioner's regulations." N.Y. Educ. Law § 7704(1)(b). *See also* NYSED LMSW License Requirements at *www.op.nysed.gov/prof/sw/lmsw.htm*, visited on November 21, 2016 ("To meet the professional education requirement for licensure as an LMSW, you must present satisfactory evidence of having received a Master's Degree in Social Work (M.S.W.), or its equivalent, ....."). 8 NYCRR § 52.30. N.Y. Educ. Law § 7704(2)(b) sets forth the detailed educational requirements to be a LCSW which requires, among other things, a master's of social work degree.

reviewing treatment plans in order to define goals, outcomes and timeframes for treatment; and intervening psychotherapeutically with patients by utilizing individual, group, family and collateral therapy. (Pl. 17:5-18, 35:9-23, 138:24-139:5; Arce 42:19-43:4, 56:25-57:17, 108:5-18). Duarte used her professional judgment in performing these duties. (*See* Arce 29:23-30:1, 42:19-43:4, 56:25-57:7; Quinones 57:3-5). Thus, Duarte was an exempt employee under the NYLL. *See, e.g.*, *Paul v. Lenox Hill Hosp.*, No. 13-CV-1566, 2016 U.S. Dist. LEXIS 16548, at \*72 (E.D.N.Y. Jan. 15, 2016); U.S. Dep't of Labor, Wage & Hour Div., FLSA 2005-50, *https://www.dol.gov/whd/opinion/FLSA/2005/2005_11_04_50_FLSA.htm* (Nov. 4, 2005) ("Social Workers with Master's Degrees who work in the field of their degree" meet the requirements for the FLSA professional exemption).[19]

### D.    Duarte's FLSA and NYLL Unpaid Wage and Overtime Pay Claims Fail.

Duarte's unpaid wage and overtime pay claims have no merit. To survive summary judgment on an unpaid wage and overtime pay claim under the FLSA or NYLL, a plaintiff must prove that: (1) "she performed work for which [s]he was not properly compensated," *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 362 (2d Cir. 2011); and (2) the employer had actual or imputed knowledge that she was working during those uncompensated hours. *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 287 (2d Cir. 2008); *Gordon v. Kaleida Health*, 299 F.R.D. 380, 392 (W.D.N.Y. 2014).

#### 1.    Alleged Work on Floating Holidays

In addition to the regular holidays recognized by the Hospital, under the CBA, employees hired before a particular year receive "floating holidays." (Pl. 147:25-148:13). Duarte was unable

---

[19] "Because the FLSA test [for the professional exemption] is more expansive ... a separate analysis of the state [NYLL] claims is unnecessary." *Levine v. Unity Health Sys.,* 847 F. Supp. 2d 507, 509 n.1 (W.D.N.Y. 2012).

to recall how many floating holidays or any specific floating holiday she worked without being paid overtime. (Pl. 20:7-20).  Moreover, she admitted that she was paid straight time pay for the floating holidays she worked and that she never worked over forty hours in a week in which she worked a floating holiday. (Pl. 21:12-16, 148:14-17). Thus, Duarte has no wage or overtime claim based on floating holidays.

### 2.        Alleged Work After 5p.m.

Duarte's scheduled work hours were 9a.m. to 5p.m. on Monday, Tuesday, Wednesday and Friday and 11a.m. to 7p.m. on Thursday. (Pl. 17:19-18:2). Not only was Duarte unable to identify any occasion on which she claims to have worked after 5p.m., she does not know for how long she worked after 5p.m. on any such occasion. (Pl. 29:19-21, 32:6-14, 32:21-25). Duarte admitted that she never worked before 9a.m. and never worked after 7p.m. (Pl. 28:10-13, 28:24-29:2).  It is undisputed that Duarte's regular schedule called for thirty-five hours per week (not counting lunch breaks) (Pl. 21:12-16, 17:19-18:2); in most weeks, she could have worked five extra hours before she exceeded forty hours. In the absence of evidence showing the amount of extra time worked beyond five hours in any week, Duarte's testimony provides no basis to infer that she worked more than forty hours in any week. *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 118-19 (S.D.N.Y. 2009) (Gardephe, J.); *see Barry v. Town of Elma*, No. 02-CV-344, 2005 U.S. Dist. LEXIS 5548, at *9 (W.D.N.Y. Mar. 28, 2005) (summary judgment appropriate where plaintiff, whose regular schedule was 35 hours per week, presented no "evidence showing how much overtime he purportedly worked in any given week").

### 3.        Alleged Work During Lunch Breaks

Duarte admitted she did not work during lunch every day. (Pl. 23:14-23). Duarte did not make any record of the days on which she worked during her lunch or how long she worked during her lunch hour on any given day (Pl. 25:14-17, 33:8-13). Duarte's vague testimony

regarding her alleged work during lunch provides no basis to support Duarte's unpaid wage and overtime claims. *Kolesnikow*, 622 F. Supp. 2d at 118-19 (granting summary judgment against plaintiff where "the only evidence concerning the amount of extra time [plaintiff] worked each week is her testimony that she 'sometimes' worked an extra half hour when she worked through her lunch break"). Again, even if she had worked through her hour lunch every day – which was not her testimony – Duarte would not have exceeded forty hours in a week.

### E.   Duarte Cannot Prove the Hospital Knew About Her Alleged Additional Work.

Further undermining her FLSA and NYLL wage and overtime claims, Duarte cannot prove that SBH had actual or imputed knowledge of work she claims to have performed during lunch or after 5p.m. She admitted that neither Quinones nor Arce told her to work during lunch and they never saw her working during her lunch hour. (Pl. 24:4-10, 27:2-22). Duarte never complained to Quinones, Arce, Human Resources or anyone else at SBH about unpaid wages or overtime (Pl. 96:9-20, 98:15-19, 107:22-108:4; *see* Exs. 23, 24). Even if Duarte had performed the work alleged (she did not), SBH is not liable for compensating her for such time because it had no knowledge of it. *Gotham Registry*, 514 F.3d at 287; *Gordon*, 299 F.R.D. at 392.

**CONCLUSION**

For the foregoing reasons, SBH requests that summary judgment be granted in its favor and the Complaint be dismissed in its entirety with prejudice.

New York, New York
November 22, 2016

EPSTEIN BECKER & GREEN, P.C.

By:  /s James S. Frank
     James S. Frank
     John F. Fullerton III
     Adriana S. Kosovych
     250 Park Avenue
     New York, NY  10177
     Telephone:  (212) 351-4500
     *Attorneys for Defendant St. Barnabas Hospital*