UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RUTH ROJAS DUARTE,

Plaintiff,

- against -

ST. BARNABAS HOSPITAL,

Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    9/13/17
```

**MEMORANDUM
OPINION & ORDER**

15 Civ. 6824 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Ruth Rojas Duarte brings this action against her former employer, St.

Barnabas Hospital (the "Hospital"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e et seq.; the Americans with Disabilities Act of 1990 ("ADA"), 42

U.S.C. § 12101 et seq.; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law

§ 290 et seq.; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-

101 et seq.; New York Labor Law §§ 740 and 741; New York Labor Law § 190 et seq.; the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; and the Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2601 et seq. Plaintiff contends that the Hospital discriminated against

her, and subjected her to a hostile work environment, based on her gender, race, national origin,

and disability, and retaliated against her after she complained about this discrimination. (See

Cmplt. (Dkt. No. 5)) Plaintiff also contends that the Hospital retaliated against her, in violation

of the New York Whistleblower Law, N.Y. Labor Law §§ 740 and 741, after she complained to

her supervisors about the Hospital's billing, treatment, and wage practices. (Id.) Plaintiff further

asserts that the Hospital interfered with her rights under the FMLA, and retaliated against her

after she complained about this interference. Finally, Plaintiff claims that the Hospital violated the wage and overtime compensation provisions of the FLSA and New York Labor Law. (Id.)

Defendant has moved for summary judgment on all claims. (Notice of Motion (Dkt. No. 48)) For the reasons set forth below, Defendant's motion will be granted in part and denied in part.

## BACKGROUND

## I. FACTS[1]

### A. The Parties

Defendant St. Barnabas Hospital is a not-for-profit community hospital located in the Bronx. The Hospital provides, inter alia, outpatient mental health services through the Fordham-Tremont Community Mental Health Center (the "Center"). (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 1)[2] The Center's Reverend David Casella Children's Services Program ("CSP") provides mental health and case management services to children and adolescents and their families. (Id.) At all times relevant to this litigation, Edgardo Quinones – a

---

[1] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where Plaintiff disputes Defendant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

[2] In her Response to Defendant's Local Rule 56.1 Statement (Dkt. No. 54), Plaintiff does not respond to Paragraph 47 of Defendant's Local Rule 56.1 Statement. (Dkt. No. 49) As a result, all paragraphs of Plaintiff's Response after Paragraph 46 are incorrectly numbered. In citing to Plaintiff's Response, however, this Court cites to the paragraph numbers as presented in Plaintiff's Response.

Hispanic man – served as the Director of CSP, and Milagros Arce-Tomale – a Hispanic woman – served as the Assistant Director of CSP. (Id. ¶¶ 5-8)

Plaintiff Duarte is a Hispanic woman who has – from birth – suffered from a hearing disability in both of her ears. (See Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 50-52)[3] Duarte has a master's degree in social work. From 2007 until her termination on August 6, 2014, Plaintiff was employed by the Hospital as a clinician in the CSP, providing mental health services, treatment, and therapy sessions to children and adolescents and their families. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶¶ 9, 16-17; Def. R. 56.1 Appx., Ex. 20 (Termination Notice) (Dkt. No. 49-22))

## B.    Plaintiff's Employment at St. Barnabas Hospital

### 1.    Hiring and Job Responsibilities

Plaintiff was hired as a clinician in the CSP on July 9, 2007. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 9; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 16-17) Arce-Tomale interviewed Plaintiff for the position, and Quinones reviewed her resume and work experience. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 10) Arce-Tomale and Quinones then jointly recommended to the Hospital's human resources department that Plaintiff be hired. (Id. ¶ 11) The terms and conditions of Plaintiff's employment were governed by a collective bargaining agreement between the Hospital and 1999 SEIU United Healthcare Workers East, which is the union that represents the Hospital's clinicians. (Id. ¶¶ 12-13)

As a clinician in the CSP, Plaintiff was assigned a caseload of child and adolescent patients and provided mental health services and treatment, including therapy

---

[3] Except as to deposition transcripts, all citations in this Order reflect page numbers assigned by this District's Electronic Case Filing system. Citations to deposition transcripts reflect the page numbers assigned by the court reporter.

sessions. (Id. ¶ 17) After a patient was referred to Plaintiff, she conducted an "intake," which includes an interview of the patient; an assessment of the patient's psychosocial condition, current mental status, and functioning (referred to as a "biopsychosocial"); a diagnosis; and a determination of the appropriate therapeutic services for that patient. (See id. ¶ 18; see also Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 17) Plaintiff then implemented a therapy program for that patient. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 19)

Depending on each patient's needs, Plaintiff provided individual therapy sessions, group therapy sessions, or family therapy sessions. (Def. R. 56.1 Appx., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 41-43; id., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-4) at 28) Plaintiff also provided "collateral sessions," during which she met with a patient's parent or guardian. (Id., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 44) Individual therapy sessions ran thirty minutes for Medicaid patients, and forty-five minutes for patients who had private insurance. (Id., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 35; id., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 41) Family and group therapy sessions ran one hour, while "collateral sessions" lasted thirty minutes. (Id., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 42-44)

Plaintiff and the other clinicians in the CSP are given a weekly target for patient interactions, which is referred to as "levels of service." The weekly target is forty face-to-face patient contacts of at least thirty minutes each. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 21) Each patient present in a given therapy session – whether individual, family, or group – counts as one patient contact, and a collateral session with a patient's family member likewise counts as one patient contact. (Id. ¶ 22) To meet the target of forty patient contacts in a week, clinicians are expected to meet with eight patients per day. (See Def. R. 56.1 Appx., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 55; id., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-4) at 55-56)

4

Because about one-third of patients do not appear for their scheduled appointment, clinicians are expected to schedule twelve patients per day. (Id., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 56) In the event that all twelve scheduled patients appear for their therapy session, clinicians are expected to meet with all twelve. (Id., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-4) at 63)

Clinicians must complete a progress note for every face-to-face encounter with a patient. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 28) A progress note is a detailed summary of a clinician's therapy session with a patient, and includes a description of the patient's response to the interaction and a treatment plan for the future. (Def. R. 56.1 Appx., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 57; id., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-4) at 27-28) Progress notes must also list the type of therapy session conducted, whether individual, group, or family. Clinicians must complete progress notes for each patient by noon on the day after the patient's therapy session, and have the notes reviewed and co-signed by a supervising clinician. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶¶ 30-33) The Hospital's billing department relies on the progress notes to obtain payment for the clinician's services. (Id. ¶ 29; Def. R. 56.1 Appx., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 100-102)

Every ninety days, clinicians must review and update the treatment plan for each of their patients and create a treatment plan review ("TPR"). (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 34) A TPR contains a summary of the services provided and, based on the patient's progress, modifies goals and objectives for the patient. (See id.)

Clinicians must also attend weekly meetings with their supervising clinician. (Id. ¶ 36) At Plaintiff's weekly meetings with Arce-Tomale – her direct supervisor – the two discussed Plaintiff's patients, identified any patient issues or candidates for discharge, reviewed Plaintiff's progress towards meeting her weekly "levels of service" requirement, and reviewed

5

Plaintiff's progress notes and TPRs. (Id.) At the end of each meeting, Arce-Tomale prepared a summary of the meeting, which Plaintiff reviewed and signed. (Def. R. 56.1 Stmt. (Dkt. No. 49) ¶ 37)

## 2.   Alleged Discrimination Against Plaintiff

Plaintiff contends that, throughout her employment at the Hospital, she was discriminated against on the basis of her gender, race, national origin, and disability.

### a.   Disability

Plaintiff has had difficulty hearing out of both her ears throughout her life. (See Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 50, 53) While employed at the Hospital, Plaintiff began to use an "amplifier," which is a "small device . . . that sit[s] on a table," connects to the user's ears through headphones, and amplifies the sound of surrounding conversations. (Id. at 51-52) Plaintiff used an amplifier to assist her hearing "at the employee [staff] meetings, [during] . . . sessions with her patients, or when she would [meet with] someone that spoke very low." (Id.) According to Plaintiff, Quinones regularly commented on and ridiculed her hearing disability during staff meetings and other interactions. (See id. at 61-73)

For example, during weekly staff meetings, Quinones would ask, "Are you deaf? Are you deaf, Ruth?" Referring to Plaintiff's amplifier, Quinones would say, "[p]ut that thing on because you're deaf and you're not going to be able to hear what I have to say." (Goddard Decl., Ex. A (Torres Dep.) (Dkt. No. 56-1) at 101; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 67) Quinones made these remarks in front of other clinicians, and after exchanges in which

Plaintiff asked Quinones a question or to repeat himself.[4]  (Goddard Decl., Ex. A (Torres Dep.)
(Dkt. No. 56-1) at 105; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 65)

           Rosa Torres, a clinician at the Hospital, testified that Quinones "[c]ould have"
made such remarks "more than 20 [times]" and "maybe" 100 times "[o]ver the course of [six]
years."  (Goddard Decl., Ex. A (Torres Dep.) (Dkt. No. 56-1) at 102-104; see also Def. R. 56.1
Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 65-67)  According to Torres, after Quinones made
these remarks, Plaintiff's "whole countenance would change," her face would "get red," and she
would come to Torres "crying" after the meeting.  (Goddard Decl., Ex. A (Torres Dep.) (Dkt.
No. 56-1) at 104)  Quinones and Arce-Tomale deny that Quinones ever made comments about
Plaintiff's hearing during staff meetings.  (See Def. R. 56.1 Appx., Ex. 2 (Quinones Dep.) (Dkt.
No. 49-3) at 82-83; id., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-4) at 47)

           Plaintiff testified that Quinones also made comments about her hearing disability
when the two met privately.  For example, when Plaintiff met with Quinones to discuss her
progress notes, on "many" occasions Plaintiff had trouble hearing Quinones, and would ask him
"to repeat or to wait for [her] to put on" her amplifier and headphones.  (Def. R. 56.1 Appx., Ex.
1 (Pltf. Dep.) (Dkt. No. 49-2) at 67-70)  Quinones would respond, "I forget that you are deaf."
(Id. at 67, 70)

           According to Plaintiff, no one else at the Hospital – including Arce-Tomale –
made comments about her hearing disability.  (See id. at 71-72)

---

[4] When Quinones commented on Plaintiff's hearing disability, he spoke in Spanish.  (Goddard
Decl., Ex. A (Torres Dep.) (Dkt. No. 56-1) at 108)  Some clinicians at the Hospital's CSP speak
Spanish, while others do not.  (Id.)

### b.   Race and National Origin

Plaintiff claims that she was treated less favorably than non-Hispanic employees "[i]n many ways." (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 38)

For example, Plaintiff testified at her deposition that, as a Hispanic clinician, she had a "higher volume [of] cases" than non-Hispanic clinicians. (Id. at 39)  When asked whether she could "identify . . . any non-Hispanic employee who had . . . a lower volume of patients than [her]," however, Plaintiff answered "No." (Id. at 42; see also id. at 41)  Similarly, when asked whether Michael Martin – a non-Hispanic clinician – had fewer patients, Plaintiff stated that she "can't say" and "not necessarily, but less women patients." (Id. at 34-35, 37)  Moreover, Plaintiff concedes in her response to Defendant's Local Rule 56.1 Statement that she "does not actually know that non-Hispanic employees had fewer patients" than her. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 78)

Plaintiff also testified that certain non-Hispanic clinicians received laptop computers, which they used at home to complete their work. Plaintiff "did not have that privilege." (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 39, 42-45)  Plaintiff identified Michael Martin and Nicole Coto – both non-Hispanic clinicians – as having received laptop computers. (Id. at 42-43)  Laptop computers were issued only to those clinicians who worked in a school-based program, however (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 95), and Plaintiff admits that she did not work in a school-based program. (Id. ¶ 96; see also Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 46)  Moreover, it is undisputed that clinicians who worked in a school-based program and who received a laptop computer were not permitted to bring the laptop computer home. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 97)

8

Plaintiff also testified that her supervisors ridiculed her accent when she spoke English, and criticized her spelling. (See Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 48, 60) According to Plaintiff, it was "[a]lmost always [Quinones]" who made comments about her Spanish accent. (Id. at 49) During staff meetings with supervisors and other clinicians, "[i]f she said a word in English[ and] . . . the pronunciation did not appear to be correct, [Quinones] would repeat it, would correct [her], and everybody would laugh." (Id. at 49, 60) Quinones also publicly corrected Plaintiff's misspelling of English words in the notes she took during the staff meetings. (See id. at 60) Quinones "told [Plaintiff that she] needed to go back to school because [she] did not know how to speak English and [that her] accent was so bad clients could not understand [her]." (Pltf. Aff. (Dkt. No. 56-7) ¶ 6)

Plaintiff also claims that Quinones "called [her] an immigrant and repeatedly made fun of [her] immigration status. . . . [and] constantly told [her] to 'go back to Ecuador.'" (Id. ¶ 6)[5]

---

[5] Plaintiff claims that non-Hispanic clinicians were disciplined more leniently than her, citing an incident involving Katie Naab – a white female clinician – who failed to contact a patient over a period of many months. (See Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 39-41) While it is undisputed that Naab "was disciplined for failing to timely contact [her] patients" (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 78), Plaintiff asserts that she was not immediately disciplined, and that "if it [were her], [she] would have been disciplined" immediately. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 39-41) Plaintiff concedes that she has no personal knowledge of the circumstances surrounding the discipline imposed on Naab, that she was only "told" this information during a staff meeting, and that she "do[es] not have exact knowledge" of the facts. (Id. at 39-40, 150)

Plaintiff also claims that her vacation requests were "always a problem" or were "denied," but that non-Hispanic clinicians – specifically Naab and Michael Martin – were "almost always given" their requested vacation. (Id. at 46) Plaintiff testified that Naab and Martin told her that their vacation requests were granted. (Id. at 47)

Plaintiff's testimony concerning the discipline imposed on Naab is both inadmissible hearsay and speculative. Similarly, Plaintiff's testimony concerning the handling of vacation requests is hearsay. Because "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," see Presbyterian Church of Sudan v. Talisman Energy, Inc., 582

9

### c.     Gender

Plaintiff claims that – throughout her employment at the Hospital – she was treated less favorably than her male counterparts, because she and other female clinicians saw more patients than the male clinicians. (See Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 34)  This disparity arose from the fact that the Hospital "would make [female clinicians] see patients of both sexes," but "would only make [male clinicians] see [patients who were] men." (Id. at 33-34)  According to Plaintiff, the Hospital adopted this policy out of concern that "male therapists [might] be attracted [to] female patients." (Id. at 34)  Plaintiff further explained that, "because most of the patients that came to the hospital were women," the Hospital's policy meant that female clinicians "almost always . . . ended up seeing more patients" than the male clinicians. (Id.)

Plaintiff identified two male clinicians – Michael Martin and Michael Gonzales – as having seen fewer patients than her. (Id. at 34-37)  When asked directly at her deposition whether Martin or Gonzales treated fewer patients than her, however, Plaintiff testified that she "can't say that" and "not necessarily, but less women patients." (Id. at 35, 37)  Moreover, Plaintiff concedes that Martin and Gonzales were subject to the same "levels of service" regime, including the requirement of forty patient contacts per week. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 81)

When asked at her deposition whether "there [were] any other way[s] that [she] w[as] treated less favorably than male employees," Plaintiff answered no. (See Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 37-38)

_____

F.3d 244, 264 (2d Cir. 2009), this Court has not considered Plaintiff's testimony concerning these points in ruling on Defendant's summary judgment motion.

10

Plaintiff also conceded at her deposition that her supervisors had not made

offensive gender-related comments:

> Q. Did either of your supervisors ever make a comment about women or female gender that you found offensive?
>
> A. Just that, that since we were women, they would rather have us see women patients.
>
> Q. Nothing beyond that?
>
> A. No.

(Id. at 38)[6]

### 3.    Plaintiff's Complaints Regarding the Hospital's Treatment and Reimbursement Practices

The New York State Office of Mental Health promulgates regulations applicable

to mental health clinics such as the CSP.  These regulations – codified at Part 599 of Title 14 of

the New York Codes, Rules, and Regulations ("Part 599") – address the services, financing, and

program rules of such clinics, and set forth guidelines for maintaining patient records, including

treatment plans, progress notes, and TPRs.  See 14 N.Y.C.R.R. Parts 599.8, 599.12, 599.13,

599.14; see also Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 2.  Although reimbursement

rates for services provided by mental health clinics are determined by Medicaid and Medicare –

and not by Part 599 – Part 599 includes a clinic classification scheme that affects a clinic's

---

[6]  In opposing Defendant's summary judgment motion, Plaintiff asserts in an affidavit that Quinones "was an abusive and unethical supervisor who tried to scare female staff members, including [herself, and] . . . talked down to all female employees." (Pltf. Aff. (Dkt. No. 56-7) ¶¶ 3-4) "Any woman who tried to stand up to [Quinones] was subjected to a hostile work environment." (Id.) These assertions are not supported by factual allegations, and are too conclusory to be given weight at summary judgment. See Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) ("'[M]ere conclusory allegations . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995))).

reimbursement schedule under Medicaid and Medicare. See 14 N.Y.C.R.R. Parts 599.13, 599.14. (See also Def. R. 56.1 Appx., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 102, 108-110)

Prior to 2012, Part 599 classified the Hospital's CSP as a comprehensive outpatient services organization, which meant that under Medicaid the reimbursement rate for a clinician's therapy session was the same for all types of visits, whether individual, family, or group. (Def. R. 56.1 Appx., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 109)

Part 599 was amended in 2012. See 2012-11 N.Y. State Reg. 20 (Mar. 14, 2012). The amendment changed the classification scheme for mental health clinics and, as a result, the Hospital's CSP qualified for a different reimbursement schedule under Medicaid. (See Def. R. 56.1 Appx., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 109-110) Under the new reimbursement schedule, individual therapy sessions were reimbursed at a higher rate than other types of therapy sessions. (Id. at 107-108) See also 14 N.Y.C.R.R. Part 599.14.

After the 2012 amendment to Part 599, Quinones conducted a training session for clinicians concerning the impact of the amendment. (Def. R. 56.1 Appx., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 106-107) Quinones testified that the amendment's effect on the reimbursement scheme was "not a secret," that the CSP's administrators "knew that [individual therapy sessions were subject to] a higher rate [of reimbursement]," and that the administrators "passed the information along to the clinicians." (Id. at 108) Quinones further testified that neither he nor Arce-Tomale told clinicians to change their treatment plans based on the new reimbursement schedule. (Id. at 110-111)

Plaintiff contends, however, that Quinones and Arce-Tomale did give such instructions. According to Plaintiff, Quinones told her and other clinicians "not to do any more group sessions [or] . . . family sessions," and to instead schedule "as many individual sessions as

12

possible, even if the patient would not . . . benefit[] from an individual session or an individual session was not part of the patient's treatment plan." (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 75-76; Pltf. Aff. (Dkt. No. 56-7) ¶ 10) Quinones also instructed the clinicians that – if a group session was conducted – the clinician should "play with the time" and "divide [the session] . . . in[to] individual ones," and record the group session as individual sessions. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 76-77) According to Plaintiff, Arce-Tomale reiterated these instructions to her during the weekly supervision meetings. (Id. at 76)

Quinones also instructed the clinicians that if a patient arrived late or at a time that would not permit a full half-hour individual therapy session, the clinician should "play with the time [in the progress notes]," so that the Hospital could bill for a full half-hour session. (Id. at 84; see also id. at 77-78) Quinones denies giving any such instruction. (See id., Ex. 2 (Quinones Dep.) (Dkt. No. 49-3) at 110-115)

Plaintiff further testified that she became concerned that these treatment and billing practices were not "ethical." (Id., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 88-89) After Quinones instructed clinicians to stop conducting group therapy sessions (see Goddard Decl., Ex. A (Torres Dep.) (Dkt. No. 56-1) at 46-47), Plaintiff began to worry about "performing the wrong sessions for patients just to allow the Hospital to [be] reimbursed more." (Pltf. Aff. (Dkt. No. 56-7) ¶ 14) Plaintiff testified that she raised these concerns, and repeatedly objected to these practices, during her weekly supervision meetings with Arce-Tomale. (See id.; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 88-89, 97) Plaintiff also states that she presented her concerns and objections to Quinones, to her union delegate, and to her union representative. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 89) Quinones and Arce-Tomale told Plaintiff, in response, "that the Hospital needed money." (Id. at 90) Quinones and Arce-Tomale

13

deny that Plaintiff ever made any such complaint. (See id., Ex. 2 (Quinones Decl.) (Dkt. No. 49-3) at 111; id., Ex. 3 (Arce-Tomale Decl.) (Dkt. No. 49-4) at 89-90)

Plaintiff claims that, as a result of her complaints, Defendant subjected her to "escalating hostility" and "repeated disciplinary action." (Pltf. Aff. (Dkt. No. 56-7) ¶ 16)

## C.   **Disciplinary Action Against Plaintiff**

### 1.   **November 20, 2013 "Verbal Warning"**

On November 5, 2013, Plaintiff attended a weekly supervision meeting with Arce-Tomale. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 38; see also Def. R. 56.1 Appx., Ex. 5 (Nov. 5, 2013 Supervisory Notes) (Dkt. No. 49-7)) During that meeting, Arce-Tomale spoke with Plaintiff about her low service levels and productivity. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 38) The two agreed to an "action plan" providing, inter alia, that Plaintiff would schedule twelve patients a day, in order to account for the typical no-show rate and to ensure that Plaintiff would meet the target of forty patient contacts per week. The two also agreed that Plaintiff would conduct more intake sessions in order to build up her case load. (Id. ¶¶ 39-41)

At the November 5, 2013 meeting, Plaintiff asked permission to treat November 15, 2013 as a floating holiday. (Id. ¶ 42; see also Def. R. 56.1 Appx., Ex. 5 (Nov. 5, 2013 Supervisory Notes) (Dkt. No. 49-7)) Arce-Tomale approved that request. (Id.)

At the next supervision meeting on November 13, 2013, however, Plaintiff asked that her day off on November 15, 2013 be treated as a sick day – rather than as a floating holiday – because she had made a doctor's appointment. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 43) Arce-Tomale denied Plaintiff's request, because "sick days are not [to be used as] scheduled days off." (Def. R. 56.1 Appx., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-4) at 71) An

14

argument ensued in which Plaintiff and Arce-Tomale raised their voices. Plaintiff told Arce-

Tomale that "one day [she] will lose [her] power," and she "stormed out" of her supervisor's

office. (Id. at 99-110; id., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 118-119)

As a result of this incident, on November 20, 2013, Arce-Tomale issued a "verbal

warning" to Plaintiff for insubordination. (Def. R. 56.1 Stmt. (Dkt. No. 49) ¶ 47; Def. R. 56.1

Appx., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-4) at 97-100) Although this discipline is referred

to as a "verbal warning," it was delivered in writing:

> During our supervisory meeting on Wednesday[,] November 13th, 2013 we discussed
> your request to change your floating holiday request on [November 15, 2013] to a sick
> day off. I informed you that I had already approved the floating holiday and would not
> change it to a sick day because sick days are used for times when there is an illness. You
> argued that you had a doctor's appointment and I informed you that as per policy a
> requested day off is not a sick day. You argued "one day you will lose your power," and
> I informed you that you were being inappropriate. I reminded you of our discussions in
> the past of how you communicate with others. This behavior was highlighted in your
> annual evaluation and has continued to reoccur. You are expected to monitor and
> improve your communication with staff, patients, and administration at the program as it
> is unprofessional and violates hospital policy.

(Def. R. 56.1 Appx., Ex. 8 (Nov. 20, 2013 Verbal Warning) (Dkt. No. 49-10))

On November 25, 2013, Plaintiff submitted a rebuttal to the verbal warning in

which she disputes Arce-Tomale's version of events and asserts that her statements have been

"taken out of context." (Goddard Decl., Ex. D (Rebuttal) (Dkt. No. 56-4) at 4) Plaintiff's

rebuttal includes a more general complaint about alleged mistreatment at the Hospital:

> I would like to take this opportunity to express my feelings about [the] many times [CSP]
> Administrators ha[ve] continually harassed, retaliated and bullied me regarding my
> disability and my work ethic by making inappropriate comments about my hearing
> disability and calling me "Deaf" and/or embarrassing me during staff meetings. They
> have continually [misconstrued] whatever is said to them to their advantage. I hope that
> through this incident[,] doors are opened for training to be provided to Administrators
> and Employees about inappropriate behavior[] and the procedures that an [e]mployee
> should take to report inappropriate behavior[ by] Administrators. I feel [that] this
> discipline was arbitrary and capricious.

(Id.)[7] Plaintiff's rebuttal does not allege any other type of discrimination or mistreatment, and does not contain any claim that the Hospital's treatment and reimbursement practices are improper. (See id.; see also Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 121-122) Pursuant to the Hospital's written policies, Plaintiff's rebuttal to the verbal warning should have been submitted to the Hospital's human resources department. It was not. (See Goddard Decl., Ex. B (Webb Dep.) (Dkt. No. 56-2) at 30-31, 41, 46-48)

## 2.    March 5, 2014 Written Warning

After the November 5, 2013 supervision meeting, Plaintiff's levels of service continued to fall below the required forty patient contacts per week. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶¶ 48-49; Def. R. 56.1 Appx., Ex. 12 (Dkt. No. 49-14)) Arce-Tomale addressed the issue in her weekly supervision meetings with Plaintiff, and also raised concerns about the quality of Plaintiff's work product, including incomplete progress notes and late or overdue TPRs. (See Def. R. 56.1 Appx. (Dkt. No. 49) Exs. 10, 11; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶¶ 49-50) During a February 19, 2014 supervision meeting, Plaintiff admitted to Arce-Tomale that she had not followed up on patient referrals and had not reviewed her written work for errors and omissions. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 49) ¶ 50)

On March 5, 2014, Arce-Tomale issued a written warning to Plaintiff based on her low service levels and performance issues. (Def. R. 56.1 Appx., Ex. 12 (Written Warning) (Dkt. No. 49-14) at 2-3)

---

[7] Plaintiff testified that she "think[s]" that her November 25, 2013 rebuttal marks the first time that she made a written complaint concerning mistreatment related to her hearing disability. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 121) Plaintiff does not contend that she engaged in any other protected activity regarding discrimination on any other occasion.

### 3.     Alleged Interference with Plaintiff's Leave in April 2014

In April 2014, Plaintiff requested leave to travel to Ecuador in order to "'see' her ill brother" and her brother-in-law. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 119; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 126-129)  According to Plaintiff, Arce-Tomale and Quinones initially attempted to prevent Plaintiff from taking time off to make this trip, but after her union became involved she was permitted to take approved vacation time – with pay – in order to travel to Ecuador. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 120; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 126, 129-130)

### 4.     Two-Day Suspension in July 2014

Plaintiff's performance issues continued in the months after the March 5, 2014 written warning. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 49) ¶ 53)  As of July 2014, Plaintiff had seven overdue TPRs, five cases without patient contact in over thirty days, and seven cases in which she had not followed up on an initial referral. Moreover, since the written warning, Plaintiff had not met the target of forty patient contacts per week. (Id. ¶¶ 53-54; Def. R. 56.1 Appx., Ex. 14 (Dkt. No. 49-16))  The Hospital had also received two written complaints from patients' families alleging that Plaintiff had acted "rude and demeaning . . . towards them." (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 54; Def. R. 56.1 Appx., Ex. 14 (Dkt. No. 49-16))

During a June 26, 2014 weekly supervision meeting with Arce-Tomale, Plaintiff asked to take a vacation day on July 7, 2014. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 56)  Plaintiff wanted the day off in order to commemorate the anniversary of the death of her brother, who had been murdered. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 130-131)  In her supervisory notes – which Plaintiff reviewed and signed – Arce-Tomale states that she "[d]enied [Plaintiff's request] due to lack of program coverage." (Id., Ex. 13 (June 26, 2014

17

Supervisory Notes) (Dkt. No. 49-15)) Arce-Tomale's supervisory notes report that Plaintiff "stated she will take [the] day despite denial." (Id.) In reviewing and signing the supervisory notes, Plaintiff added a statement denying what Arce-Tomale had written. Plaintiff wrote that she had told Arce-Tomale that she "need[ed] the day off . . . to pray and [that Arce-Tomale] w[as] very insensitive." (Id.; see also id., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 135)

On July 7, 2014, Plaintiff did not come to work. She called Quinones to say that she would be out sick. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 59; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 131-134) At her deposition, Plaintiff testified that she had a stomach illness and had obtained a doctor's note excusing her absence from work. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 132-134) Plaintiff also called in sick on July 8, 2014. (Id.) Plaintiff testified that her supervisors did not believe that she was sick, however. (Id. at 131, 133)

On July 15, 2014, Arce-Tomale issued a two-day suspension to Plaintiff based on her insubordination, excessive absenteeism, the poor quality of her work, and her failure to meet the required levels of service. (See id. at 136; see also id., Ex. 14 (Suspension Notice) (Dkt. No. 49-16) at 2-3) That same day, Plaintiff sent an email to Patricia Smalls, CSP's Executive Director, complaining about the disciplinary action taken against her. (Goddard Decl., Ex. E (Dkt. No. 56-5); see also Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 140-141) Plaintiff had spoken with Smalls on June 26, 2014, to complain about Arce-Tomale's refusal to permit Plaintiff to take a vacation day on July 7, 2014. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 140-141) In her July 15, 2014 email, Plaintiff states:

I am writing to you as I am very debilitated over [my] disciplinary [action]. . . .

I would like to meet with you regarding the "Day" in question 7/7/14 where I called you and you understood my situation. In turn, [Arce-Tomale] and [Quinones] . . . have now .

18

> .. suspended me for 2 days without pay and a whole host of other [claims] were added to the disciplinary [action] that I was not aware of in prior meetings. . . .
>
> I produced doctor's notes, I have sick time, and I am still being retaliated against every other month or when I call out sick.

(Goddard Decl., Ex. E (Dkt. No. 56-5)) Smalls responded that she could not "interfere with the process," and she told Plaintiff to file a grievance through her union. (Id.) Plaintiff served the suspension and returned to work. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 146-147)

### 5. August 6, 2014 Termination

On July 31, 2014, Arce-Tomale discovered what she believed were discrepancies in Plaintiff's progress notes concerning the times at which she had conducted therapy sessions on July 30, 2014. (See Def. R. 56.1 Appx., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-5) at 118-119; see also id., Exs. 15-18)

The progress notes for "Patient A" show that Plaintiff met with Patient A at 9:00 a.m. on July 30, 2014, for a thirty-minute individual therapy session (see id., Ex. 15 (Patient A Progress Note) (Dkt. No. 49-17)), but registration records maintained by the facility's front desk show that Patient A had not arrived at the CSP until 10:14 a.m. (Id., Ex. 16 (Registration Records) (Dkt. No. 49-18)) The progress note for "Patient B" show that Plaintiff met with a member of Patient B's family at 10:30 a.m. for a thirty-minute collateral therapy session. (See id., Ex. 18 (Patient B Progress Note) (Dkt. No. 49-20)) However, Arce-Tomale testified that Plaintiff called her at 10:40 a.m. – while still meeting with Patient A – to request permission to meet with Patient A's family member for a collateral therapy session.[8] (See id., Ex. 3 (Arce-

---

[8] The record does not disclose whether Plaintiff met with Patient A's family member for an additional collateral therapy session, or whether she created a separate record indicating that she

Tomale Dep.) (Dkt. No. 49-5) at 118-119; id., Ex. 20 (Dkt. No. 49-22))  According to Arce-

Tomale, "if by 10:40 a.m. [Plaintiff] was still meeting with Patient A, she could not have [had] a

30 minute[] session with Patient B['s family member] at 10:30 a.m."  (Id., Ex. 20 (Termination

Notice) (Dkt. No. 49-22))  Plaintiff also attended a staff meeting at 11:00 a.m.  (Pltf. Resp. to

Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 68)

Arce-Tomale discussed these discrepancies with Plaintiff during a July 31, 2014

weekly supervision meeting.  (See Def. R. 56.1 Appx., Ex. 19 (July 31, 2014 Supervisory Notes)

(Dkt. No. 49-21) at 3)  Arce-Tomale testified that Plaintiff "had nothing to say" when asked

about the discrepancies.  (Id., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-5) at 123-124)  Arce-

Tomale further testified that, after the July 31, 2014 meeting, Plaintiff changed the session time

on the progress note for Patient A from 9:00 a.m. to 9:30 a.m. (See id. at 123; compare id., Ex.

17 (Dkt. No. 49-19), with id., Ex. 16 (Dkt. No. 49-18))  The new time still conflicted with the

registration records.  (See id., Ex. 16 (Registration Records) (Dkt. No. 49-18))

According to Plaintiff, however, patient registration records maintained by the

Hospital's front desk are "often" inaccurate.  (See Pltf. Aff. (Dkt. No. 57-6) ¶¶ 18-19; Def. R.

56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 170-172)  As a result, "[i]t was rare for the

registration time to ever match the time noted on a treatment or progress note."  (Pltf. Aff. (Dkt.

No. 57-6) ¶ 19)  Plaintiff further testified that, during her July 31, 2014 supervisory meeting,

Arce-Tomale directed her to change the progress note for Patient A to reflect a treatment time of

9:30 a.m., rather than 9:00 a.m., and that this instruction was consistent with her supervisors'

general instructions to "fix" or "play" with patient records for billing and reimbursement

---

conducted such a session.  (Cf. Def. R. 56.1 Appx., Ex. 3 (Arce-Tomale Dep.) (Dkt. No. 49-5) at
124-25; id., Ex. 15 (Patient A Progress Note))

purposes. (See id. ¶¶ 21-24; see also Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 75-78, 150-151, 160-161) According to Plaintiff, inconsistent registration records or changing treatment times on progress notes "had never been a problem previously." (Pltf. Aff. (Dkt. No. 57-6) ¶¶ 19, 26) Plaintiff claims that Arce-Tomale and Quinones "set [her] up for termination" – and used a "common discrepancy to justify terminating [her] employment" – because she had "continued to complain about discrimination and retaliation" and the Hospital's treatment and billing practices. (See id. ¶¶ 16, 26; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 99-100, 102)

On August 6, 2014, Arce-Tomale and Quinones met with Plaintiff and her union representative and informed Plaintiff that the Hospital had terminated her employment "for falsifying the time and length of services provided to patients." (Def. R. 56.1 Appx., Ex. 20 (Termination Notice) (Dkt. No. 49-22) at 2-3; id., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 166-169)

On August 7, 2014, Plaintiff participated in a "step-three grievance hearing" to challenge her termination. (Pltf. Aff. (Dkt. No. 56-7) ¶ 27; Goddard Decl., Ex. F (Pltf. Hearing Notes) (Dkt. No. 56-6)) During the hearing – which was attended by Marc Wolf, the Hospital's Associate Vice President of Human Resources, Plaintiff's union representative, Quinones, and Arce-Tomale – Plaintiff "alerted Hospital personnel . . . to the ongoing unethical and discriminatory culture at the Hospital." (Pltf. Aff. (Dkt. No. 56-7) ¶ 27) In particular, Plaintiff complained that

   a. The Hospital was engaged in unethical practices by instructing clinicians to play with time; and

   b. [Quinones] had frequently discriminated against [her] as a Hispanic female by, among other things, (i) making fun of [her] accent; (ii) commenting on [her] status as a victim of domestic violence; (iii) making fun of [her] hearing disability; and (iv) treating [her] less well than [her] male, Caucasian co-workers.

21

(Id.; see also Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 179-180)[9] In an August 12, 2014 letter, Wolf informed Plaintiff that the Hospital had determined that her "termination was appropriate" and had denied her grievance. (Def. R. 56.1 Appx., Ex. 21 (Denial of Grievance Letter) (Dkt. No. 49-23))

## II. PROCEDURAL HISTORY

The Complaint was filed on August 28, 2015, and asserts claims for (1) discrimination and hostile work environment, in violation of Title VII, the ADA, the NYSHRL, and the NYCHRL; (2) unpaid wages and overtime, in violation of the FLSA and New York Labor Law; (3) retaliation, in violation of New York Labor Law §§ 740, 741 and the NYSHRL; (4) FMLA interference and retaliation; and (5) failure to provide a reasonable accommodation, in violation of the NYSHRL and the NYCHRL. (Cmplt. (Dkt. No. 5) ¶¶ 63-110)

On September 6, 2016, Plaintiff joined a separate collective action brought under the FLSA against St. Barnabas Hospital – Khansari et al. v. St. Barnabas Hospital, No. 15 Civ. 1803 (PGG) – as an opt-in plaintiff. (See No. 15 Civ. 1803 (Dkt. No. 76)) Plaintiff has informed this Court that she "withdraws [from this action] all claims for overtime and straight time wages under the FLSA and [the New York Labor Law]," and will "pursu[e] such claims solely in the [Khansari action]." (Pltf. Opp. Br. (Dkk. No. 55) at 10 n.1) Accordingly, Plaintiff's wage and overtime claims under the FLSA and the New York Labor Law will be dismissed.

On October 20, 2016, Plaintiff voluntarily withdrew her failure to accommodate claim, acknowledging that it is time-barred. (Oct. 20, 2016 Pltf. Ltr. (Dkt. No. 42) at 4) This

---

[9] Plaintiff testified that, after terminating Plaintiff's employment on August 6, 2014, Quinones said, "[n]ow I know why your husband hit you." (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 167)

22

Court dismissed the failure to accommodate claim on November 21, 2016. (Nov. 21, 2016 Order (Dkt. No. 45))

On January 30, 2017, Defendant moved for summary judgment on all remaining claims. (Notice of Motion (Dkt. No. 48))

## DISCUSSION

## I.     LEGAL STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where

23

none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"In cases based on allegations of [discrimination and] discriminatory retaliation, courts must use 'an extra measure of caution' in determining whether to grant summary judgment 'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence.'" Thompson v. Morris Heights Health Ctr., No. 09 Civ. 7239 (PAE) (THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)).

However, "'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination [and retaliation] cases than to . . . other areas of litigation.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). As in any other case, a plaintiff in a discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown, 257 F.3d at 252 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal citations omitted). "Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion. Gross v. Nat'l Broad. Co., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) ("'[E]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment' . . . [and] 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008); Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005))).

24

## II.   ANALYSIS

Defendant argues that it is entitled to summary judgment on Plaintiff's (1) discrimination and retaliation claims, because they "are precluded by the election of remedies provision [of] the New York State Whistleblower Law," N.Y. Lab. Law. § 740 (Def. Moving Br. (Dkt. No. 50) at 16-18); (2) discrimination claims, because (a) Plaintiff has not made out a prima facie case, and (b) the Hospital has a legitimate, non-discriminatory reason for the adverse actions taken against Plaintiff (id. at 17-18, 21-24); (3) hostile work environment claims, because Plaintiff has not shown severe or pervasive discriminatory conduct by the Hospital (id. at 24-26); (4) retaliation claims, because Plaintiff did not engage in any protected activity and because there is no causal connection between any protected activity and any adverse employment action (id. at 18-21); and (5) FMLA interference and retaliation claims, because Plaintiff was not entitled to leave under the FMLA (id. at 7 n.1).

### A.   Election of Remedies under New York Whistleblower Law

Defendant argues that Plaintiff's discrimination and retaliation claims should be dismissed pursuant to the waiver provision of New York Labor Law § 740. (Def. Moving Br. (Dkt. No. 50) at 16-17; Def. Reply Br. (Dkt. No. 52) at 5-6)

Labor Law § 740 – known as the "Whistleblower Law" – "prohibits employers from retaliating against any employee who 'discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety.'" Humphrey v. Rav Investigative & Sec. Servs. Ltd., 169 F. Supp. 3d 489, 500 (S.D.N.Y. 2016) (quoting N.Y. Lab. Law § 740(2)(a)). Section 740(7) of the Whistleblower Law sets forth a "broad waiver provision" stating that the "'institution of an action in accordance

with this section shall be deemed a waiver of the rights and remedies available under any other

. . . law, rule or regulation or under the common law.'" Id. (quoting N.Y. Lab. Law § 740(7)).

Defendant argues that Plaintiff's "gender, race, and national origin discrimination

and retaliation claims largely arise out of the same alleged adverse employment actions" –

namely, Plaintiff's larger case load and the disciplinary actions she suffered – and, as a result,

when Plaintiff elected to seek relief under N.Y. Labor Law § 740, she waived her right to pursue

discrimination and retaliation claims under federal, state, and city law. (See Def. Moving Br.

(Dkt. No. 50) at 17-18)

Courts in this District have, however, rejected the argument that Section 740's

waiver provision bars federal discrimination claims. See Humphrey, 169 F. Supp. 3d at 501

("the majority of district courts in this Circuit, citing the constitutional concerns raised by a

construction that requires the automatic waiver of a plaintiff's federal rights, have construed the

provision as not barring claims under federal law") (collecting cases); see also Slay v. Target

Corp., No. 11 Civ. 2704 (MHD), 2011 WL 3278918, at *4 (S.D.N.Y. July 20, 2011) (concluding

that Whistleblower Law "does not purport to reach" federal claim "as a means of avoiding a

serious potential constitutional defect in the state enactment"); Kramsky v. Chetrit Grp., LLC,

No. 10 Civ. 2638 (HB), 2011 WL 2326920, at *6 (S.D.N.Y. June 13, 2011) (construing Section

740's waiver provision "narrowly . . . to avoid . . . [c]onstitutional issues," and holding that the

waiver provision "is not applicable to claims brought under Title VII"). This Court concludes

that the waiver provision in Labor Law § 740 does not bar Plaintiff's Title VII and ADA

discrimination claims.

This Court likewise concludes that Section 740's waiver provision does not bar

Plaintiff's state law discrimination and retaliation claims under the NYSHRL and the NYCHRL.

A suit under Section 740(7) "waives only 'other legal rights and remedies that protect against the same wrong that the statute itself protects.'" Barker v. Peconic Landing at Southold, Inc., 885 F. Supp. 2d 564, 569 (E.D.N.Y. 2012) (quoting Collette v. St. Luke's Roosevelt Hosp., 132 F. Supp. 2d 256, 267 (S.D.N.Y. 2001)) (emphasis omitted). In this regard, courts have concluded that "discrimination claims [do not] protect against the same wrongs that Section 740 prohibits." Id. at 568. The NYSHRL "seeks to 'encourage programs designed to insure that every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the state[,] to encourage and promote the development and execution by all persons within the state of such state programs,'" and to "eliminate and prevent discrimination" in a variety of activities, including employment.'" Id. (quoting N.Y. Exec. Law § 290). Similarly, the "purpose of the NYCHRL is to protect persons . . . against discriminatory employment actions based upon protected classifications such as gender or disability." Cabrera v. Fresh Direct, LLC, No. 12 Civ. 6200 (PKC) (RER), 2013 WL 4525659, at *3 (E.D.N.Y. Aug. 27, 2013) (citing N.Y.C. Admin. Code § 8–107). Section 740, on the other hand, "'is aimed at protecting the rights of employees who report violations of law that present a danger to public health or safety.'" Id. "Because the anti-discrimination statutes seek to protect against wrongs completely separate from those sought to be protected by Section 740, there is no waiver of any such claims [when a Section 740 claim is filed]." Barker, 885 F. Supp. 2d at 569 (waiver provision does not bar disability discrimination claims under NYSHRL and ADA); Cabrera, 2013 WL 4525659, at *3 (waiver provision does not bar gender and disability discrimination claims under NYCHRL).

In sum, Labor Law § 740's waiver provision does not bar Plaintiff's claims under the federal, state, or city anti-discrimination statutes.

27

## B.     Discrimination Claims

### 1.     Applicable Law

Claims of employment discrimination under Title VII, the ADA, and the

NYSHRL "are analyzed using the familiar burden-shifting framework established in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973)." Walsh v. New York City Hous. Auth., 828 F.3d

70, 74-75 (2d Cir. 2016); see also McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir.

2013) (applying McDonnel Douglas analytical framework to ADA claims). First, Plaintiff must

establish a prima facie case of discrimination by demonstrating that "(1) she was within the

protected class; (2) she was qualified for the position; (3) she was subject to an adverse

employment action; and (4) the adverse action occurred under circumstances giving rise to an

inference of discrimination." Liebowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009).

"'The burden of establishing a prima facie case is not onerous, and has been frequently described

as minimal.'" Walsh, 828 F.3d at 75 (quoting Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir.

1998)).

Once a plaintiff establishes a prima facie case, "the burden then . . . shift[s] to the

employer to articulate some legitimate, nondiscriminatory reason for the adverse employment

action." United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011) (internal quotation marks

omitted). If the employer carries that burden, "the plaintiff's admissible evidence must show

circumstances that would be sufficient to permit a rational finder of fact to infer that the

defendant's employment decision was more likely than not based in whole or in part on

discrimination." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). "A plaintiff's

evidence at the third step of the McDonnell Douglas analysis must be viewed as a whole rather

than in a piecemeal fashion." Walsh, 828 F.3d at 76 (citing Byrnie v. Town of Cromwell, Bd. of

Educ., 243 F.3d 93, 102 (2d Cir. 2001)).  "No one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination."  Id.

       In order to establish a hostile work environment claim under Title VII, the ADA, and the NYSHRL, "'a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'"  Grewal v. Cuneo Gilbert & LaDuca LLP, No. 13 Civ. 6836 (RA), 2017 WL 1215752, at *11 (S.D.N.Y. Mar. 31, 2017) (quoting Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))); see also Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 151 n.6 (2d Cir. 2014) (NYSHRL); Kleinman v. Fashion Inst. of Tech., No. 16 Civ. 4348 (KPF), 2017 WL 3016940, at *10 (S.D.N.Y. July 14, 2017) (ADA).[10]  "'This standard has both objective and subjective components:  the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive.'"  Grewal, 2017 WL 1215752, at *11 (quoting Littlejohn, 795 F.3d at 321).  "'[T]he plaintiff also must show that the hostile conduct occurred because of a protected characteristic.'"  Id. (quoting Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015)).

       Moreover, "[a]s a general rule, incidents must be more than 'episodic'; they must be sufficiently continuous and concerted in order to be deemed pervasive."  Tolbert, 790 F.3d at

---

[10]  Although "'[t]he Second Circuit has not yet decided whether a hostile work environment claim is cognizable under the ADA,'" Kleinman, 2017 WL 3016940, at *10 (quoting Flieger v. E. Suffolk BOCES, No. 16-2556-cv, 2017 WL 2377853, at *3 (2d Cir. June 1, 2017) (summary order)) (internal quotation marks omitted), district courts in this Circuit "evaluate[] ADA hostile work environment claims using 'the Title VII standard.'"  Id.

439. "[A] plaintiff alleging a hostile work environment 'must [thus] demonstrate either that a
single incident was extraordinarily severe, or that a series of incidents were sufficiently
continuous and concerted to have altered the conditions of her working environment.'" Alfano
v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560,
570 (2d Cir. 2000)). "'The fact that the law requires harassment to be severe or pervasive before
it can be actionable does not mean[, however,] that employers are free from liability in all but the
most egregious of cases,'" Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir.
2000), and the Second Circuit has "cautioned against setting the bar too high." Terry v.
Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (noting that a work environment "need not be
'unendurable' or 'intolerable'" in order to be actionable).

　　　　　"In assessing whether a plaintiff has met her burden, 'courts should examin[e] the
totality of the circumstances, including:  the frequency of the discriminatory conduct; its
severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with the victim's [job] performance.'" Belton v. City of New
York, No. 12 Civ. 6346 (JPO), 2014 WL 4798919, at *8 (S.D.N.Y. Sept. 26, 2014) (quoting
Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2012)).

　　　　　Finally, "[u]nder the NYCHRL, there are not separate standards for
'discrimination' and 'harassment' claims; rather, 'there is only the provision of the law that
proscribes imposing different terms, conditions and privileges of employment based [on a
protected characteristic].'" Clarke v. InterContinental Hotels Grp., PLC, No. 12 Civ. 2671
(JPO), 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) (quoting Sotomayor v. City of New
York, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012)).  In order to prevail on a discrimination claim
or a hostile work environment claim under the NYCHRL, a plaintiff "'need only demonstrate by

a preponderance of the evidence that she has been treated less well than other employees'
because of a protected trait." See Johnson v. Strive E. Harlem Employment Grp., 990 F. Supp.
2d 435, 445 (S.D.N.Y. 2014) (quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715
F.3d 102, 110 (2d Cir. 2013)).  That is, "[t]he plaintiff need only show differential treatment –
that she is treated 'less well' – because of a discriminatory intent."  Mihalik, 715 F.3d at 110.
"When applying this standard, however, district courts must be mindful that the NYCHRL is not
a 'general civility code.'"  Id. (quoting Williams v. New York City Hous. Auth., 61 A.D.3d 62,
79 (1st Dept. 2009)).

## 2.   Title VII, ADA, and NYSHRL Discrimination Claims

Plaintiff asserts claims under Title VII, the ADA, and the NYSHRL based on
gender, disability, race, and national origin discrimination.  (See Cmplt. (Dkt. No. 5) ¶¶ 63-76)
Plaintiff's discrimination claims are premised on two theories of liability:  disparate treatment
and hostile work environment.

### a.   Disparate Treatment

As to Plaintiff's disparate treatment claims, Defendant argues, inter alia, that the
record contains "no admissible evidence [showing] that [Plaintiff] was subjected to any adverse
action because of her gender, race, or national origin."[11]  (Def. Moving Br. (Dkt. No. 50) at 18)

In order to establish a prima facie case for discrimination premised on disparate
treatment, Plaintiff must show, inter alia, that "she was subject to an adverse employment action"
on the basis of a protected characteristic.  See Liebowitz, 584 F.3d at 498.  Here, the protected
characteristics cited by Plaintiff are her gender, race, and national origin.  "To constitute an

---

[11]  Plaintiff does not assert a claim for disparate treatment based on disability.  Because there is
no evidence that Plaintiff suffered an adverse employment action as a result of her disability, any
such claim would fail.

adverse employment action in the context of a discrimination claim, an action must cause 'a materially adverse change in the terms and conditions of employment.'" Henry v. NYC Health & Hosp. Corp., 18 F. Supp. 3d 396, 404 (S.D.N.Y. 2014) (quoting Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008)) (internal quotation marks and emphasis omitted). "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'" Id. (quoting Mathirampuzha, 548 F.3d at 78).

At her deposition, Plaintiff testified that she had been subjected to disparate treatment because (1) as a Hispanic clinician, she had a "higher volume [of] cases" than non-Hispanic clinicians (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 34, 37, 39); (2) as a female clinician, she saw more patients than male clinicians (id. at 33-37); and (3) non-Hispanic clinicians were given laptop computers to complete their work, but she was not provided with a laptop (id. at 39, 42-45).[12]

As to Plaintiff's claim that she was assigned more cases than non-Hispanic or male clinicians – assuming arguendo that a larger caseload constitutes an "adverse employment action" – the evidence offered in support of this assertion is insufficient to create a material issue of fact.

---

[12] Plaintiff also testified that (1) non-Hispanic clinicians received more lenient discipline, and (2) non-Hispanic clinicians' vacation requests were "almost always granted," while her requests were "always a problem." (See Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 39-41, 47) As explained above, the evidence offered in support of these arguments is not admissible, and cannot be considered in resolving Defendant's summary judgment motion. See Fed. R. Civ. P. 56(c) (requiring parties to "produce admissible evidence to support" factual assertions); see also Presbyterian Church of Sudan, 582 F.3d at 264.

Plaintiff testified that she "almost always had a higher volume of cases" than the male clinicians. (See Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 34-37) According to Plaintiff, Hospital policy is that male clinicians see only male patients, while female clinicians see "patients of both sexes." (Id. at 33-34) "[B]ecause most of the patients that came to the hospital were women," this policy meant that female clinicians "almost always . . . ended up seeing more patients." (Id. at 34) Plaintiff identified Michael Martin and Michael Gonzales as male clinicians who had a lower caseload than her. (See id. at 34-37) Plaintiff also testified that, as a Hispanic clinician, she had a "higher volume [of] cases" than non-Hispanic clinicians. Plaintiff identified Michael Martin as a non-Hispanic clinician who had a smaller caseload than her. (See id. at 34, 39)

When asked directly at her deposition whether Martin or Gonzales had fewer patients than her, however, Plaintiff testified that she "can't say that" and "not necessarily, but less women patients." (Id. at 35, 37) Moreover, in her Rule 56.1 Response, Plaintiff concedes that she "does not actually know that non-Hispanic employees had fewer patients" than her. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 78) It is undisputed that Martin and Gonzales had the same "levels of service" obligation as Plaintiff, and were required to have forty patient contacts per week. (Id. ¶ 81) Given this record, Plaintiff has not offered sufficient evidence to demonstrate that male and non-Hispanic clinicians had a smaller caseload than her.

As to Plaintiff's laptop claim – assuming arguendo that this circumstance could constitute an adverse employment action – Plaintiff has not offered evidence sufficient to demonstrate that this alleged adverse action "occurred under circumstances giving rise to an inference of discrimination." Liebowitz, 584 F.3d at 498. Indeed, it is undisputed that laptop computers were issued only to those clinicians who worked in a school-based program. (Pltf.

33

Resp. to Def. R. 56.1 Stmt. (Dkt. No. 54) ¶ 95)  Plaintiff admits that she did not work in a school-based program.  (Id. ¶ 96; see also Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 46)

The Court concludes that Plaintiff has not made out a prima facie case of gender, race, or national origin discrimination under Title VII and the NYSHRL to the extent that Plaintiff is proceeding on a theory of disparate treatment.  Defendant is entitled to summary judgment on these claims.

### b.    Hostile Work Environment

As to Plaintiff's hostile work environment claims, Defendant argues that Plaintiff has not offered evidence showing that she was subjected to "severe or pervasive" discriminatory abuse on the basis of her gender, disability, race, or national origin.  (See Def. Moving Br. (Dkt. No. 50) at 25-26)

In determining whether Plaintiff has met her burden with respect to her hostile work environment claims, this Court must "'examin[e] the totality of the circumstances.'"  See Belton, 2014 WL 4798919, at *8 (quoting Rivera, 743 F.3d at 20).  In conducting this analysis, courts in this District have recognized that "different forms of harassment may exacerbate each other," Donahue v. Asia TV USA Ltd., 208 F. Supp. 3d 505, 517 (S.D.N.Y. 2016) (citing Cruz, 202 F.3d at 570), meaning that "abuse against various different groups – such as both [gender] and [race] – . . . exacerbates the effect of harassment experienced [with respect to each characteristic] individually."  Boggs v. Die Fliedermaus, LLP, 286 F. Supp. 2d 291, 298 (S.D.N.Y. 2003) (citing Cruz, 202 F.3d at 570); see also id. ("[G]iven the evidence of both race-based and sex-based hostility, a jury could find that [defendant's] racial harassment exacerbated the effects of his sexually threatening behavior and vice versa").

34

The Second Circuit has, however, expressly reserved decision on "whether a plaintiff may aggregate evidence of [two types of] harassment to support a hostile work environment claim where neither charge could survive on its own." See Cruz, 202 F.3d at 572 n.7. In this regard, "aggregation is inappropriate where . . . the claim sought to be buttressed is patently inadequate." Weiss v. Hustedt Chevrolet, No. 05 Civ. 4230, 2009 WL 2132444, at *8 (E.D.N.Y. July 13, 2009). Nonetheless, "aggregation may be appropriate to nudge, but not catapult, a claim across the line between merely offensive conduct and conduct sufficient to establish a hostile work environment." Id.

Here, Plaintiff has offered evidence that – during weekly staff meetings with other clinicians – Quinones, her supervisor, repeatedly made demeaning and degrading remarks concerning her hearing disability. (See Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 61-73) For example, Plaintiff testified that when she asked a question or asked Quinones to repeat himself during a staff meeting, Quinones would call her "deaf" or ask, "Are you deaf? Are you deaf, Ruth?" Quinones also told Plaintiff at the start of staff meetings, and in reference to her amplifier, to "[p]ut that thing on because you're deaf and you're not going to be able to hear what I have to say." There is evidence that Quinones made such comments "more than 20 [times]" and perhaps as many as 100 times "[o]ver the course of [six] years." (See Goddard Decl., Ex. A (Torres Dep.) (Dkt. No. 56-1) at 101-105; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 65-67)

Plaintiff also testified that, during the same staff meetings, "[i]f she said a word in English[ and] . . . the pronunciation did not appear to be correct," Quinones "would repeat it, would correct [her], and everybody would laugh." (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 49, 60) Quinones also publicly corrected Plaintiff's misspelling of English words in

notes she took during staff meetings. (See id. at 60) Quinones also "told [Plaintiff that she] needed to go back to school because [she] did not know how to speak English and [that her] accent was so bad clients could not understand [her]." (Pltf. Aff. (Dkt. No. 56-7) ¶ 6)

Quinones also "called [Plaintiff] an immigrant and repeatedly made fun of [her] immigration status. . . . [He] constantly told [her] to 'go back to Ecuador.'" (Pltf. Aff. (Dkt. No. 56-7) ¶ 6)

Courts have recognized that "accents are perhaps the most recognizable indication of one's national identity, and '[a]ccent and national origin are obviously inextricably intertwined in many cases.'" Pibouin v. CA, Inc., 867 F. Supp. 2d 315, 324 (E.D.N.Y. 2012) (quoting Rivera v. Baccarat, Inc., 10 F. Supp. 2d 318, 324 (S.D.N.Y. 1998) (quoting Fragante v. City and County of Honolulu, 888 F.2d 591, 596 (9th Cir. 1989))). Indeed, "'[t]he EEOC "defines national origin discrimination broadly as including" unequal treatment "because an individual has the physical, cultural or linguistic characteristics of a national origin group."'" Costantin v. New York City Fire Dept., No. 06 Civ. 04631 (GBD) (THK), 2009 WL 3053851, at *19 (S.D.N.Y. Sept. 22, 2009) (quoting 29 C.F.R. § 1606.1 (2005)). Accordingly, "[e]vidence that supervisors ridiculed an employee's accent may . . . help support a finding that the employer created a hostile work environment because of the employee's national origin." Id.; see also Levitant v. City of New York Human Res. Admin., No. 05 Civ. 0230 (JFB) (MDG), 2008 WL 5273992, at *10 (E.D.N.Y. Dec. 18, 2008) (finding issues of fact on hostile work environment claim based on national origin where defendants mocked plaintiff's Russian accent); Hernandez v. Jackson, Lewis, Schnitzler & Krupman, 997 F. Supp. 412, 418 (S.D.N.Y. 1998) (remark that plaintiff would never be promoted because of her "thick accent" gives rise to an inference of unlawful discrimination based on national origin); Carino v. Univ. of Oklahoma Bd. of Regents,

36

750 F.2d 815, 819 (10th Cir. 1984) (evidence that an employee was demoted on the basis of his

accent sufficient to establish discriminatory intent based on national origin).

In Costantin, the court concluded that ridicule of an employee's accent was

sufficient to create a material issue of fact as to hostile work environment on the basis of national

origin:

> Testimony that [a supervisor] asked [plaintiff] if she could speak and write in English,
> threw paperwork at her, commanded her to read in front of colleagues, and required that
> she repeat certain words that emphasized her "harsh" accent to elicit laughter, provides
> "direct evidence of national origin discrimination." Rodriguez v. FedEx Freight East,
> Inc., 487 F.3d 1001, 1008-09 (6th Cir. 2007) (discussing disparaging comments about an
> employee's "language" and "how he speaks" and that he is difficult to understand, and
> noting that "accent and national origin are inextricably intertwined").
>
> . . .
>
> That [the supervisor] fixed upon [plaintiff's] accent as the subject of ridicule provides
> evidence that he targeted her because she is foreign-born. A rational jury could conclude
> that receiving cleaning duties on a daily basis, and having her accent belittled "every
> morning" for several months, amounted to sufficiently frequent harassment of Plaintiff to
> qualify as "pervasive."

Costantin, 2009 WL 3053851, at *20-21.

Here, this Court concludes that Plaintiff has offered sufficient evidence to raise a

material issue of fact as to whether Plaintiff was subjected to a hostile work environment based

on her hearing disability and national origin. A reasonable jury could conclude that Quinones'

disability-based and national origin-based remarks about Plaintiff were "sufficiently continuous

and concerted to have altered the conditions of her working environment.'" Alfano, 294 F.3d at

374. Moreover, Quinones' remarks about Plaintiff's deafness and accent address closely related

conditions, such that one "form[] of harassment . . . exacerbate[d] . . . the other." Donahue, 208

F. Supp. 3d at 517. Because "'the existence of . . . a hostile work environment' is 'a mixed

question of law and fact,'" Boggs, 286 F. Supp. 2d at 297 (quoting Richardson v. New York

37

State Dept. Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999)), "[s]uch mixed questions are especially well-suited for jury determination." Id.

Plaintiff has not offered sufficient evidence to demonstrate a hostile work environment premised on gender, however. Plaintiff testified that neither of her supervisors made any offensive comments about her gender, except to say that because she was a woman, "they would rather have [her] see women patients" instead of her male colleagues. (See Def. R. 56.1 Appx., Ex.1 (Pltf. Dep.) (Dkt. No. 49-2) at 38) These comments are not sufficient to create a hostile work environment based on gender.[13]

Plaintiff has likewise not offered sufficient evidence to demonstrate a hostile work environment premised on race. While "claims based on race and national origin 'may substantially overlap or even be indistinguishable depending on the specific facts of a case[,]'" Vill. of Freeport v. Barrella, 814 F.3d 594, 607 (2d Cir. 2016) (quoting Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003)), this is not that case. Quinones and Arce-Tomale – who are both Hispanic – did not disparage Plaintiff based on her race. Instead, Quinones' alleged ridicule of Plaintiff was tied to her status as an immigrant from Ecuador and her accent as an immigrant from Ecuador.

For the reasons set forth above, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claims under Title VII, the ADA, and the NYSHRL to the extent those claims are premised on gender and race. Defendant's motion as to Plaintiff's hostile work environment claims will otherwise be denied.

---

[13] As noted above, Plaintiff testified at her deposition that – after her August 6, 2014 termination – Quinones said, "[n]ow I know why your husband hit you." (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 167) This alleged comment, while highly reprehensible, occurred after the Hospital had terminated Plaintiff's employment. As such, it does not constitute evidence of a gender-based hostile work environment.

### 3. NYCHRL Claims

As noted above, the NYCHRL does not distinguish between disparate treatment and hostile work environment claims, and requires a plaintiff "only [to] show differential treatment – that she is treated 'less well' – because of a discriminatory intent." Mihalik, 715 F.3d at 110. For the reasons set forth above, a reasonable jury could conclude that Plaintiff was treated "less well" because of her disability and national origin. See Holness v. Nat'l Mobile Television, Inc., No. 09 Civ. 2601 (KAM) (RML), 2011 WL 1085167, at *2 (E.D.N.Y. Mar. 21, 2011) ("[T]he court need not determine precisely how the NYCHRL claim must be analyzed because if a plaintiff satisfies his burden under Title VII[] . . . and NYSHRL, then a fortiori he satisfies his burden under the more liberal NYCHRL framework."). However, for the reasons set forth above, Plaintiff has not offered sufficient evidence to demonstrate that she was treated "less well" because of her gender and race.

Accordingly, as to Plaintiff's discrimination claims under the NYCHRL, Defendant's motion for summary judgment will be granted as to the gender and race-based claims, but denied as to the claims based on disability and national origin.

### C. Retaliation Claims

Plaintiff asserts claims for retaliation under the NYSHRL and New York Whistleblower Law, Labor Law §§ 740 and 741.[14]   (See Cmplt. (Dkt. No. 5) ¶¶ 88-96)

---

[14]   The Complaint does not include claims for retaliation under Title VII, the ADA, and the NYCHRL.

1. **NYSHRL Retaliation Claim**

   a. **Applicable Law**

Retaliation claims under the NYSHRL "are also governed by the McDonnell Douglas burden-shifting framework." Nieblas-Love v. New York City Hous. Auth., 165 F. Supp. 3d 51, 69 (S.D.N.Y. 2016). "To establish a prima facie case of retaliation under the NYSHRL, as under federal employment anti-discrimination law, a plaintiff-employee must show that (1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action." Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 361-62 (S.D.N.Y. 2012) (citation and internal quotation marks omitted).

"A causal connection between the protected activity and the adverse action may be demonstrated by showing '(1) direct proof of retaliatory animus directed against the [p]laintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities.'" Elhanafy v. Shinseki, No. 10 Civ. 3192 (JG), 2012 WL 2122178, at *17 (E.D.N.Y. June 12, 2012) (quoting Ashok v. Barnhart, 289 F. Supp. 2d 305, 314 (E.D.N.Y. 2003)).

"Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a prima facie case." Aka v. Jacob K. Javits Convention Ctr. of N.Y., No. 09 Civ. 8195 (FM), 2011 WL 4549610, at *9 (S.D.N.Y. Sept. 30, 2011) (citing El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932-33 (2d Cir. 2010)). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse . . . action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be

'very close,'" however.  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (quoting

O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)).  "[D]istrict courts within

the Second Circuit have consistently held that the passage of two to three months between the

protected activity and the adverse employment action does not allow for an inference of

causation."  Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007)

(collecting cases).

### b.      Analysis

        At the outset, the Court notes that it appears that Plaintiff has abandoned her

claim for retaliation under the NYSHRL.  In the Complaint, Plaintiff alleges that she

"complained to her superiors about the illegal discrimination [that] she was subjected to," and

was "repeatedly retaliated against . . . as a result of her complaints."  (Cmplt. (Dkt. No. 5) ¶ 93)

In moving for summary judgment, Defendant contends that Plaintiff's "discrimination and

retaliation claims must be dismissed."  (Def. Moving Br. (Dkt. No. 50) at 18)  Defendant

provides citations for the legal standards applicable to retaliation claims under the NYSHRL, and

asserts that "there is no evidence that [Plaintiff] engaged in any protected activity, nor any

evidence of a causal connection to any retaliatory acts."  (Id. at 17 n.9, 18)  In her opposition to

Defendant's motion, however, Plaintiff does not address her NYSHRL retaliation claim.

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one

ground and the party opposing summary judgment fails to address the argument in any way."

Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (citing Douglas v. Victor

Capital Grp., 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)); see also Nzegwu v. Friedman, No. 10

Civ. 02994 (CBA) (RML), 2014 WL 1311428, at *1 n.2 (E.D.N.Y. Mar. 31, 2014) (deeming

claim abandoned where defendant moved for summary judgment on all claims and plaintiff

"failed to raise any arguments in support of . . . [that] claim"), aff'd, 605 Fed. Appx. 27 (2d Cir. 2015).

Even if Plaintiff had not abandoned her NYSHRL retaliation claim, she has not proffered sufficient evidence to create a material issue of fact as to that claim.  Plaintiff has offered evidence of only one protected activity – her November 25, 2013 written rebuttal to the November 20, 2013 verbal warning, in which she complains that CSP "Administrators ha[ve] continually harassed, retaliated and bullied me regarding my disability . . . by making inappropriate comments about my hearing disability and calling me 'Deaf' and/or embarrassing me during staff meetings."  (Goddard Decl., Ex. D (Rebuttal) (Dkt. No. 56-4) at 4)  Plaintiff has not argued that she engaged in any other protected activity regarding discriminatory conduct during her employment at the Hospital.[15]  (See Goddard Decl., Ex. D (Rebuttal) (Dkt. No. 56-4) at 4; see also Def. R. 56.1 Appx., Ex. 8 (Nov. 20, 2013 Verbal Warning) (Dkt. No. 49-10))

On March 5, 2014 – more than three months after Plaintiff had submitted her rebuttal – Arce-Tomale issued a written warning to Plaintiff, citing her low "levels of service" and performance issues.  (See Def. R. 56.1 Appx., Ex. 12 (Written Warning) (Dkt. No. 49-14) at 2-3)  "[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow

---

[15]  Indeed, at her deposition, Plaintiff was asked, "Did you ever complain to Human Resources about Edgardo [Quinones] calling you deaf?"  Plaintiff answered "No."  (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 72-73)

While Plaintiff has offered evidence that she complained about the Hospital's discriminatory practices during the hearing concerning her grievance (see Pltf. Aff. (Dkt. No. 56-7) ¶ 27; Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 179-180), that hearing took place after Plaintiff had been terminated.  Accordingly, Plaintiff cannot rely on her hearing testimony for purposes of demonstrating that she engaged in protected activity.  See Kishia v. Coca Cola Refreshments USA, Inc., No. 12 Civ. 234 (BMC), 2014 WL 5587349, at *20 (E.D.N.Y. Nov. 3, 2014) (retaliation claims premised on conduct that took place before plaintiff engaged in protected activity "fail as a matter of law").

42

for an inference of causation." Murray, 528 F. Supp. 2d at 275; see also Clark Cnty. Sch. Dist.,

532 U.S. at 273 (citing cases dismissing retaliation claims where there was a three-to-four month

gap between protected activity and adverse employment action); Chukwueze v. NYCERS, 891

F. Supp. 2d 443, 456-58 (S.D.N.Y. 2012) (no inference of causal connection where there was a

three-to-six-month gap between protected activity and adverse employment action). Because

more than three months passed between Plaintiff's alleged protected activity – her rebuttal – and

Arce-Tomale's written warning to Plaintiff, the necessary causal connection is absent.

Defendant's motion for summary judgment on Plaintiff's NYSHRL retaliation

claim will be granted.

## 2.   **New York State Whistleblower Retaliation Claim**

### a.   **Applicable Law**

Section 740 of the New York Labor Law provides that "[a]n employer shall not

take any retaliatory personnel action against an employee because such employee . . . discloses,

or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the

employer that is in violation of law, rule or regulation which violation creates and presents a

substantial and specific danger to the public health or safety." N.Y. Lab. Law § 740(2)(a).

Section 741 of the Labor Law offers additional protections to individuals

"perform[ing] health care services for and under the control or direction of any public or private

employer which provides health care services." N.Y. Lab. Law § 741(1)(a). Section 741(2)

provides that

> no employer shall take retaliatory action against any employee because the employee
> does any of the following:
>
> (a) discloses or threatens to disclose to a supervisor, or to a public body an activity,
> policy or practice of the employer or agent that the employee, in good faith,
> reasonably believes constitutes improper quality of patient care; or

> (b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

N.Y. Lab. Law § 741(2).

The "[w]histleblower cause of action incorporates policies, elements and remedies distinct from those of Title VII," Swanston v. Pataki, No. 97 Civ. 9406 (MJL) (KTD), 1999 WL 504905, at *5 (S.D.N.Y. July 15, 1999), and such claims are not analyzed under the McDonnell Douglas burden-shifting framework. "[T]o fall afoul of the [whistleblower] statute, [however,] the adverse action must be taken 'because' the employee engaged in protected activity. In other words, the whistleblower statute, like the anti-discrimination laws, requires some causal connection between an adverse personnel action and a report of dangerous activity." Varughese v. Mount Sinai Med. Ctr., No. 12 Civ. 8812 (CM) (JCF), 2015 WL 1499618, at *68 (S.D.N.Y. Mar. 27, 2015), aff'd, No. 15-1328, 2017 WL 2889483 (2d Cir. July 7, 2017).

### b.    **Analysis**

Defendant contends that Plaintiff's Section 740 and 741 claims "must be dismissed because there is no evidence that [Plaintiff] engaged in any protected activity, nor any evidence of a causal connection to any retaliatory acts." (Def. Moving Br. (Dkt. No. 50) at 18)

As to protected activity, there is evidence that Plaintiff objected to, and complained about, the Hospital's alleged policy of scheduling patients for individual therapy sessions – and not for other types of therapy – in an effort to increase Medicaid reimbursement. According to Plaintiff, after the New York State Office of Mental Health amended Part 599 in 2012 to provide for higher reimbursement for individual therapy sessions, Plaintiff's supervisors instructed her and other clinicians "not to do any more group sessions [or] . . . family sessions," and to instead schedule "as many individual sessions as possible, even if the patient would not

. . . benefit[] from an individual session or an individual session was not part of the patient's treatment plan." (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 75-76; Pltf. Aff. (Dkt. No. 56-7) ¶ 10)

    Plaintiff asserts that she became concerned about "performing the wrong sessions for patients just to allow the Hospital to [be] reimbursed more." (Pltf. Aff. (Dkt. No. 56-7) ¶ 14) Plaintiff testified that she objected to the new practice at "[a]lmost all of the [weekly] supervision[]" sessions with Arce-Tomale after 2012. Plaintiff also complained to Quinones, her union delegate, and her union representative about the Hospital's new practice. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 88-89, 97; Pltf. Aff. (Dkt. No. 56-7) ¶ 14) Acknowledging that Defendant denies that Plaintiff ever complained about its treatment and reimbursement practices (see Def. R. 56.1 Appx., Ex. 2 (Quinones Decl.) (Dkt. No. 49-3) at 111; id., Ex. 3 (Arce-Tomale Decl.) (Dkt. No. 49-4) at 89-90), Plaintiff's evidence is sufficient to raise a material issue of fact as to whether she made such complaints.

    As to whether the Hospital's alleged practices present a "substantial and specific danger to the public health and safety," "[c]ourts have consistently held that the statute addresses only traditional 'public health and safety' concerns." Villarin v. Rabbi Haskel Lookstein Sch., 96 A.D.3d 1, 5 (1st Dept. 2012). Accordingly, complaints about "financial wrongdoing" or "fraudulent billing" generally fall outside the ambit of the Whistleblower Law, see Chin v. Chinatown Manpower Project, No. 11 Civ. 5270 (CM), 2014 WL 2199424, at *14 (S.D.N.Y. May 23, 2014) (citing Remba v. Fed'n Employment & Guidance Serv., 559 N.E.2d 655 (N.Y. 1990)), unless a plaintiff demonstrates "that the illegal activity concomitantly creates 'substantial and specific danger to the public health and safety.'" Villarin, 96 A.D.3d at 5.

Here, there is evidence that Plaintiff complained to her supervisors about fraudulent billing and timekeeping practices, and about mental health treatment and therapy decisions being made on the basis of reimbursement rates. Plaintiff's alleged complaints concerning the latter issue are sufficient to implicate a "danger to public health and safety" within the meaning of Section 740, and to implicate "improper quality of patient care" within the meaning of Section 741, and thus qualify as protected activity under the Whistleblower Law. See Varughese, 2015 WL 1499618, at *67 (at summary judgment, finding protected activity element satisfied for Section 740 and 741 claims where plaintiff complained about medical practitioners "drinking on the job").

As to causal connection, there is evidence that – after the 2012 amendment to Part 599 – Plaintiff raised objections and concerns about the Hospital's new treatment practices in "[a]lmost all of the [weekly] supervision[]" sessions with Arce-Tomale. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 88-89, 97; Pltf. Aff. (Dkt. No. 56-7) ¶ 14) "'[R]esolv[ing] all ambiguities, and credit[ing] all factual inferences'" in favor of the non-movant – as this Court must do on summary judgment, see Spinelli, 579 F.3d at 166 – the Court concludes that a reasonable jury could infer that Plaintiff continued her objections to the Hospital's treatment practices in late 2013 and the first half of 2014, when Plaintiff became the target of disciplinary action. Although Defendant contends that it had legitimate, non-retaliatory reasons for the discipline it imposed – including Plaintiff's termination in August 2014 (see Def. Moving Br. (Dkt. No. 50) at 21-22; Def. Reply Br. (Dkt. No. 52) at 9-10) – there are material issues of fact concerning Defendant's intent that cannot be resolved as a matter of law. For example, Plaintiff has offered evidence that the time discrepancies which resulted in her termination "had never been a problem previously." (Pltf. Aff. (Dkt. No. 56-7) ¶¶ 19, 26)

46

Accordingly, Defendant's motion for summary judgment on Plaintiff's whistleblower retaliation claim under Labor Law §§ 740 and 741 will be denied.

### D.      FMLA Claims

#### 1.      Legal Standard

The Family and Medical Leave Act provides that

an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

(A)  Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B)  Because of the placement of a son or daughter with the employee for adoption or foster care.

(C)  In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D)  Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

(E)  Because of any qualifying exigency (as the Secretary shall, by regulation, determine) arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces.

29 U.S.C. § 2612(a)(1).

The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the statute.  29 U.S.C. § 2615(a)(1).  "The Second Circuit has recognized two types of FMLA claims – 'interference' claims and 'retaliation' claims."  Smith v. Westchester Cty., 769 F. Supp. 2d 448, 463 (S.D.N.Y. 2011) (citing Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam)). Plaintiff asserts both types of claims here.  (See Cmplt. (Dkt. No. 5) ¶¶ 99-107)

In order to prevail on a claim for FMLA interference, a plaintiff must establish "'(1) that she is an eligible employee under the FMLA; (2) that defendant is an employer as defined in [the] FMLA; (3) that she was entitled to leave under [the] FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which she was entitled under [the] FMLA.'" Rengan v. FX Direct Dealer, LLC, No. 15 Civ. 4137, 2017 WL 3382074, at *5 (S.D.N.Y. Aug. 4, 2017) (quoting Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004)).

"Unlike the interference claim, an FMLA retaliation claim is analyzed under the McDonnell Douglas burden shifting framework, requiring the [p]laintiff first to establish a prima facie case." Colon v. Fashion Inst. of Tech. (State Univ. of New York), 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013). "In order to make out a prima facie case of FMLA retaliation, a plaintiff must establish that '(1) [she] exercised rights protected under the FMLA; (2) [she] was qualified for [her] position; (3) [she] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.'" Fernandez v. Woodhull Med. & Mental Health Ctr., No. 14 Civ. 4191 (MKB), 2017 WL 3432037, at *7 (E.D.N.Y. Aug. 8, 2017) (quoting Potenza, 365 F.3d at 168). "Although the Second Circuit . . . has not . . . directly addressed whether employees must prove they were entitled to FMLA leave to satisfy the first element of a prima facie case [of retaliation], recent decisions in this District have uniformly held that proving entitlement is a necessary prerequisite to a valid FMLA retaliation claim." Kim v. Goldberg, Weprin, Finkel Goldstein, LLP, 862 F. Supp. 2d 311, 318 (S.D.N.Y. 2012) (collecting cases).

2.    **Analysis**

Defendant argues that Plaintiff's FMLA claims must be dismissed because, inter

alia, Plaintiff has not demonstrated that she was entitled to leave under the FMLA. (See Def.

Moving Br. (Dkt. No. 50) at 7 n.1; Def. Reply Br. (Dkt. No. 52) at 8 n.1)

It is undisputed that, in April 2014, Plaintiff requested leave to travel to Ecuador

in order to "'see' her ill brother" and her brother-in-law. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt.

No. 54) ¶ 119; Def. R.56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 126-129) According to

Plaintiff, her supervisors initially objected to Plaintiff's leave request, but later permitted her to

take approved vacation time – with pay – in order to travel to Ecuador. (Pltf. Resp. to Def. R.

56.1 Stmt. (Dkt. No. 54) ¶ 120; Def. R.56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 126,

129-130) Plaintiff nonetheless argues, however, that in "attempt[ing] to preclude Plaintiff from

taking time to be with her ill brother," Defendant violated her rights under the FMLA. (Pltf.

Opp. Br. (Dkt. No. 55) at 33)

Plaintiff's FMLA claims fail as a matter of law.  In order to prevail on an FMLA

interference claim, Plaintiff must show, inter alia, that "she was entitled to leave under [the]

FMLA." Rengan, 2017 WL 3382074, at *5.  As noted above, however, the FMLA only entitles

an eligible employee to take leave in order to "care for the spouse, or a son, daughter, or parent,

of the employee, if such spouse, son, daughter, or parent has a serious health condition." See 29

U.S.C. § 2612(a)(1) (emphasis added).  The FMLA does not grant employees the right to take

leave to care for – or to "see" – a sibling who has a serious health condition.  Because Plaintiff

has not demonstrated that she was entitled to leave under the FMLA, her FMLA interference

claim fails.  Moreover, because "proving entitlement is a necessary prerequisite to a valid FMLA

retaliation claim," Plaintiff's FMLA retaliation claim likewise fails. See Kim, 862 F. Supp. 2d at 318.

Defendant's motion for summary judgment on Plaintiff's FMLA interference and retaliation claims will be granted.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted in part and denied in part. Defendant is granted summary judgment on Plaintiff's (1) disparate treatment discrimination claims under Title VII, the ADA, the NYSHRL, and the NYCHRL; (2) hostile work environment claims under Title VII, the NYSHRL, and the NYCHRL, to the extent those claims are premised on gender or race; (3) NYSHRL retaliation claim; and (4) FMLA interference and retaliation claims. Plaintiff's claims for unpaid wages and overtime compensation under the FLSA and New York Labor Law are dismissed without prejudice, given Plaintiff's status as an opt-in plaintiff in Khansari v. St. Barnabas Hospital, No. 15 Civ. 1803 (PGG).[16] Defendant's summary judgment motion is otherwise denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 48).

The parties will proceed to trial on Plaintiff's remaining claims on **December 4, 2017 at 9:30 a.m.** The parties are directed to comply with this Court's Individual Rules

---

[16] Defendant argues that Plaintiff's claims for unpaid wages and overtime compensation should be dismissed with prejudice (Def. Reply Br. (Dkt. No. 52) at 5, 12-13), contending that Plaintiff has not met the requirements for voluntary dismissal under Fed. R. Civ. P. 41(a), and that she "should not be permitted to escape adjudication of [her unpaid wage and overtime compensation] claims by withdrawing them [at] the eleventh hour." (Id. at 13)

Voluntary dismissal may occur "by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Here, Plaintiff opted into the Khansari collective action on September 6, 2016 (No. 15 Civ. 1803 (Dkt. No. 76)), months before the briefing and filing of the instant motion for summary judgment. Defendant has cited no law suggesting that it would be appropriate for this Court to disregard Plaintiff's pre-existing opt-in notice. Accordingly, dismissal of Plaintiff's wage and overtime claims will be without prejudice.

concerning the preparation of a pre-trial order. The joint pre-trial order, motions in limine,

proposed voir dire, and requests to charge are due on November 6, 2017.  Responsive papers, if

any, are due on November 16, 2017.

Dated: New York, New York
     September 13, 2017          SO ORDERED.

Paul G. Gardephe
United States District Judge

51