UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| RUTH DUARTE, | **ECF** |
| Plaintiff, | |
| – against – | Case No.: |
| | <u>15-CV-6824(PGG)</u> |
| ST. BARNABAS HOSPITAL, | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW OF DEFENDANT ST. BARNABAS HOSPITAL IN SUPPORT OF ITS MOTION FOR A NEW TRIAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59

EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500
*Attorneys for Defendant*
*St. Barnabas Hospital*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF EVIDENCE.......................................................................................... 2

A.  Duarte's Conclusory Evidence Regarding Her Alleged "Garden Variety"
    Emotional Distress. ................................................................................................. 2

B.  The Hospital's Policy Against Discrimination and Harassment in its
    Workplace and Its Annual Mandatory Training. .................................................... 6

C.  Duarte Knew That She Could Report Alleged Discrimination to Human
    Resources and That She Would Not Suffer Any Retaliation for Doing So. ............ 9

D.  The Hospital Investigated Complaints of Discrimination Reported to
    Human Resources. .................................................................................................. 9

E.  Duarte's Failure to Follow the Reporting Requirements of the Hospital's
    Policy Against Harassment in the Workplace. ....................................................... 10

ARGUMENT .................................................................................................................... 12

I.  THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE
    JURY'S EMOTIONAL DISTRESS DAMAGES AWARD WAS
    EXCESSIVE. ..................................................................................................... 12

    A.  Applicable Law Governing The Right To A New Trial. ...................... 12

    B.  The Jury's Award for Duarte's "Garden Variety" Emotional
        Distress Damages Was Excessive ...................................................... 13

II.  THE JURY'S PUNITIVE DAMAGES AWARD WAS CONTRARY TO
    THE EVIDENCE AND SHOULD BE VACATED ENTIRELY OR, IN
    THE ALTERNATIVE, REDUCED AS EXCESSIVE. ...................................... 17

    A.  The Punitive Damages Award Should be Vacated as Contrary to
        the Evidence. ..................................................................................... 17

    B.  In the Alternative, the Punitive Damages Award Should be
        Reduced as Excessive. ...................................................................... 21

CONCLUSION................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allam v. Meyers*,
    906 F. Supp. 2d 274 (S.D.N.Y. 2012)...............................................................12, 23

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996)..............................................................................................21, 22

*Bouveng v. NYG Capital LLC*,
    175 F. Supp. 3d 280 (S.D.N.Y.  2016)........................................................... *passim*

*Broome v. Biondi*,
    17 F. Supp. 2d 211 (S.D.N.Y. 1997)......................................................................23

*Caravantes v. 53rd St. Partners, LLC*,
    No. 09 Civ. 7821, 2012 U.S. Dist. LEXIS 120182 (S.D.N.Y. Aug. 23, 2012) .....................13

*Cioffi v. New York Cmty. Bank*,
    465 F. Supp. 2d 202 (E.D.N.Y. 2006) ...................................................................23

*DeCurtis v. Upward Bound Int'l, Inc.*,
    No. 09 Civ. 5378, 2011 U.S. Dist. LEXIS 114001 (S.D.N.Y. Sept. 27, 2011) ...................24

*DLC Mgmt. Corp. v. Town of Hyde Park*,
    163 F.3d 124 (2d Cir. 1998)..................................................................................18

*Gasperini v. Center for Humanities, Inc.*,
    518 U.S. 415 (1996).............................................................................................13

*Greenbaum v. Handelsbanken*,
    67 F. Supp. 228 (S.D.N.Y. 1999) ..........................................................................22

*Iannone v. Frederic R. Harris, Inc.*,
    941 F. Supp. 403 (S.D.N.Y. 1996) ....................................................................13, 23

*Kim v. Dial Serv. Int'l*,
    No. 96 Civ. 3327, 1997 U.S. Dist. LEXIS 12544 (S.D.N.Y. Aug. 11, 1997) .............23, 24, 25

*Koch v. Greenberg*,
    14 F. Supp. 3d 247 (S.D.N.Y. 2014).......................................................................23

*Lee v. Edwards*,
    101 F.3d 805 (2d Cir. 1996)..................................................................................22

Firm:45489646

*Lore v. City of Syracuse*,
    670 F.3d 127 (2d Cir. 2012)..................................................................................13

*MacMillan v. Millenium Broadway Hotel*,
    873 F. Supp. 2d 546 (S.D.N.Y. 2012).............................................................. *passim*

*Manley v. AmBase Corp.*,
    337 F.3d 237 (2d Cir. 2003)..................................................................................18

*McIntosh v. Irving Trust Co.*,
    887 F. Supp. 662 (S.D.N.Y. 1995) .................................................................15, 16

*Payne v. Jones*,
    711 F.3d 85 (2d Cir. 2012)....................................................................................21

*Reiter v. Metro. Transp. Auth. of NY*,
    No. 01 Civ. 2762, 2003 U.S. Dist. LEXIS 17391 (S.D.N.Y. Sept. 30, 2003) ...................14, 15

*Shukla v. Sharma*,
    No. 07 Civ. 2972, 2012 U.S. Dist. LEXIS 18392 (E.D.N.Y. Feb. 14, 2012) .........................23

*Song v. Ives Labs., Inc.*,
    957 F.2d 1041 (2d Cir. 1992)................................................................................18

*Stampf v. Long Island R. Co.*,
    761 F.3d 192 (2d Cir. 2014)..................................................................................12

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)..............................................................................................23

*Thomas v. iStar Fin., Inc.*,
    652 F.3d 141 (2d Cir. 2010)..................................................................................23

*Tingley Sys., Inc. v. Norse Sys., Inc.*,
    49 F.3d 93 (2d Cir. 1995)......................................................................................13

**Statutes**

Americans with Disabilities Act, 42 U.S.C. § 12101 ..................................................1

N.Y.C. Admin.  Code § 8-101 et seq.  ........................................................................1

N.Y.C. Admin. Code § 8-126(a)................................................................................23

N.Y. State Exec. Law § 296......................................................................................1

iii

## PRELIMINARY STATEMENT

At the conclusion of the trial in this case, the jury entered a verdict against defendant St. Barnabas Hospital (the "Hospital") and in favor of plaintiff Ruth Duarte on a single count of disability-based hostile work environment under the New York City Human Rights Law, Admin. Code of the City of New York § 8-101 *et seq.* (the "NYCHRL").   (Trial Transcript ("Tr." 1003:16-21)).[1]   The jury awarded Duarte $624,000 for emotional distress damages and $750,000 in punitive damages.   (Tr. 1004:15 to 1005:5).   The Hospital now moves, pursuant to Federal Rule of Civil Procedure 59, for a new trial.

A new trial should be ordered because the jury's compensatory damages award was excessive, as it bears no relationship whatsoever to the evidence.   Duarte presented no evidence that she suffered any debilitating and permanent (or even temporary) alterations of her lifestyle, substantial harm, or lasting physical symptoms associated with her claimed emotional distress, or that she required or sought psychiatric or psychological treatment.   Instead, she testified in an entirely conclusory fashion about having unspecified "anxiety" from time to time – without providing any details about it.   She never missed a day of work at the Hospital because of the alleged unlawful conduct, and never even missed a meeting where she claimed that it occurred. Rosa Torres, Duarte's "close" friend and former co-worker, offered equally conclusory observations, and admitted on cross-examination that she did not "console" Duarte during Duarte's last year of employment with the Hospital.   On this record, this Court – as it and other

---

[1] At the beginning of the fourth day of trial, Duarte's counsel abruptly voluntarily dismissed Duarte's claims for disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101, and the New York State Human Rights Law, New York State Exec. Law § 296 (the "NYSHRL"), and her national origin discrimination claims under the NYSHRL and the NYCHRL.   Prior to the resumption of testimony, the Court informed the jury "that the only claim in the case now on a moving-forward basis is the New York City Human Rights Law claim which is based on disability discrimination."   (Tr. 611:3-7).   Later, the Court reminded the jury that "there is no longer any issue about national origin or pronunciation in the case.   It is strictly disability discrimination under the New York City Human Rights Law."   (Tr. 615:12-16).   The late withdrawal of these claims – coming after its witnesses had testified – ultimately prejudiced the Hospital.   *See* n.11, *infra.*

courts have done where a jury's award of compensatory damages was not supported by the evidence – should order a new trial or remit the award to an amount at the low end of the range of what the Second Circuit has described as "garden variety" emotional distress, which is $30,000.

The Hospital also moves, pursuant to Fed. R. Civ. P. 59(a)(1)(A), for an Order vacating the punitive damages award because it is a miscarriage of justice or, in the alternative, granting a remittitur to a substantially reduced punitive damages award. As discussed below, the jury failed to follow the court's instructions on the law, as it completely disregarded the evidence that (1) the Hospital maintained policies and procedures to prevent, detect, and report discrimination and harassment, (2) conducted annual mandatory training, (3) investigated all internal complaints reported to its Human Resources department, and (4) thereby made a good faith effort to enforce these policies and procedures. But if the Court does not vacate the punitive damages award, then it should order a new trial on punitive damages or remit the award to, at most, the same 1:1.2 ratio between compensatory and punitive damages in the verdict arrived at by the jury (*after* the Court remits the compensatory damages award).

## STATEMENT OF EVIDENCE

### A.  Duarte's Conclusory Evidence Regarding Her Alleged "Garden Variety" Emotional Distress.

In responding to the questions of her counsel, Duarte attempted to present a year-by-year account of her alleged emotional distress. She did so in the most conclusory of terms, in short, non-specific responses without providing any detailed descriptions. In 2008, the year that Duarte testified that she started using a hearing amplifier to weekly staff meetings, she claimed that

Firm:45489646

Edgardo Quinones, the Division Director of DCCS[2], told her "I want you to hear what I am going to say," and "I don't want to hear later that you didn't hear." (Tr. 766:9-12).[3] She further testified that when doing so, Quinones "hit the table with his hands." (Tr. 766:24 to 767:5)[4]. When her counsel asked if she had "a reaction to that physically" in 2008, she replied that she "cried," "remain[ed] silent," and "avoid[ed] asking questions." (Tr. 767:11-16). Duarte offered no further evidence of any emotional distress that she allegedly suffered in 2008 – and she was out of work for "approximately 3 ½ months" in 2008 for unrelated reasons. (PX-24 at SBH000325).

As for 2009, Duarte testified that on a Tuesday evening (the night before weekly staff meetings), she "was worried and unable to sleep, thinking that Mr. Quinones come on Wednesday to the unit." (Tr. 865:2-5). She added that "Wednesdays were the days where I was more anxious at work." (Tr. 865:5-6). When asked how "frequently [she] experience[d] the anxiety … in 2009," Duarte replied "[e]very week." (Tr. 865:15-17). But she then conceded that she was on a leave of absence from work for most of the last three months of 2009. (Tr. 877:15-17). Duarte offered no further evidence of any emotional distress that she allegedly suffered in 2009.

With respect to 2010, Duarte did not work at all until the middle of August (she was on an unrelated medical leave through August 16). (*Id.*). The totality of her testimony regarding

---

[2] DCCS is an agency of the Hospital that provides mental health services to children and their families in the Bronx regardless of their ability to pay. (Tr. 229:4-11).

[3] The Hospital no longer employs Quinones, as he left the Hospital in December 2016, almost two years after being moved from the Division Director role to another role within the Hospital. (Tr. 228:2-14).

[4] Duarte never testified that Quinones "hit the table" other than in 2008. When asked if Quinones "gesture[d] at all in 2010 when he made these statements," she replied "yes"; but when asked to describe the "gesture," she answered "[t]he same thing that I described before" and did not make clear what that was. (Tr. 773:22 to 774:1).

3

the "anxiety" she claimed to have experienced in 2010 – without accounting for the fact that she

was out of work for much of the year – consisted of the following:

> Q.    Did you have anxiety in 2010?
>
> A.    Yes, I did.
>
> Q.    When?
>
> A.    The same, Tuesday night and Wednesday the whole day.

(Tr. 866:3-6).  Without providing any detail for the few months that she worked in 2010, Duarte

testified that she felt "sad" and "angry" when Quinones "responded to" her; and she "felt guilty

of having this impairment."  (Tr. 774:2-7).  When asked if she could describe anything "more

personal," Duarte answered, "No, no."  (Tr. 774:9-11).  Duarte offered no further evidence of

any emotional distress that she allegedly suffered in 2010.

     As for any "anxiety" she had in 2011, Duarte essentially repeated what she had said about

the prior year, referring to the "anxiety" as the "[t]he same."  (Tr. 866:7-10).  She merely added

that she "started to feel very anxious, nervous," and "[s]ometimes [she] couldn't sleep the night

before [the staff meeting]"; she also mentioned feeling "sad" and having "headaches" and

"stomachache[s]," without describing their frequency or severity.  (Tr. 775:5-15).  As a social

worker, she self-diagnosed herself as having "panic attacks," but when asked to describe them,

she repeated what she had already said, only referring again to being "anxious" and not sleeping

"the night before."  (Tr. 775:18 to 776:2).  Duarte offered no further evidence of any emotional

distress that she allegedly suffered in 2011.

     Duarte's testimony about her claimed "anxiety" in 2012 and 2013 was likewise

remarkably short and conclusory:

> Q.    Did you have anxiety in 2012?
>
> A.    Yes, I did.

Q.      When?

A.      The same.

Q.      2013, did you have anxiety?

A.      Yes, I did.

Q.      When?

A.      Tuesday night, Wednesday the whole day, and Thursday
        morning.

(Tr. 866:12-20).  Duarte offered no further evidence of any emotional distress that she allegedly

suffered in 2012 and 2013 – and in 2013, she "was out on leave [for unrelated reasons] on two

occasions[,] one for a medical leave and the other for worker's compensation…."  (DX-L at

SHB000285).

As for 2014, Duarte testified that the "anxiety" allegedly "increased," which meant that

"sometimes Thursday the whole day [she] was anxious."  (Tr. 866:21-25).  Thus, it was not the

severity of the "anxiety" that increased, but rather the duration that increased "sometimes" by a

few hours on a Thursday.  Duarte offered no further evidence of any emotional distress that she

allegedly suffered in 2014 (her employment ended in August 2014).

When asked if she was currently "experiencing any symptoms associated with your

experience … at St. Barnabas Hospital," she gave the same vague answers as before, reporting

"poor sleeping, lower self-esteem, lack of confidence sometimes, feeling less or uncapable [sic]

to do what [she] did before coming to St. Barnabas…."  (Tr. 870:9 to 871:3).[5]  Duarte did not

seek professional therapy or medical treatment; instead she merely "implement[ed] coping

skills" – but provided no testimony explaining what that meant.  (Tr. 871:7-14).  Duarte offered

---

[5] Duarte also testified that she was "doubting about being able to speak English and being understood" (Tr. 871:3-4), but given the Court's prior instruction to the jury that those issues were no longer in the case (see n.1, supra), this testimony could not provide a basis for awarding emotional distress damages.

Firm:45489646

no evidence that she had been prescribed or taken any medication to help her deal with her alleged symptoms (not even an aspirin for headaches or a dose of Pepto-Bismol for her stomachaches).

Rosa Torres' testimony regarding Duarte's emotional distress was equally conclusory, and so minimal as to add no probative evidence on these claimed damages. Torres testified that Duarte "was appearing nervous" before staff meetings and "would just grab [Torres'] hand and say, well, hopefully everything goes well." (Tr. 613:15 to 614:3). According to Torres, "[a]fter the meetings, if the meeting went bad," Duarte "would leave crying." (Tr. 616:19-21). In the same vague and conclusory language used by Duarte, Torres testified that she and Duarte "came together during lunchtime and [they] would speak about it," and she "would comfort [Duarte], talk to her … during our lunch hour." (Tr. 617:18-23). But Torres admitted that she stopped having lunch with Duarte a year before Duarte's termination from employment in August 2014. (Tr. 642:23 to 644:1).

## B. The Hospital's Policy Against Discrimination and Harassment in its Workplace and Its Annual Mandatory Training.

The record contained substantial evidence that the Hospital – which provides services to patients in the Bronx regardless of their ability to pay – was committed to creating an environment free of disability discrimination during Duarte's employment. (Tr. 97:9-11, 228:22 to 229:11).[6] The Hospital's Employee Handbook set forth the Harassment and Discrimination policy, which stated in relevant part, as follows:

> *St. Barnabas is committed to creating a work environment free of discrimination or harassment.* Discrimination against and/or harassment of any employee based on … disability is illegal and strictly prohibited. *Every employee is responsible for complying with this policy. . . .*

---

[6] The mission of DCCS, which was part of the Hospital, was to provide quality and competent services to patients in the mental health clinic. (Tr. 229:12-25).

Firm:45489646

> If you believe that you have been subject to discrimination or harassment, we encourage you to promptly notify the offender, particularly if such individual is a co-worker, that his or her behavior is unwelcome and inappropriate and that you want the behavior to stop immediately.  However, *if* you are uncomfortable confronting the alleged wrongdoer for any reason, such as because (i) he or she is a supervisor or high level member of management; (ii) the severity of the conduct or (iii) *informal, direct communication was unsuccessful, the St. Barnabas [sic] requires that you promptly report the conduct, either verbally or in writing to management, as follows*: Keith Wolf, Ext. 6500 or Deborah Schneider, Ext. 5813; however, if you are uncomfortable discussing the matter with either of these individuals for any reason, including because either of them is believed to be involved in the conduct, you must instead report the matter to the individual who runs your specific department.
>
> *Any St. Barnabas supervisor or manager who receives a report or complaint of discrimination or harassment must report that alleged offence immediately* to Keith Wolf, Ext. 6500 or Deborah Schneider, Ext. 5813, and await instruction.
>
> *All complaints will be investigated promptly and thoroughly and, if appropriate, corrective action will be taken.*

(PX-7 at SBH000900-01) (Emphasis added).  Thus, if an employee's communication of a complaint to her supervisor was unsuccessful, she was *required* to promptly report the alleged discrimination or harassment to Wolf or Schneider.  (*Id.*).

The record also established that the Hospital made good faith efforts to implement and enforce the policies and procedures set forth in the Employee Handbook.  Quinones testified that he received annual training on the Hospital's policy prohibiting discrimination and harassment in the workplace.  (Tr. 272:21 to 273:7).  Likewise, Milagros Arce-Tomala, Assistant Director of DCCS and Duarte's supervisor, testified that the Hospital *required* its employees to receive annual training on its harassment and discrimination policy – and that she (Arce-Tomala) had received the training on at least twenty different occasions:

> Q.  *SBH employees are … also required to have ongoing harassment and discrimination training, right?*

7

A.      *Yes.*

Q.      And you're required to have that training, right?

A.      Yes.

Q.      It's annual training, isn't it?

A.      Yes.

Q.      *That means that every year you get retrained on discrimination and harassment, right?*

A.      *Yes.*

****** 

Q.      *Is it fair to say that you have been trained 20 or 21 times on harassment and discrimination at St. Barnabas?*

A.      *Yes.*

(Tr. 318:7-25) (Emphasis added).   The training involved a mandatory, annual review of sensitivity training videos that educated employees about dealing with people within various protected categories, including people with disabilities.   (Tr. 435:15 to 438:4).   Arce-Tomala organized the annual training for the Clinicians at DCCS, including Duarte, and made sure that they attended it.   (Tr. 538:12 to 539:6).

Duarte testified that the Hospital *required* her and her co-workers to view these training videos on an annual basis: "[w]e were told that *we needed to see it on a yearly basis*…." (Tr. 862:21 to 863:9)(Emphasis added).   She also certified annually that she had "completed the following annual mandatory in-service training during the last 12 months," including on harassment and discrimination. (Tr. 878:12-16, 879:2-4, 880:16 to 881:22, 885:4-20, 886:9 to 887:2; DX-L; PX-12, 17, 18 & 25).   While Duarte admitted signing the certifications, she testified that she did not always read them before signing; she never denied, however, that she

was *required* to watch the training videos or testified that she did not watch them.  (Tr. 879:14 to 880:2, 881:17-22, 887:3-5).

## C.  Duarte Knew That She Could Report Alleged Discrimination to Human Resources and That She Would Not Suffer Any Retaliation for Doing So.

Duarte testified that when she began working at the Hospital, she "read and understood the St. Barnabas policy concerning all forms of discrimination and harassment and agreed to comply with it."   (Tr. 890:18-22).   She also testified that she had signed a written acknowledgment of receipt of the Hospital's policy and confirming that she had read and understood the policy and agreed to comply with it.  (Tr. 889:14 to 890:17; DX-E).

Throughout her employment, Duarte knew that she could report to Human Resources any concerns she had with the workplace; in fact, she knew that Torres had made a complaint to Human Resources in December 2013 on behalf of both them (but having nothing to do with alleged comments about Duarte's hearing).  (Tr. 897:8 to 898:4).[7]  Additionally, Duarte, together with other Clinicians, submitted a December 2012 written complaint to the Hospital's Human Resources Department regarding a number of workplace issues (but again mentioned nothing related to alleged comments about Duarte's hearing even though Torres testified that it contained individual grievances).  (Tr. 685:17 to 690:24, 697:7 to 698:6).  Duarte also understood that the Hospital would *not* take any retaliatory action against her for reporting alleged discrimination or harassment.  (Tr. 845:18 to 846:9).

## D.  The Hospital Investigated Complaints of Discrimination Reported to Human Resources.

Wayne Webb, the Hospital's Assistant Vice President of Human Resources, testified that the Hospital *required* a supervisor to forward to Human Resources "a complaint of

---

[7] Duarte never hesitated to complain about anything that she considered a personal slight or unfair treatment. (Tr. 874:7-14, 876:18 to 877:5, 882:6-19, 887:6 to 888:24).

Firm:45489646

discrimination" that he or she received.   (Tr. 106:10-18).   He also testified that once the complaint was *received* by Human Resources, it would be promptly investigated.   (Tr. 106:19-20).   Both Quinones and Arce-Tomala understood that if they received a complaint of discrimination from an employee, they were *required* to bring that complaint to Human Resources.   (Tr. 206:19-25, 322:8-24).

### E.  Duarte's Failure to Follow the Reporting Requirements of the Hospital's Policy Against Harassment in the Workplace.

According to Duarte, she put her "complaint" of discrimination in a "rebuttal" to a disciplinary notice that she had received on November 20, 2013.   (Tr. 799:12-25, 801:25 to 802:6; PX-15).   The events leading to the discipline occurred on November 13, 2013 during a weekly supervision meeting between Duarte and Arce-Tomala; the notes for that meeting recorded that Duarte told Arce-Tomala that "one day you will lose your power," and Duarte wrote in the same notes that Arce-Tomala took the comment "out of context."   (Tr. 899:4-14, 903:10-24, 904:17 to 905:5, 907:3-8; DX-W).

A week later, Duarte was issued an Official Warning Notice prepared by Arce-Tomala, which reprimanded Duarte for the comment that she had made to Arce-Tomala ("one day you will lose your power"); the Warning further stated Duarte needed to "monitor and improve [her] communication with staff, patients, and administrators at the program as it is unprofessional and violates hospital policy." (Tr. 509:13 to 510:1, 797:7-9; PX-14).[8] Arce-Tomala was present when the Official Warning Notice was issued to Duarte on November 20. (Tr. 512:3-25, 514:19-20).

In response to the Warning, Duarte prepared what she labeled as "a rebuttal to a Discipline on 11/20/13," which she testified she "gave" to Arce-Tomala without indicating that

---

[8] The Official Warning Notice also referred to Duarte's most recent performance appraisal, which was prepared by Arce-Tomala, and stated: "… Ms. Duarte has been informed of staff and client complaints regarding how she communicates with them in an inappropriate manner.   During supervision Ms. Duarte has been encouraged to exercise more tactful ways of communicating."  (DX-L at SBH000285).

she said anything about it or even intimating that she was complaining about discrimination.  (Tr. 751:1-3, 800:4-13; PX-15).  Duarte had prepared the "rebuttal" on November 25, within five days of the disciplinary meeting.  (Tr. 907:14-19, 921:24 to 922:5).

Duarte devoted most of the single-spaced "rebuttal" to objecting to the contents of the Official Warning Notice and setting forth her detailed version of the November 13 supervision meeting.  (Tr. 908:8 to 912:2).  In the last paragraph of the "rebuttal," without calling any attention to it, Duarte addressed *an entirely different subject*, writing that she "would like to take this opportunity to express my feelings about many times DCCS Administrators had continually harassed, retaliated and bullied me regarding my disability and my work ethic by making inappropriate comments about my hearing disability and calling me "Deaf" and/or embarrassing me during staff meetings."  (Tr. 912:3-5; PX-15).[9]  Arce-Tomala testified that she did not recall seeing the "rebuttal" before her deposition, but if she had become aware that Quinones made an inappropriate comment about Duarte's hearing, she "would personally have been insulted by it" because she had family members who used hearing aids and would have spoken to Quinones to tell him to stop making such comments; she also would have reported the situation to Human Resources.  (Tr. 522:20-22, 527:7-21, 539:17 to 540:18, 543:25 to 544:16, 544:22 to 545:5).

Duarte never followed up with Human Resources about the "complaint" in the "rebuttal" or its last paragraph; she simply waited for an investigation.  (Tr. 803:6-11).  By doing nothing, Duarte failed to comply with the Hospital's policy, which *required* her to report the alleged discrimination or harassment to Wolf or Schneider if her prior communication to her supervisor had been unsuccessful.  (PX-7 at SBH000901).

---

[9] At trial, Duarte admitted that her allegation in the "rebuttal" that "DCCS Administrators" had called her "deaf" was false, as Arce-Milagros had never made any inappropriate comments about her hearing.  (Tr. 899:1-3).

Firm:45489646

In the circumstances surrounding the "rebuttal," it should not be surprising – and was entirely reasonable – that the "rebuttal" document never made its way to the Hospital's Human Resources department as a "complaint" that would have been investigated under the Hospital's policy.[10]  If Arce-Tomala had started to read the "rebuttal," then she would have seen that it addressed the weekly supervision meeting of November 13 and the resulting discipline on November 20, in which she was directly involved and had complete knowledge – and there would have been no reason for her to read any further.  Thus, Arce-Tomala would likely have never reached the "complaint" in the last paragraph, and that conclusion is supported by the fact that if she had reached the last paragraph, as noted above, she would have sent it to the Human Resources department as she had been trained to do.

## ARGUMENT

I.   THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE JURY'S EMOTIONAL DISTRESS DAMAGES AWARD WAS EXCESSIVE.

### A.  Applicable Law Governing The Right To A New Trial.

Under New York law, "a monetary judgment is excessive 'if it deviates materially from what would be reasonable compensation.'" *Allam v. Meyers*, 906 F. Supp. 2d 274, 286 (S.D.N.Y. 2012).  "To determine whether a jury award is excessive within the meaning of § 5501(c), New York courts compare it with awards in similar cases."  *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (citations omitted).

It is well established that the trial judge enjoys "discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence," and that "[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or

---

[10] The "rebuttal" was not in Duarte's personnel file maintained in the Hospital's Human Resources Department. (Tr. 134:11-13, 146:25 to 147:2, 152:6-24; PX-15 (SBH001057)).  Further, no one from Human Resources ever notified Arce-Tomala that the "rebuttal" had been received by Human Resources. (Tr. 528:17-20).

conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Lore v. City of Syracuse*, 670 F.3d 127, 176-77 (2d Cir. 2012) (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (internal quotation marks omitted)).  If the Court concludes that a remittitur is warranted, then it must offer the plaintiff an option between accepting the remittitur or submitting to a new trial.  *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995); *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 411 (S.D.N.Y. 1996).

Based on the evidence adduced at trial, it is plain that the size of the compensatory damages award was excessive, and motivated by sympathy for Duarte or other inappropriate considerations rather than any actual evidence of harm she may have suffered.

### B. The Jury's Award for Duarte's "Garden Variety" Emotional Distress Damages Was Excessive.

As this Court has recognized, in "garden variety" emotional claims, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury."  *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 328 (S.D.N.Y. 2016) (quoting *Caravantes v. 53rd St. Partners, LLC*, No. 09 Civ. 7821, 2012 U.S. Dist. LEXIS 120182, at *71 (S.D.N.Y. Aug. 23, 2012)); *MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012) (same).  "Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration."  *Id.*  Further, as this Court has previously stated, "garden variety" emotional distress claims generally merit awards in the range of $30,000 to $125,000.  *Id.*  Duarte's alleged emotional distress falls squarely in the category of "garden variety" damages.

This Court's decision in *MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546 (S.D.N.Y. 2012), where Your Honor granted the defendant's motion for a new trial following a

jury award of $125,000 for emotional distress damages on the plaintiff's claims of a race-based hostile work environment under Title VII and the NYCHRL, is instructive.  As the Court noted, the plaintiff in *MacMillan* offered "very little evidence of emotional distress."  *Id.* at 561.  He testified that his work environment had been "horrible," but there was no evidence that the plaintiff "ever sought medical or psychological treatment, that he missed work, that he had any difficulty sleeping, that he lost his appetite, or that his alleged emotional distress had any physical manifestation or disrupted other aspects of his daily life." *Id.*  Indeed, Your Honor noted that the plaintiff "remained at work throughout the period of alleged discriminatory acts."  *Id.* The plaintiff's daughter's testimony was "only marginally more descriptive," as she testified that her father "wasn't as happy anymore" and "wasn't his same self." *Id.*  Given the "conclusory nature of [the plaintiff's] and his daughter's testimony, and lack of any supporting detail or specific examples of emotional injuries suffered by [the plaintiff]," the Court found "the evidence warrants only a modest award of emotional distress damages."  *Id.* at 562.  As a result, the Court ordered a new trial unless the plaintiff agreed to a remitter reducing the emotional distress award from $125,000 to $30,000.  *Id.* at 563.

Similarly, in *Reiter v. Metro. Transp. Auth. of N.Y.*, No. 01 Civ. 2762, 2003 U.S. Dist. LEXIS 17391 (S.D.N.Y. Sept. 30, 2003) (Koeltl, J.), the jury returned a verdict in favor of the plaintiff under Title VII, finding that he had been retaliated against (in the form of verbal reprimands, negative performance reviews and a demotion) because his wife, who was also an employee of the defendant, had filed a discrimination charge. *Id.* at *3-4. The jury awarded $140,000 in compensatory damages and the defendant moved for a new trial or remittitur. At trial, the plaintiff testified that as a result of the defendant's actions, he felt "'stressed,' 'nervous,' 'on edge,' and 'clammy,' but he also admitted that he never had trouble eating or sleeping and he

never sought medical or psychological help." *Id.* at *27.  The court observed that the plaintiff "did not detail the severity, duration, or consequences of his mental suffering, which were relatively minor on all fronts."  *Id.* at *33.  Additionally, the evidence of the plaintiff's mental injury was "largely vague and conclusory testimony, without any evidence of medical treatment, and there [were] no signs that his demotion disrupted his family or personal life."  *Id.*  Finally, the court noted that the plaintiff had not lost his job or his income, "factors that increase the level of humiliation and anxiety connected with discrimination."  *Id.*  at *29-30. Accordingly, the court concluded that the case fell at the low end of the spectrum of "garden variety" claims and ordered a new trial unless the plaintiff accepted a remittitur reducing the emotional distress damages from $140,000 to $10,000.  *Id.* at *33-34.

In *McIntosh v. Irving Trust Co.*, 887 F. Supp. 662 (S.D.N.Y. 1995), the jury awarded the plaintiff $219,428 in compensatory damages for emotional distress on his claim that he had been terminated in retaliation for complaining about discrimination. To establish his alleged emotional distress, the plaintiff had testified that he "was devastated," "angry," "depressed," "embarrassed" and "ashamed" after being terminated. *Id.* at 664.  He also testified that the mistreatment he suffered while still employed resulted in physical ailments, specifically, that "he felt weakness in his legs, had stomach cramps, had chest pains and felt 'beaten down' mentally." *Id.*  He offered no testimony, however, that his life activities were curtailed in any way.  *Id.* at 664-65.  He did not offer any detail regarding the magnitude of his mental distress, and did not seek any medical or psychological help except for one visit to a doctor while he was still employed, nor did he seek professional assistance during the years between his termination and the trial. *Id.*  After comparing the evidence to damages awards in other cases, the court concluded that the evidence of "highly subjective feelings" fell far short, both quantitatively and qualitatively, of cases in

15

which damages at the level awarded by the jury were sustained.  *Id*. at 664, 667. Accordingly, the court granted the motion for a new trial unless the plaintiff agreed to a remittitur reducing the emotional distress damages award from $219,428 to $20,000.  *Id.* at 669.

Finally, this Court's opinion in *Bouveng*, 175 F. Supp. 3d 280, where a jury awarded $500,000 in emotional distress damages to the plaintiff on her *quid pro quo* sex harassment claims under the NYSHRL and the NYCHRL, is instructive because the conduct at issue was far more egregious than that here.  In *Bouveng*, the plaintiff had testified at trial about how she felt as a result of submitting to the sexual advances of the chief executive officer and sole owner of her employer. *Id.* at 296. On the employer's motion for a new trial, the Court considered the plaintiff's testimony as to how she felt after several sexual encounters with the CEO; she testified that she felt "used and weak."  *Id.*  She also testified that regarding her emotional distress suffered as a result of her termination, at which time the CEO had engaged in "screaming, use of profanity, and violent behavior."  *Id.* at 329.   While acknowledging that the CEO's behavior was "outrageous," the Court concluded that the plaintiff had described her emotional distress in "largely 'vague or conclusory terms, without relating either the severity or consequences of the injury' in a meaningful way."  *Id.*  Taking into account that the CEO's demands for sex "culminated in sexual intercourse," the Court ordered a new trial unless the plaintiff accepted a remittitur reducing the emotional distress award to $150,000.  *Id.* at 334.

As in these other emotional distress cases, Duarte offered testimony of highly subjective feelings in vague and conclusory terms, with no evidence of severity or consequences, specifically limited duration, no evidence of therapeutic assistance, and minimal corroborating testimony.  Duarte testified that she felt anxious, sad, angry, and nervous, and occasionally, prior to 2012, experienced headaches and stomachaches but offering no specificity or detail, including

whether they had any impact on her day-to-day activity.  She never missed a day of work because of Quinones's alleged behavior or even sought to be excused from a staff meeting where Quinones's words were allegedly spoken.  Duarte admitted that she did not seek professional medical or psychological assistance, and instead applied her own undefined coping mechanisms; this decision, by a trained therapist, is in itself evidence that Duarte recognized that she was suffering a low level of emotional distress that she could handle without professional assistance. Further, she offered no evidence of emotional distress in 2012, 2013 and 2014 – the last three years of her employment – other than non-specific "anxiety" on certain days of the week.  The "corroboration" offered by Torres was only that she observed Duarte appearing "nervous" before staff meetings and "crying" during and after meetings, requiring a minimal level of comforting by Torres.  Finally, Duarte's emotional distress is not connected to any job loss, and there was no evidence that the alleged misconduct interfered with her ability to perform her job as a Clinician; indeed, she received generally positive annual performance evaluations – and she continues to work today.  (Tr. 870:18).

Here, based on the similarly limited, non-specific and conclusory evidence adduced by Duarte, a new trial should be ordered unless Duarte accepts an award on the low end of the spectrum of "garden variety" damages for emotional distress, which this Court has recognized is $30,000.

## II.   THE JURY'S PUNITIVE DAMAGES AWARD WAS CONTRARY TO THE EVIDENCE AND SHOULD BE VACATED ENTIRELY OR, IN THE ALTERNATIVE, REDUCED AS EXCESSIVE.

### A.  The Punitive Damages Award Should be Vacated as Contrary to the Evidence.

Under Fed. R. Civ. P. 59(a)(1)(A), a new trial may be granted if the Court concludes "that 'the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice,'

Firm:45489646

*i.e.*, it must view the jury's verdict as 'against the weight of the evidence.'" *Bouveng*, 175 F. Supp. 3d at 310-11 (quoting *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003) (internal citations omitted)).  The Court is free to weigh the evidence itself and need not view the evidence in the light most favorable to the plaintiff.  *Id.; see also DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) ("[a] motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice") (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992)).  Here, the jury's award of punitive damages was "a miscarriage of justice" that must be corrected.

The Court instructed the jury to apply the following law, in relevant part, with respect to its consideration of punitive damages:

> [A]n employer is not liable for punitive damages based on an employee's wrongful conduct where the employer proves by a preponderance of the evidence that it has (1) put into place policies and procedures to educate employees about unlawful discrimination, to prevent and detect unlawful discrimination, and to investigate and effectively resolve complaints of such conduct; and (2) has made good faith efforts to implement and enforce these policies and procedures.

(Tr. 995:7-14).  The jury failed to apply this instruction properly, however, and appears to have assessed punitive damages against the Hospital based solely on its liability for the acts of Quinones, while ignoring the substantial evidence that the Hospital (1) maintained policies and procedures to prevent and detect unlawful discrimination, (2) through frequent training, made a good faith effort to enforce these policies and procedures, and (3) was not given a chance to investigate and effectively resolve a complaint that such conduct was occurring.

First, the evidence showed that the Hospital was committed to creating a workplace free of discrimination and harassment. There was substantial evidence regarding the policies and

procedures in place to prevent and detect unlawful discrimination. The Hospital maintained a written policy prohibiting disability discrimination and harassment in the workplace. The policy included a detailed reporting procedure with specific names and telephone numbers of individuals who should be contacted by an employee who believed that she was a victim of discrimination and harassment, as well as alternative means of reporting any such incidents. The policy itself states that "[a]ll complaints will be investigated promptly and thoroughly and, if appropriate, corrective action will be taken," and Webb testified that the practice of the Hospital was to investigate all complaints of discrimination that were escalated to Human Resources. At the outset of her employment, Duarte signed a written acknowledgment of her receipt of that policy.

<u>Second</u>, the Hospital made a good faith effort to enforce those policies through frequent training of its employees. Quinones, Arce-Tomala, and Duarte all testified that mandatory, annual, in-service training was *required* regarding discrimination and harassment. Arce-Tomala testified that she ensured that all of the Clinicians in DCCS attended the training every year; and she had attended the training no fewer than twenty times during her tenure with the Hospital. Duarte certified in writing each year that she had received such training. Quinones and Arce-Tomala both understood that if they received a complaint of discrimination, they were *required* to bring it to the attention of the Hospital's Human Resources Department.

Thus, the Hospital proved by a preponderance of the evidence that it had (1) put into place policies and procedures to educate employees about unlawful discrimination, to prevent and detect unlawful harassment, and to investigate and effectively resolve complaints of such conduct; and (2) made good faith efforts to implement and enforce these policies and procedures.

On this basis alone, Duarte should not have been awarded punitive damages, and that award should be vacated accordingly.

It appears that Duarte's focus at trial on the fact that Human Resources department did not investigate her complaint of discrimination prejudiced the jury's decision with respect to punitive damages and is likely the reason the jury ignored the foregoing legal instructions and undisputed evidence. The Hospital's Human Resources department could not investigate any claim of discrimination raised by Duarte while she was still employed because it was not given an opportunity to do so.  While Duarte alleged that the harassment by Quinones began in or about 2008, she admitted that she did not even attempt to raise the issue the last paragraph of her November 2013 "rebuttal."  Duarte never availed herself of any of the clearly stated means of raising a complaint set forth in the Harassment and Discrimination policy, which would have ensured that her concerns were conveyed to Human Resources.  Instead, Duarte provided to Arce-Tomala a "rebuttal" to a discipline having nothing to do with alleged discrimination, and she did not in any way attempt to bring to Arce-Tomala's attention the complaint of disability mentioned in the "rebuttal's" last paragraph; nor did Duarte follow up with Human Resources as she was *required* to do by the policy.  Duarte herself testified that she did not do what she *knew* she should have done (in fact, what she was *required* to do): "speak up to a further or higher person." (Tr. 782:13-14).  By failing to follow up with Human Resources after she did not hear back from Arce-Tomala, Duarte violated the Hospital's policies.

The fact that Arce-Tomala apparently never saw the last paragraph of the "rebuttal" under the circumstances here – and therefore did not forward it to Human Resources – does not constitute willful or wanton negligence, recklessness, or a conscious disregard of Duarte's rights.

Nor does it detract from the existence of the Hospital's policies, practices, and procedures for preventing, reporting, and investigation internal complaints of discrimination and harassment.[11]

In sum, the jury should not have awarded punitive damages based on the evidence adduced at trial.  As such, the Court should vacate the jury's award of punitive damages in its entirety.

### B.   In the Alternative, the Punitive Damages Award Should be Reduced as Excessive.

The standard for establishing the excessiveness of a punitive damages award is set forth in the Supreme Court decision *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996).  As explained in *Gore,* whether a punitive damages award is excessive is judged according to three factors: (1) degree of reprehensibility of the defendant's conduct; (2) the proportion of punitive damages to compensatory damages; and (3) the difference between the punitive damage remedy and civil penalties authorized or imposed in comparable cases.  *Id.* at 574-75; *see also MacMillan,* 873 F. Supp. 2d at 564 (same).  As is the case with the compensatory damages award, a "federal court in a case governed by state law must apply the state law standard for appropriateness of remittitur," *i.e.,* CPLR § 5501(c).  *Payne v. Jones*, 711 F.3d 85, 97 n.8 (2d Cir. 2012).  Nevertheless, the *Gore* factors are pertinent to, and should guide the Court, in applying the "deviates materially" standard under CPLR § 5501(c).

With respect to the degree of reprehensibility, a finding of liability alone does not justify an excessive punitive damages award; the conduct must be sufficiently reprehensible as judged

---

[11] Here, the Hospital was unfairly prejudiced by Duarte's belated dismissal of her national origin discrimination claims after her lawyers had repeatedly made the point in front of the jury that Duarte's "complaint" of discrimination in the "rebuttal" to her 2011 performance evaluation (bias because of her "culture and language") was not investigated by Human Resources and should have been. (Tr. 125:12-17, 213:23 to 214:17, 480:10-19, 482:13-19).  Webb's explanation that the circumstances surrounding the appraisal had to be considered before determining whether an investigation should have been conducted (Tr. 162:7 to 163:25) could not undo that prejudice.  But for the presence of Duarte's national origin discrimination claim in the case at the time, this evidence would have *not* been before the jury, and these circumstances also favor vacating the punitive damages award in its entirety and ordering a new trial.

by a number factors to warrant punitive damages.   *Gore*, 517 U.S. at 580.   As to these aggravating factors, this Court has observed that:

> [c]ases upholding punitive damages award of $200,000 or more generally involved discriminatory or retaliatory termination resulting in severe financial vulnerability to plaintiff, repeated incidents of misconduct over a significant period of time, repeated failures to address complaints of discrimination, and/or deceit.

*MacMillan*, 873 F. Supp. 2d at 566; *see also Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996). In addition, violence or the threat of violence is frequently cited as a justification for a higher punitive damages award. *Id.* at 809.   Further, whether the defendant's conduct resulted in physical injury to the plaintiff, evidenced indifference or reckless disregard for the health of safety of others, or established a "'pattern of discrimination' that extended to other employees in [her] protected group" have also been considered by courts. *MacMillan*, 873 F. Supp. 2d at 566 (quoting *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 269-70 (S.D.N.Y. 1999)).

Virtually all of the factors in the reprehensibility analysis were *not* present here. There was no violence or threat of violence; no physical injury; no termination of employment resulting in financial vulnerability; no deceit; no repeated failures to address claims of discrimination; no evidence of indifference or reckless disregard for the health of safety of others; and no evidence of an established "pattern of discrimination" that extended to other employees with *any* type of disability.   Only one of the factors is present here – the claim that Quinones, repeatedly over the course of several years, referred to Duarte as "deaf."   But there was no evidence that the words ever changed, increased in frequency, or became more severe or malicious over time.   Thus, the "reprehensibility" of the alleged conduct here was low, falling in the range of cases where awards were reduced significantly.   *See MacMillan*, 873 F. Supp. 2d at 566-68 (collecting and comparing cases).

Firm:45489646

The second *Gore* factor is the ratio of compensatory to punitive damages.  In this regard, "the Supreme Court has 'concluded that [a punitive damages] award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.'" *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 149 (2d Cir. 2010) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)).  Accordingly, courts in this Circuit have often found a ratio of punitive damages to compensatory damages of no more than 2:1 to be appropriate.[12] Further, a 1:1 ratio has also been found appropriate in some cases, including by this Court, which involved much more egregious and malicious violations than those presented here.[13]

The third *Gore* factor is the difference between the punitive damages award and civil penalties authorized or imposed in comparable cases.  As this Court has noted previously, "the civil penalty for violating the NYCHRL – a maximum of $250,000 for an 'unlawful discriminatory practice [that] was the result of the respondent's willful, wanton or malicious act' – counsels in favor of reduction.  *MacMillan*, 873 F. Supp. 2d at 568 (quoting N.Y.C. Admin. Code § 8-126(a)) (analyzing a punitive damages award that was four times the civil penalty under the NYCHRL). The punitive damages award in this case was similarly excessive (three

---

[12] *See, e.g., Koch v. Greenberg*, 14 F. Supp. 3d 247, 277-79 (S.D.N.Y. 2014) (reducing punitive damages from a 33:1 ratio to 2:1), *aff'd*, 626 F. App'x 335 (2d Cir. 2015); *Cioffi v. New York Cmty. Bank*, 465 F. Supp. 2d 202, 206, 214 (E.D.N.Y. 2006) (punitive damages award based on jury's finding of sexual harassment and retaliation not excessive where ratio between punitive and compensatory damages was less than 2:1); *Broome v. Biondi*, 17 F. Supp. 2d 211, 229 (S.D.N.Y. 1997) (court declined to reduce a $410,000 punitive damages award to an interracial couple where jury found that the defendant cooperative board rejected their application to lease apartment because of their race where award was only two times amount of compensatory damages); *Iannone*, 941 F. Supp. at 415 (ratio of 10:1 reduced to approximately 2:1 in a sexual harassment case) *aff'd*, 159 F.3d 1347 (2d Cir. 1998).

[13] *See, e.g., Bouveng*, 175 F. Supp. 2d at 350 (finding a 1:1 ratio with respect to punitive damages on defamation claims to be appropriate); *Shukla v. Sharma*, No. 07 Civ. 2972, 2012 U.S. Dist. LEXIS 18392, at *47-48 (E.D.N.Y. Feb. 14, 2012) (remitting $2.5 million punitive damages award for forced labor and trafficking from 2.5:1 to 1:1); *Allam*, 906 F. Supp. 2d at 294 (reducing punitive award from $300,000 to $200,000 to set a 1:1 ratio where husband found liable for assault, battery, and intentional infliction of emotional distress against wife for domestic violence); *Kim v. Dial Serv. Int'l*, 96 Civ. 3327, No. 1997 U.S. Dist. LEXIS 12544, at *49 (S.D.N.Y. Aug. 11, 1997) (Cote, J.) (reducing punitive damages award to establish a 1:1 ratio in a race discrimination case).

times the applicable civil penalty); thus, this factor also supports a substantial reduction in the award.

In addition to reviewing each of these factors, the Court should compare the evidence here to the evidence presented in other decisions in this Circuit to find the appropriate level of remittitur. In *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09 Civ. 5378, 2011 U.S. Dist. LEXIS 114001 (S.D.N.Y. Sept. 27, 2011) (Sullivan, J.), the plaintiff prevailed on claims under the NYSHRL and NYCHRL that she was sexually harassed, including claims that her supervisor engaged in unwanted touching, sent sexually explicit emails, made sexually explicit comments, and called the plaintiff later at night and on weekends to talk about sex. *Id.* at *3. When she complained directly to her supervisor, he threatened her job. *Id.* When she complained to the head of human resources, that individual informed the owner of the company, who took no action, instead telling the plaintiff not to let the supervisor upset her. *Id.* When co-workers complained on the plaintiff's behalf, the company finally hired an outside law firm to investigate, and the supervisor was ultimately discharged, two years after the sexual harassment began. *Id.* at *4. The court awarded $100,000 in compensatory damages for the emotional distress suffered by the plaintiff, but rejected her request for $250,000 in punitive damages, finding that the amount was not justified under the circumstances. *Id.* at *14-15. After applying the *Gore* factors and comparing the evidence to comparable cases decided in the Second Circuit, the court awarded $75,000 in punitive damages, a ratio of *less* than 1:1 with compensatory damages, despite the severity of the conduct, actual physical contact, and length of time over which it occurred. *Id.* at *17.

Equally instructive is *Kim*, 1997 U.S. Dist. LEXIS 12544, a case where a jury found in favor of the plaintiff on his race discrimination claim under 42 U.S.C. § 1981 and state law, and

awarded $750,000 in punitive damages.  The plaintiff had been terminated from employment amid several comments made by his supervisors that indicated racial animus.  *Id.* at *6.  In considering the defendants' motion for a new trial or remittitur, the court followed the guidance set forth by the Supreme Court in *Gore* and the Second Circuit in *Lee*, *supra.*  Although crediting the jury's finding that the racially motivated unlawful conduct was malicious and reprehensible, the court concluded that the degree of such reprehensibility was "low" because there was no violence and "very little" repetition of the conduct.  *Id.* at *49.  After remitting the compensatory damages award to $25,000, the court found that a 1:1 ratio was appropriate, and remitted the punitive damages award to $25,000, notwithstanding the finding that the defendants' conduct was malicious and reprehensible.

As the foregoing analysis shows, all of the *Gore* factors favor remitting the punitive damages.  As such, the Court should apply a ratio no larger than the jury's ratio of 1.2:1 *after* remitting the compensatory damages award.

## CONCLUSION

For all the foregoing reasons, the Court should grant the Hospital's motion for a new trial.

Dated: New York, New York
      February 26, 2018

Respectfully submitted,

EPSTEIN BECKER & GREEN, P.C.

By:      /s/ *David W. Garland*
        David W. Garland
        John F. Fullerton III
        Adriana Kosovych
250 Park Avenue
New York, New York  10177-1211
Tel: (212) 351-4500
*Attorneys for Defendant*
*St. Barnabas Hospital*

25