UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
RUTH DUARTE,

                 Plaintiff,

-vs-                                   15 Civ. 6824 (PGG)

ST. BARNABAS HOSPITAL,

                 Defendant.
----------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR A NEW TRIAL


| STEPHEN BERGSTEIN | BRUCE GITLIN | GABRIELLE VINCI | MEGAN GODDARD |
|---|---|---|---|
| BERGSTEIN & ULLRICH, LLP 5 Paradies Lane New Paltz, N.Y. 12561 (845) 468-1277 | GITLIN, HORN & VAN de KIEFT, LLP 2095 Broadway, Suite 407 New York, N.Y. 10023 (212) 514-5347 | NESENOFF & MILTENBERG, LLP 363 Seventh Avenue, 5th Floor New York, N.Y. 10001 (212) 736-4500 | GODDARD LAW 39 Broadway, Suite 1540 New York, N.Y. 10006 (646) 504-8363 *Counsel for Plaintiff* |

| |
|---|
| BENNITTA JOSEPH JOSEPH & NORINSBERG LLC 225 Broadway, Suite 2700 New York, NY 10007 (212) 227-5700 |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2. Plaintiff commences employment with Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    3. Plaintiff suffers disability discrimination at work . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    4. Rosa Torres corroborates Plaintiff's account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    5. Plaintiff complaints about the disability harassment . . . . . . . . . . . . . . . . . . . . . . . 8

        a. Plaintiff complains to Quinones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        b. Plaintiff complains to Arce-Tomala . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        c. Plaintiff submits a rebuttal on performance criticism . . . . . . . . . . . . . . . . 10

        d. Plaintiff submits a rebuttal complaining about disability discrimination . . . . 11

    6. Plaintiff's damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    7. The verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

POINT I:    THE COMPENSATORY DAMAGES AWARD IS NOT EXCESSIVE . . . . . . 15

POINT II:    THE PUNITIVE DAMAGES AWARD IS APPROPRIATE . . . . . . . . . . . . . . 21

    A. The punitive damages award is not contrary to the weight of the evidence . . . . . . . . 21

        1.    Once the jury determined that Quinones harassed Plaintiff,
            Defendant could not avoid liability for punitive damages by
            showing it undertook proper measures to prevent and correct the
            discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        2.    The jury had an evidentiary basis to find that Defendant failed to
            properly prevent and detect discrimination . . . . . . . . . . . . . . . . . . . . . . . 26

    B. The punitive damages award is not grossly excessive as a matter of law . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## TABLE OF AUTHORITIES

**Cases**

*Blissett v. Coughlin*, 66 F.3d 531 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*BMW of N. Am. v. Gore*, 517 U.S. 559 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bouveng v. Nyg Capital, LLC*, 175 F. Supp. 3d 280 (S.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . . 21

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . 18

*Chauca v. Abraham*, 30 N.Y.3d 325 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . 22

*Dotson v. City of Syracuse*, 2011 U.S. Dist. LEXIS 20374 (N.D.N.Y. 2011) . . . . . . . . . . . . . . 16

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Gorzynski v. Jet Blue Airways, Corp.*, 596 F.3d 93 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 28

*Greenbaum v. Handlesbanken*, 67 F. Supp. 2d 229 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . 33

*Hughes v. PBA*, 850 F.2d 876 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Jordan v. Bates Advert. Holdings, Inc.*, 11 Misc. 3d 764 (Sup. Ct. N.Y. Co. 2006) . . . . . . . . . 33

*Katt v. City of New York*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546 (S.D.N.Y. 2012) . . . . . 16, 17, 21

*Manley v. AmBase Corp.*, 337 F.3d 237 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*McIntyre v. Manhattan Ford*, 256 A.D.2d 269 (1st Dept. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 15

*Nardelli v. Stamberg*, 44 N.Y.2d 500 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

*Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . 15

*Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Osorio v. Source Enters.*, 2007 U.S. Dist. LEXIS 18725 (S.D.N.Y. Mar. 2, 2007) . . . . . . . . . . 20

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Phillips v. Bowen*, 278 F.3d 103 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Rivera v. United Parcel Serv., Inc.*, 148 A.D.3d 574 (1st Dept. 2017) . . . . . . . . . . . . . . . . . . . . 32

*Salemi v. Gloria's Tribeca, Inc.*, 115 A.D.3d 569 (1st Dept. 2014) . . . . . . . . . . . . . . . . . . . . . . 32

*Santana v. G.E.B. Med. Mgt. Inc.*, 2017 N.Y. Misc. LEXIS 4186 (Bronx Co. Sup. Ct.
        Oct. 20, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Singleton v. City of N.Y.*, 308 Fed. Appx. 521 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sogg v. American Airlines*, 193 A.D.2d 153 (1st Dept. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Stampf v. Long Island R.R.*, 761 F.3d 192 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) . . . . . . . . . . . . . . . . . . . . 29-30

*Thomas v. iStar Fin., Inc.*, 652 F.3d 141 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Thorsen v. County of Nassau*, 772 F. Supp. 2d 277 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . 18

*Town of Hempstead v. State Div. of Human Rights*, 233 A.D.2d 451 (2d Dept. 1996) . . . . . . . . 19

*Townsend v. Benjamin Enters.*, 679 F.3d 41 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . 15, 33

*Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Zakre v. Norddeutsche Landesbank*, 541 F. Supp. 2d 555 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . 32

*Zakrzewska v. New Sch.*, 14 N.Y.3d 469 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Statutes**

Fed. R. Civ. P. 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.P.L.R. 5501(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

N.Y.C. Admin. Code § 8-107(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

## PRELIMINARY STATEMENT

The jury found that Defendant St. Barnabas Hospital discriminated against Plaintiff on the basis of her disability in violation of the New York City Human Rights Law, awarding her $624,000 for pain and suffering and $750,000 in punitive damages. On this Rule 59 motion, Defendant challenges both awards in claiming that (1) Plaintiff only suffered "garden variety" emotional distress and (2) the punitive damages award should be vacated as a "miscarriage of justice." However, as demonstrated below, Defendant views the facts in the light most favorable to its position by (1) minimizing the nature of the extensive disability harassment; (2) excusing its failure to investigate Plaintiff's complaints about the harassment and (3) minimizing the pain and suffering to which Plaintiff and a corroborating witness testified. As none of these arguments satisfy the heightened standard of review governing relief under Rule 59, this Court should enter judgment for Plaintiff.

## STATEMENT OF FACTS

### 1. Background.

Plaintiff Ruth Duarte was born in Ecuador. (Tr. 727). In the late 1970s at the age of 19, she moved to the United States, settling in the Bronx. (Tr. 727-28, 729-30). Since childhood, Plaintiff has had a hearing impairment. (Tr. 727). Approximately 20 years ago, Plaintiff underwent a procedure that improved her hearing ability. (Tr. 739-40). However, as further demonstrated below, Plaintiff's hearing impairment continued throughout her employment with Defendant.

After learning English, Plaintiff earned a degree in Public Administration in 1994. (Tr. 731-32). She eventually became a medical records specialist and began working at Harlem Hospital as a Community Associate. (Tr. 732-33). In 1998, while employed at Lincoln Hospital, Plaintiff earned a degree at John Jay College of Criminal Justice. (Tr. 733-35). Plaintiff then worked as a

crime victim's advocate for two years at the Bronx District Attorney's office. (Tr. 735). By this point, since her hearing had begun to decline, Plaintiff began utilizing an amplifier to ameliorate her hearing impairment. (Tr. 738-39). After that, Plaintiff worked for one year at the New York State Crime Victims Board as an investigator. (Tr. 736). Plaintiff earned her Masters in Social Work at Hunter College in 2007. (Tr. 737-38, 740-41).

### 2. Plaintiff commences employment with Defendant.

On July 9, 2007, Plaintiff began working for St. Barnabas Hospital as a bilingual clinician. (Tr. 741-42). The Hospital provides outpatient mental health services through the Fordham-Tremont Community Mental Health Center. The Center's Reverend David Casella Children's Services Program (DCCS) provides mental health and case management services to children and adolescents and their families. *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 330-31 (S.D.N.Y. 2017).

At St. Barnabas, Plaintiff provided psychotherapy services for children and adolescents through individual, family and group therapies. (Tr. 743-45; PX 23). Immediately taking on a busy caseload, Plaintiff saw 35-40 patients per week. (Tr. 746, 747-48). She also attended biweekly clinical meetings and weekly supervisor meetings. (Tr. 747).

From 2007 through 2014, Edgardo Quinones was the divisional director for children's services, supervising more than 35 employees, including four clinical supervisors. (Tr. 204-05). Milagros Arce-Tomala was Plaintiff's immediate supervisor. (Tr. 535, 785). When Arce-Tomala was on vacation, Quinones became Plaintiff's immediate supervisor. (Tr. 785).

### 3. Plaintiff suffers disability discrimination at work.

Plaintiff was "open" about her disability at work. (Tr. 560). Although Quinones testified

that he was unaware of Plaintiff's hearing disability (Tr. 195-96), he worked closely with Plaintiff for approximately seven years and met with her regularly for administrative and clinical purposes. (Tr. 196-99). Contrary to Quinones's testimony, Plaintiff's disability was well-known to her colleagues, including coworker Rosa Torres and Arce-Tomala, as evidenced by the amplifier that included a piece resembling a headset. (Tr. 169-70, 559). Arce-Tomala recalled that the device resembled "a little rectangular box with some earbuds" and a cord. (Tr. 389). Torres testified the hearing device resembled "one of those little iPods." (Tr. 562). The jury had an opportunity to see the amplifier. (PX 16).

Plaintiff and other staff members attended regular meetings on Wednesdays. (Tr. 342). These meetings were held in a large room at DCCS. (Tr. 567). Administrative meetings and clinical team meetings were held every other Wednesday. (Tr. 342).

The administrative meetings were also referred to as staff meetings. (Tr. 346-47). These meetings focused on vacancies at the program, new policies, anticipated audits, "work performance and quality and levels of service" as well as the timely completion of paperwork. (Tr. 353, 755, 765). The focus was on increasing the number of patients the clinicians saw on a daily and weekly basis. (Tr. 765). They also discussed writing proper progress notes. *Id.* Along with Quinones and Arce-Tomala, seven to ten clinicians attended the administrative meetings. (Tr. 344). Plaintiff also attended these meetings, along with an intake worker, a family support worker, clinicians, an administrative assistant and sometimes the registration clerk. (Tr. 340-41, 344-47, 755). At times, the child psychologist was also present. (Tr. 341). A total of 13 to 16 people attended these meetings. (Tr. 350, 756).

In addition to the administrative meetings, Plaintiff also attended clinical team meetings,

3

held every other Wednesday. (Tr. 347). Five to seven people usually attended these meetings, including the clinical supervisor, the clinicians and the psychiatrists. (Tr. 350, 563-64). In total, Plaintiff attended administrative and/or clinical meetings approximately three times per month. (Tr. 347-48).

Quinones ran the administrative/staff meetings; on occasion, Arce-Tomala did so. (Tr. 353, 578, 756). At the staff meetings, Quinones sat at the head of the table. (Tr. 570). Arce-Tomala usually sat next to Quinones. (Tr. 571-72, 583). Since she has a hearing disability and Quinones led the meetings, Plaintiff typically sat next to Quinones to ensure that she could hear everything. (Tr. 571, 577, 579-80, 582-83, 756-57). When Plaintiff began attending these meetings in 2007, even though she had undergone a procedure in her left ear, she was still experiencing hearing difficulties, especially in large rooms in a group setting. (Tr. 759-60).

In 2007, when Plaintiff asked Quinones to repeat what he had said during the meetings, he asked, "are you deaf?" (Tr. 761). Commencing in 2008, Plaintiff brought the hearing device to staff meetings. (Tr. 762). Rosa Torres, who also attended the staff and clinical meetings (Tr. 564), testified, "When it came to staff meetings, Ruth Duarte would . . . take out her piece. She would set it up and she would always comment like I have to put these on, make sure they're up so I can hear the speaker." (Tr. 560). Plaintiff openly adjusted the device at meetings. (Tr. 562).

Arce-Tomala testified that Plaintiff only started using this device at staff meetings "after . . . years of working there." (Tr. 355). Arce-Tomala was not sure Plaintiff used the device from 2007 through 2011 or 2012. (Tr. 359-60, 388-89). However, Plaintiff testified – and the jury was therefore able to find – that she wore this device at all staff meetings from 2008 through 2014, as well as all administrative and clinical meetings during this time period. (Tr. 947). *See also* Tr. 356

4

(Arce-Tomala recalled Plaintiff used the device at clinical meetings). Once Plaintiff began using the device, she always did so at administrative and staff meetings. (Tr. 357).

Even with the hearing amplifier, Plaintiff still had difficulty hearing at the meetings. (Tr. 763-64). In the staff meetings, sitting next to Quinones, Plaintiff sometimes asked Quinones to repeat himself. (Tr. 760, 764-65). Quinones derisively responded, "You are deaf? You don't listen? Put your thing on. I want you to hear what I said. I don't want to hear later that you say that you didn't hear me. . . . You hear when it is convenien[t] to you." (Tr. 765-66). Quinones would then slam his hand on the table in anger. (Tr. 766-67). The silver rings on Quinones' fingers compounded the noise that amplified into Plaintiff's ear. (Tr. 767). Quinones's hand-slamming triggered painful memories for Plaintiff, who grew up with a violent father who yelled at her and disparaged her hearing impairment. (Tr. 767-68). Plaintiff's father "took it as I was not obeying him." (Tr. 768). In response to Quinones' outbursts, Plaintiff told him about her difficult childhood. (Tr. 769). This did not stop Quinones' harassment.

In 2009, Plaintiff's hearing difficulties in staff meetings continued. (Tr. 769). When Plaintiff asked Quinones to repeat himself, he berated Plaintiff over her hearing disability as he had done in the past. (Tr. 770). Quinones did this two or three times during Plaintiff's limited employment with Defendant in 2009 due to her medical leave from October 16, 2009 through August 2010. (Tr. 790-91, 877).

Following her medical leave, Plaintiff returned to the weekly staff meetings. (Tr. 770-71, 789-90). Even with the hearing amplifier, Plaintiff could not always hear Quinones. (Tr. 770-71). In 2010, when Plaintiff asked Quinones to repeat himself – or when she could not hear him – Quinones responded, "Put your things on your ear." (Tr. 773). He again smacked the table, once

5

more triggering memories of Plaintiff's childhood and making her feel guilty about "having this impairment, that I tend to isolate and not asking anything." (Tr. 774). In 2010, Quinones made these comments about Plaintiff's hearing impairment on two or three occasions. (Tr. 791-92). This pattern continued through 2011, when Plaintiff during staff meetings told Quinones that she could not hear him, prompting more ridicule from Quinones. (Tr. 774, 792).

The weekly staff meetings continued through 2014. (Tr. 846). Although Plaintiff had complained to Quinones about his discriminatory comments through 2011-2012 (Tr. 788-89), Quinones did not stop. By 2014, Plaintiff's hearing impairment had gotten worse since 2007. (Tr. 849). That year, when Plaintiff could not fully hear Quinones during the meetings, "I asked Mr. Quinones or the person who was running the meeting if they could repeat whatever I was unable to hear or I will ask my colleagues if they can clarify over what I missed." (Tr. 848). Quinones variously responded: "I know you're deaf. I forgot you're deaf. You had your thing on. Make sure you have your thing on. . . . I want you to hear what I'm going to say. I don't want you to say that you didn't hear me because you only hear when it is convenient to you." (Tr. 848).

In 2014, Plaintiff and her union representative, Marcie Van Hoven-Hernandez, attended a disciplinary meeting with Arce-Tomala and Quinones. (Tr. 180-81). At the meeting, Arce-Tomala and Quinones criticized Plaintiff's job performance, stating she was not meeting with enough clients. (Tr. 186-87). Defending herself, Plaintiff denied these allegations. (Tr. 187). Her supervisors laughed when Plaintiff said she was properly handling her duties. (Tr. 187-88). As Plaintiff tried to defend herself, Quinones raised his voice and banged his hand on the table. (Tr. 188). The rings on Quinones's fingers only made the banging louder. (Tr. 188). This prompted Plaintiff to adjust her earpiece, "and [Quinones's] voice got loud as she was adjusting it." (Tr. 189). Plaintiff was

6

crying, shaking and distraught. (Tr. 189). As Plaintiff adjusted her amplifier, Quinones said, "What are you deaf?" (Tr. 189-192). This comment prompted laughter from Arce-Tomala and Quinones. *Id.* Plaintiff "just looked at [Quinones]. She was crying and saying 'I can't believe it' and just in shock." (Tr. 191). These supervisors "had no reaction" when Plaintiff objected to their unprofessional and disrespectful antics. (Tr. 192).

### 4. Rosa Torres corroborates Plaintiff's account.

Having regularly attended meetings with Plaintiff three to four times per month, Rosa Torres corroborated Plaintiff's testimony about Quinones' discriminatory comments. (Tr. 594). Prior to these meetings, Plaintiff asked Torres if they could attend the meetings together, pleading with her, "please don't leave me alone." (Tr. 612-13). Plaintiff was nervous before the meetings started. (Tr. 613-14). On their way to the meetings, Torres calmed Plaintiff down ("everything will be okay, you'll get through it") and "prayed for a miracle that Edgardo wouldn't show up, that he wouldn't come out and say those horrible things ['are you deaf[.']" (Tr. 614-15).

At these meetings, from 2008 through 2014, Torres always observed Plaintiff with the hearing device. (Tr. 594). Torres testified that "I can't pinpoint a date or year because it just happened so much, so much that Mr. Quinones was constantly telling Ms. Duarte ['are you deaf? Are you deaf?['] Throughout the times that I have been there." (Tr. 585). Torres recalled that Quinones said this "maybe every other meeting." (Tr. 586). *See also* Tr. 680, 683 (Quinones "frequently" asked Plaintiff, "Are you deaf?"). This would happen when Plaintiff asked a question about the agenda "or she asked to repeat or she will pronounce a word wrong, that will trigger it." (Tr. 588). In addition to regularly mocking Plaintiff's disability, Quinones "frequently" asked Plaintiff if her hearing device was on. (Tr. 684). In addition, Quinones once told Plaintiff that she

only heard what she wanted to hear (Tr. 676-77), and he slammed his hand on the table, again rattling Plaintiff's ears. (Tr. 591, 593). After saying this to Plaintiff, Quinones "would fall back on his seat and crack a laugh." (Tr. 591).

Torres also testified that Quinones ridiculed Plaintiff's pronunciation when Plaintiff made reference to SOAP, an acronym for the "SOAP method": Subjective, Objective, Assessment and Planning. (Tr. 592). In the context of discussing her progress notes, Plaintiff verbalized it as "SOUP." (Tr. 592, 710-11). Quinones responded, "Ruth, we're not making soup. It's SOAP, SOAP." (Tr. 592-93, 710-11). In response, Plaintiff's "eyes watered, her face just became red. She again started to slouch, shook her head, put her hand on her head like – and again she just shut down. She shut down at the staff meeting." (Tr. 593).

Similarly, when Quinones ridiculed Plaintiff's hearing disability, "Ms. Duarte would basically say one word and sigh, 'Edgardo.' . . . Just kind of shake her head, bring it down slowly she would just withdraw back on her seat and that is it. She would shut down the rest of the staff meeting." (Tr. 589). Plaintiff's face would turn "so red." (Tr. 590). If Quinones made a discriminatory comment during a meeting, Plaintiff "would leave crying" and "would appear tearful during the session." (Tr. 616). Torres would then comfort Plaintiff, who in tears asked, "I don't understand why he does this." (Tr. 616-17). As time passed, Plaintiff stopped speaking up at meetings "because of fear that it would trigger Mr. Quinones." (Tr. 618). When that happened, if Plaintiff could not understand everyone, Torres told Plaintiff what transpired at the meeting. *Id.*

### 5. Plaintiff complains about the disability harassment.

#### a. Plaintiff complains to Quinones.

Plaintiff began to confront Quinones about his reaction to her hearing impairment in

2010. (Tr. 783-84). They had these conversations in Plaintiff's office when Quinones was reviewing her progress notes and Quinones did not want her to use the speakerphone, necessitated by Plaintiff's hearing impairment. (Tr. 786). Referencing his discriminatory comments, Plaintiff said, "Edgardo, I don't like when you say this. It is very hurtful to me. It hurts me. Can you please stop." (Tr. 784). Plaintiff testified that she once again told Quinones that she hated to be treated this way and that his offensive conduct reminded her of an abusive and difficult childhood. She also said, "I don't like it when he say that I'm deaf or when he made remarks to remind me of my childhood, my adolescent days." *Id. See also* Tr. 769 (in connection with her complaints about his comments, Plaintiff told Quinones "how abuse[d] I was by my father and how difficult was my childhood"). Reflecting his indifference to Plaintiff's concerns, Quinones did not respond. (Tr. 784). Plaintiff raised her concerns with Quinones on two or three occasions in 2010. (Tr. 785-86). They discussed it again between two and four times from 2010 through 2012. (Tr. 787-88, 792-93). During these conversations in 2011, Quinones told Plaintiff she was "dumb" and "stupid." (Tr. 788). This left Plaintiff in tears, and "I cried and I told him that I don't feel comfortable with what he just said." (Tr. 788). In 2012, Plaintiff told Quinones that he needed to stop and "it is not a joke." (Tr. 789). Upon hearing this, Quinones "just stepped out of my office." (Tr. 789).

### b. Plaintiff complains to Arce-Tomala.

On two or three occasions in 2011, Plaintiff also spoke with Arce-Tomala about Quinones's discriminatory comments, noting that Quinones disparaged her when Arce-Tomala was out of the office. (Tr. 793-95). Plaintiff pleaded with Arce-Tomala not to go on vacation. "When you go on vacation, and Edgardo reviews my notes, he tells me things that I feel bad about, such as remarks about my hearing disability." Rather than notify Human Resources, Arce-Tomala threw her

hands up, telling Plaintiff, "You've got to deal with him." (Tr. 795). Plaintiff similarly recalled her

other conversations with Arce-Tomala:

> Q: In other conversations that you had with Ms. Arce-Tomala about remarks that Mr. Quinones made concerning your hearing disability, what did you say to her?
>
> A: What I just said, "don't go on vacation. When you go on vacation, Mr. Quinones reviews my notes and he always finds something to make me write the notes over and over again or he made these comments about my hearing disability.
>
> Q: What, if anything, did she respond?
>
> A: The same thing, "You've got to speak to him, you've got to deal with him."

(Tr. 796). Eventually, Plaintiff stopped confronting Quinones about this, "as I feel I have done it

already and I don't see no changes." *Id.* Referencing Exhibit 15, the rebuttal document in which

Plaintiff formally articulated her concerns, she testified, "I left it like that until I think I put it in

writing." *Id.*

### c. Plaintiff submits a rebuttal on performance criticism.

Although the national origin claim was not before the jury, evidence surrounding

Plaintiff's written rebuttal arising from this claim sheds light on the Hospital's procedures for

reviewing and responding to rebuttals. In October 2011, Plaintiff received a performance review for

the previous year. (Tr. 115-16, 458; PX 12). The evaluation stated, "due to cultural and language

challenges, Ms. Duarte at times struggles with grammatical errors, however, she makes great effort

to correct her work." (PX 12 [last page]). Plaintiff drafted a rebuttal: "I believe my culture and

language does not interfere with the way I perform my job. I am understood when I speak and write

in English. If I do make grammatical errors, I apologize, but I do work hard and utilize tools to help

me with my grammar such as spell check and dictionary." (PX 13). Arce-Tomala was not made aware of this rebuttal, and no one from Human Resources discussed it with her. (Tr. 468-69, 480, 497-98).

Arce-Tomala forwarded employee rebuttals to Human Resources. (Tr. 408-09). However, Arce-Tomala testified that she did not recall Plaintiff submitting any rebuttals to her and that she knew about them through Human Resources. (Tr. 410-11). Arce-Tomala never discussed the content of Plaintiff's rebuttals with her, and Human Resources never discussed any employee rebuttals with Arce-Tomala, including Plaintiff's rebuttals. (Tr. 411, 416-17). While Arce-Tomala knew Plaintiff had submitted rebuttals, she did not ask to read them or find out what Plaintiff had said. (Tr. 417).

In reviewing rebuttals, Human Resources typically investigated discrimination complaints like this. (Tr. 119, 121-22, 133). Rebuttals are placed in the employee's file. (Tr. 209). While Quinones admitted seeing the evaluation, he denied seeing the rebuttal. (Tr. 212-13). While Wayne Webb, the Assistant Vice President for Human Resources, denied that Human Resources was in possession of the rebuttal (Tr. 123), in fact, Defendant produced the documents in discovery as part of the personnel file. (Tr. 149-153). When confronted with the bate-stamped rebuttal, Webb testified, "I can't speak to where you got the document. I know when I reviewed the file, it wasn't there." (Tr. 153). The Hospital's files do not reflect that anyone had investigated Plaintiff's discrimination complaint in 2011. (Tr. 124-25). No one from Human Resources asked Quinones how Plaintiff was being treated at work. (Tr. 214).

### d. Plaintiff submits a rebuttal complaining about disability discrimination.

On November 13, 2013, Arce-Tomala and Plaintiff discussed Plaintiff's schedule. (Tr.

797). Plaintiff wanted to coordinate her holiday time to meet a doctor's appointment. *Id.* Arce-Tomala said, "no, you have to go on your holiday, I'm not going to change it." (Tr. 797-98). A week later, Plaintiff was written up for allegedly telling Arce-Tamala, "One day you will lose your power." (PX 14, at 1).

On November 20, 2013, Plaintiff met with Arce-Tomala, Quinones and a union representative, Kwame Shaw, to discuss this discipline. (Tr. 539, 918-19, 921-22). During that meeting, once again disparaging Plaintiff's disability, Quinones said, "it is not my fault that you are deaf, something between those lines." (Tr. 919-20). Plaintiff was in tears during the meeting. (Tr. 920). Union representative Shaw told Plaintiff to memorialize her objections to Quinones' harassment in writing. (Tr. 920).

On November 25, 2013, a few days after the union representative encouraged Plaintiff to complain about the harassment (Tr. 921), Plaintiff submitted a written response to this discipline, giving it to Arce-Tamala and her union representatives. (PX 15; Tr. 750-52). Plaintiff denied making the "lose your power" statement to Arce-Tamala. (Tr. 798). Plaintiff placed in context the comment that she did make: "Okay Milagros, you have the power to use my earned time as you please." (PX 15). After worrying "that I will not be able to express my concerns during supervision due to my comment being taken out of context," Plaintiff expressly complained about discrimination:

> *I would like to take this opportunity to express my feelings about many times DCCS Administrators had continually harassed, retaliated and bullied me regarding my disability and my work ethic by making inappropriate comments about my hearing disability and calling me "Deaf" and/or embarrassing me during staff meetings.* They have continually misconstrued whatever is said to them to their advantage. I hope that through this incident doors are opened for training to be provided to Administrators and

12

Employees are about inappropriate behaviors and the procedures that an Employee should take to report inappropriate behaviors from Administrators. I feel this discipline was arbitrary and capricious.

(PX 15) (emphasis supplied). Plaintiff's reference to DCCS meant Quinones and Arce-Tomala. (Tr. 801-02). Although Arce-Tomala denied seeing this document prior to her deposition (Tr. 527-28), claiming that Human Resources did not advise her that Plaintiff had written it (Tr. 528), Plaintiff testified that she contemporaneously gave this document to Arce-Tomala. (Tr. 799-800).

In November-December 2013, no one from Human Resources interviewed Quinones about Plaintiff's discrimination complaint. (Tr. 211). Defendants did not follow up with Quinones on Plaintiff's complaint. Quinones was unaware that Plaintiff had even made this accusation until 2016, when he prepared for his deposition. *Id.* Quinones did not even know that Plaintiff had filed an EEOC charge alleging that he had discriminated against her. (Tr. 216). Similarly, no one at the Hospital has ever asked Arce-Tomala if she had witnessed discrimination at work. (Tr. 331). Nor was Arce-Tomala aware of any discrimination-related investigations at DCCS. *Id.*

### 6. Plaintiff's damages.

In 2009, as a consequence of Quinones's verbal abuse, Plaintiff regularly experienced anxiety on Tuesday nights through Thursday mornings. (Tr. 865). Quinones came to Plaintiff's unit on Wednesdays, when the staff meetings were held. (Tr. 865). Plaintiff's Tuesday-through-Thursday anxiety persisted through 2011-2014. (Tr. 865-66).

By 2011, Quinones's hostile response to Plaintiff's hearing-impairment caused her to suffer anxiety and nervousness. (Tr. 775). My "self-esteem was decreasing as far as asking questions, of feeling confident, crying, sad, headaches." *Id.* In addition to stomach aches, Plaintiff lost sleep, obsessing over what would happen at the next staff meeting. (Tr. 775-76). She also felt

13

guilty and blamed herself. (Tr. 775). The anxiety led to panic attacks, in which "I started to feeling anxious, shaking. As I say, I couldn't sleep the night before, scared of what is going to happen or what is going to transpire in that particular staff meeting." (Tr. 775-76).

Plaintiff shared her pain and suffering with colleagues and family. (Tr. 775-76). At work, starting in 2008 and continuing to the end of her employment in 2014, Plaintiff on a weekly basis talked about her hostile work environment with clinicians Rosa Torres, Carmen Lopez, Silva Dolman and Janet Santa Cruz. (Tr. 776-77, 781-82). The anxiety increased in 2014, particularly on Tuesdays, Wednesdays "and sometimes Thursday the whole day I was anxious." (Tr. 866). Approximately once or twice a month from 2009 through 2014, Plaintiff complained about Quinones' discriminatory comments to her union representative, Van Hoven-Hernandez. (Tr. 170-71).

Plaintiff continues to suffer anxiety. (Tr. 870). Plaintiff still feels "anxious, scared, angry, blaming myself for not doing what I should have done and for not listening what my colleagues and family told me to do." (Tr. 782). "I experience depressing time, anxiety, panic attacks." (Tr. 870). Her present emotional state involves "poor sleeping, lower self-esteem, lack of confidence sometimes, feeling less or [i]ncapable to do what I did before coming to St. Barnabas, doubting about being able to speak English and being understood." (Tr. 870-71). While Plaintiff has not sought therapy, as a trained mental health provider, she engages in self-help techniques and finds it therapeutic to work with patients who are experiencing similar problems. (Tr. 871).

### 7. The verdict.

The jury found that, in violation of the City law, Plaintiff had proven that Defendant discriminated against her on the basis of her hearing disability. (Tr. 1003). The jury further found

14

that Defendant did not establish that it would have treated Plaintiff the same even without her disability. (Tr. 1004). The jury awarded Plaintiff $624,000 in damages for pain and suffering. (Tr. 1004). It also awarded Plaintiff $750,000 in punitive damages. (Tr. 1004-05).

## ARGUMENT

## POINT I

## THE COMPENSATORY DAMAGES AWARD IS NOT EXCESSIVE

"Because the compensatory damages were allocated entirely to the [City] law claim, the remittitur is evaluated under state law." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 137 (2d Cir. 2008). "The 'calculation of damages is the province of the jury,' and 'we will not vacate or reduce a jury award merely because we would have granted a lesser amount of damages.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014).

"New York law requires that a court grant remittitur when a jury award 'deviates materially from what would be reasonable compensation.'" *Singleton v. City of N.Y.*, 308 Fed. Appx. 521, 522-523 (2d Cir. 2009) (summary order) (citing C.P.L.R. 5501(c); *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006); *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 78 (2d Cir. 2004), *vacated on other grounds sub nom KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005)).

This Court should "accord considerable deference to the [jury's] factual findings." *Blissett v. Coughlin*, 66 F.3d 531, 536 (2d Cir. 1995). "[T]he standard under § 5501(c) is not whether an award deviates at all from past awards – 'it is whether an award deviates materially from reasonable compensation.' To determine whether a jury award is excessive within the meaning of 5501(c), New York courts compare it with awards in similar cases." *Stampf v. Long Island R.R.*, 761 F.3d 192, 204 (2d Cir. 2014) (citing *inter alia Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d

15

420, 439 (S.D.N.Y. 2008) ("I seek to assess what amount is the 'highest amount of compensation allowable,' based on the evidence, that would not deviate materially from reasonable compensation. . . . '[R]eduction [of a jury award for damages] can only be permitted so far as the 'maximum amount that would be upheld . . . as not excessive' and not a penny less")).

Courts in this Circuit have identified three categories of damages for pain and suffering in discrimination cases: (1) garden variety; (2) significant and (3) egregious. "In 'garden variety' emotional distress claims, 'the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury.' Such claims typically 'lack[ ] extraordinary circumstances' and are not supported by any medical corroboration.' 'Significant' emotional distress claims 'differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses.' 'Finally, 'egregious' emotional distress claims 'generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff.' 'In 'significant' or 'egregious' cases, where there is typically evidence of 'debilitating and permanent alterations in lifestyle,' larger damage awards may be warranted.'" *MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012).

Plaintiff's case falls within the "significant" category. "For 'significant' emotional distress, courts in this Circuit have routinely found that awards ranging from $100,00 to $500,000 are not excessive." *Dotson v. City of Syracuse*, 04-CV-1388, 2011 U.S. Dist. LEXIS 20374, at *39 (N.D.N.Y. 2011). The $675,000 damages award does not "deviate materially from what would be

16

reasonable compensation." CPLR 5501(c). As an initial matter, "[a] compensatory award for emotional distress in a discrimination action may be based on testimonial evidence alone and 'is not preconditioned on whether [the plaintiff] underwent treatment, psychiatric or otherwise.'" *MacMillan*, 873 F. Supp. 2d at 560. Yet, while Plaintiff did not undergo formal counseling, she did speak with four other Hospital clinicians about the abusive work environment created by Quinones. (Tr. 170-71). As these clinicians are trained to address mental health issues, this was tantamount to treating with a mental health professional. She also undergoes "my own therapy" in treating her patients. (Tr. 871).

      In addition, in fixing the compensatory damages award, the jury was able to consider the lengthy regime of disability harassment, which began in 2007 (Tr. 461) and lasted continuously through 2014. (Tr. 180-81, 186-192). As corroborated by Rosa Torres, on a regular basis over the course of this eight-year period, Quinones cruelly humiliated Plaintiff at staff meetings by ridiculing her hearing disability in the presence of her colleagues. Not only did Quinones laugh in denigrating Plaintiff's disability (Tr. 187-88, 190-92, 591), but he intentionally caused additional pain by slamming his hand on the table, blasting her ear through Plaintiff's amplifier and further calling attention to her disability. (Tr. 766-67, 774). Prior to the meetings, Plaintiff prayed that Quinones would not show up, and she pleaded with Arce-Tomala not to take vacation so she could avoid Quinones' harassment (Tr. 795), which often left Plaintiff in tears (Tr. 616) and caused her to slouch into her seat and shut down during staff meetings. (Tr. 593). Following the meetings, Torres had to comfort Plaintiff (Tr. 616-17), who stopped speaking up at meetings to avoid further ridicule. (Tr. 618). The harassment triggered painful memories of Plaintiff's childhood, when her father yelled at her because of her hearing disability. (Tr. 769, 784). She also testified to stomach aches, anxiety,

17

panic attacks, low self-esteem, nervousness, sleep difficulties and depression (Tr. 775-76, 782, 865-66, 870-71), symptoms that continue through the present day.  (Tr. 870).

These damages are significant, not "garden variety." In *Phillips v. Bowen*, 278 F.3d 103 (2d Cir. 2002), the Court of Appeals upheld a $400,000 verdict in a harassment case, noting that "Plaintiff submitted evidence of ongoing harassment by each defendant over a five-year period. Phillips and her boyfriend testified in detail about her emotional distress, physical illness, and the effects of defendants' conduct on her lifestyle and relationships.  Phillips' co-workers testified about the deterioration they observed in Phillips." *Id.* at 111-12. Additionally, the award in *Phillips* was issued more than 15 years ago.  "When considering the sizes of the awards in earlier cases, we must take into account inflation, as the reasonable range for [plaintiff's] injuries today is higher than what it would have been ten years ago." *DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003). *Compare Hughes v. PBA*, 850 F.2d 876 (2d Cir. 1988) (sustaining $275,000 in emotional damages – $589,139.37 in 2018 dollars – where plaintiff alleged "campaign of harassment" in the workplace but he received no mental health treatment and made no claim of ongoing psychological problems); *Thorsen v. County of Nassau*, 772 F. Supp. 2d 277, 295 (E.D.N.Y. 2010) (holding that $500,000 in emotional distress damages was not excessive where "the jury credited Thorson's allegations that, not only did the defendants remove him from his job duties, but in doing so they subjected him to personal humiliation and attempted to destroy his professional reputation in retaliation for his political affiliation," and the plaintiff eventually stopped treatment and taking antidepressants); *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 197-98, 201 (E.D.N.Y. 2006) (where ADA plaintiff was "particularly susceptible to emotional harm flowing from the discrimination to which the defendants subjected him," he was entitled to no more than $600,000 for pain and suffering

where the discrimination caused him "great suffering," as corroborated by his parents, and he lost interest in school, lost his appetite, cried for no reason, "displayed an overall demeanor that steadily worsened over time"), *aff'd* 531 F.3d 127, 137-39 (2d Cir. 2008); *Town of Hempstead v. State Div. of Human Rights*, 233 A.D.2d 451, 452 (2d Dept. 1996) ("The record contains substantial evidence that the petitioner's agent, Eugene Long, a supervisor of the six complainants, engaged in a pattern of extremely lewd and offensive conduct. The awards made as compensation for the psychological injuries suffered by the six complainants, which ranged from $200,000 to $500,000 are no more punitive than the award made for psychological injuries in *Matter of New York City Tr. Auth. v. State Div. of Human Rights* (78 N.Y.2d 207, *rev'g* 163 A.D.2d 315). While reasonable persons may disagree as to the exact amount to be awarded as adequate compensation for psychological injuries, we are bound to uphold the agency determination '[u]nless the award is so arbitrary and capricious as to constitute an abuse of discretion'"); *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 47 (E.D.N.Y. 2009) (declining to remit Plaintiff Ketcham's $400,000 award for pain and suffering [$469,571.81 in 2018 dollars] where she "testified that the discrimination she suffered affected her 'immensely'" and the discrimination caused her to feel "disillusioned and very disappointed" and "caused her to become very 'stressed' and 'anxious' about what would happen next at work (*i.e.*, would someone 'play a ridiculous prank' or 'say something offensive'), which carried over into her personal life," prompting her to seek counseling); *Katt v. City of New York*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001) (since the jury reasonably found that the plaintiffs acute psychological disabilities were caused by her experiences working in that environment, the jury's award of $400,000 in compensatory damages [$566,229.58 in 2018 dollars] falls within the "reasonable range" of comparable cases); *Sogg v. American Airlines*, 193 A.D.2d 153, 163 (1st Dept. 1993) (jury verdict of $400,000 for emotional

19

distress under state law: failure to promote and termination based on disability (heart condition) age and sex. 27-year career worked her way up to "second in command" only to be denied a deserved promotion and ultimately terminated. Plaintiff was particularly vulnerable because it was difficult for her to find another position); *Osorio v. Source Enters.*, 05 Civ. 10029 (JSR), 2007 U.S. Dist. LEXIS 18725, at *17 (S.D.N.Y. Mar. 2, 2007) (sustaining emotional distress award in excess of $4 million on City law retaliation claim where "plaintiff testified at some length about the emotional distress and damage to reputation caused by the retaliation, including how defendants' retaliation caused her to feel depressed and anxious and to feel embarrassed in front of others in the industry, as well as causing her difficulty during subsequent job interviews and professional events and the like").

In asking this Court to reduce Plaintiff's pain and suffering award to $30,000, Defendants improperly classify her damages as "garden variety," claiming her lack of professional treatment "is in itself evidence that Duarte recognized that she was suffering a low level of emotional distress that she could handle without professional assistance," and that she only articulated "non-specific anxiety on certain days of the week." (Def. Br. at 17). They also minimize the corroboration offered by Torres and claim "the alleged misconduct [did not] interfere[] with her ability to perform her job as a Clinician." *Id.*

On this motion, Defendant views the record in the light most favorable to its position. Plaintiff confided in friends and colleagues about her work-related emotional distress and anxiety (Tr. 776-77, 781-82), which lasted for years and was not limited to a few days per week but continues to the present day and affects her sleep patterns, self-esteem and self-confidence and still triggers panic attacks. (Tr. 870-71). The discrimination also affected Plaintiff's ability to perform

her job, as she shut down during staff meetings to avoid Quinones' abusive comments and public humiliation. (Tr. 589, 593, 616, 618). Nor can Defendants minimize the corroborating testimony of Torres, who saw the pain and suffering first-hand and provided detailed testimony about how the harassment affected Plaintiff emotionally. (Tr. 589, 590, 593, 613-18).

Defendant relies on *Bouveng v. Nyg Capital, LLC*, 175 F. Supp. 3d 280 (S.D.N.Y. 2016), which remitted the emotional distress award to $125,000 even though the CEO's behavior was "outrageous" and the plaintiff submitted to his unwanted sexual advances. (Def's Br. at 16). But unlike *Bouveng*, Plaintiff did not offer "brief and transitory" testimony about her pain and suffering, and her work-related anxiety "continued for years." 175 F. Supp. 3d at 329, 332. Similarly, Plaintiff's corroborated evidence of pain and suffering is unlike *MacMillan v. Millenium Broadway Hotel*, where this Court remitted the plaintiff's damages in that racial harassment case to $30,000 because his "evidence concerning emotional distress was quite limited." The Plaintiff in *MacMillan* testified that "he found working in the Engineering Department 'horrible,' but otherwise did not testify about any emotional distress he suffered, and his daughter testified only that her father "was always sad" and "wasn't as happy anymore" and "wasn't his same self." 873 F. Supp. 2d at 554.

### POINT II

### THE PUNITIVE DAMAGES AWARD IS APPROPRIATE

#### A. The punitive damages award is not contrary to the weight of the evidence.

Under Fed. R. Civ. P. 59(a)(1)(A), "(1) a new trial may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. That being said, for a district court to order a new trial under Rule 59(a), it must conclude that 'the jury has reached a

seriously erroneous result or . . . the verdict is a miscarriage of justice,' *i.e.*, it must view the jury's verdict as 'against the weight of the evidence.'" *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003). "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is 'egregious.' Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).

"'Punitive damages' as used in [N.Y.C. Admin. Code] section 8-502 is a legal term of art that has meaning under the New York common law. Punitive damages are intended not only to 'punish the tortfeasor' but also to 'deter future reprehensible conduct.'" *Chauca v. Abraham*, 30 N.Y.3d 325, 331, 334 (2017) (holding that punitive damages are available under the City law when "the wrongdoer has engaged in discrimination with wilful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard'").

Defendant argues that the punitive damages verdict was a "miscarriage of justice" because the jury appears to have assessed punitive damages based solely on Quinones' conduct even though the Hospital maintained policies to prevent and correct discrimination and Plaintiff did not properly invoke the Hospital's procedures. (Def. Br. at 18-21). Defendant's argument misunderstands the punitive damages inquiry under the City law. Defendant also views the evidence in the light most favorable to its position, contrary to Rule 59 standards.

> 1. **Once the jury determined that Quinones harassed Plaintiff, Defendant could not avoid liability for punitive damages by showing it undertook proper measures to prevent and correct the discrimination.**

The jury awarded Plaintiff punitive damages because a high-ranking supervisor,

Quinones, created a hostile work environment in repeatedly ridiculing and attacking her disability.

This Court charged the jury, in part:

> Where an employee engages in discrimination with willful or wanton negligence, reckless, or a conscious disregard of the plaintiff's rights under the City Human Rights Law, the employer may be held liable for punitive damages where the (1) the offending employee exercised managerial or supervisory responsibility; (2) the employer knew of the offending employee's discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action; or (3) the employer should have known of the offending employee's unlawful discriminatory conduct, yet failed to exercise reasonable diligence to prevent it.

(Tr. 994-95).

This language derives from N.Y.C. Admin. Code § 8-107(13)(b)(1-3). Under the City law, for purposes of determining whether to impose punitive damages, a high-ranking supervisor's discrimination is automatically imputed to the employer. The statute does not provide the employer any safe harbor from punitive damages. Instead, if the discriminatory behavior is imputed to management and the jury determines to award punitive damages, the best the employer can do is to mitigate the amount of those damages, not eliminate them. In analyzing the statute, the New York Court of Appeals stated, "[r]egarding the first two instances, an employer's antidiscrimination policies and procedures may be considered 'in mitigation of the amount of civil penalties or punitive damages' recoverable in a civil action. . . . Further, an employer's antidiscrimination policies and procedures . . . shield against liability, rather than merely diminish otherwise potentially recoverable civil penalties and punitive damages, *only where an employer should have known of a non-supervisory employee's unlawful discriminatory acts*." *Zakrzewska v. New Sch.*, 14 N.Y.3d 469, 479-80 (2010) (emphasis supplied) (citing N.Y.C. Admin. Code § 8-107(13)(e), which states that

"the demonstration of any or all of the factors listed above [in § 8-107(13)(d)] in addition to any other factors shall be considered in mitigation of the amount of . . . punitive damages . . . and shall be among the factors considered in determining an employer's liability" under § 8-107(13)(b)(3)).[1] *See also Chauca*, 30 N.Y.3d at 332 ("This section provides a way for an employer, when faced with vicarious liability, to mitigate punitive damages, where they are otherwise warranted, if certain factors are established").

While the employer is vicariously liable for punitive damages when the offending employee or agent "exercises managerial or supervisory responsibility" (N.Y.C. Admin. Code § 8-107(13)(b)(1)), the defendant "shall be permitted to plead and prove to the discriminatory conduct for which it was found liable that it had" meaningful antidiscrimination procedures and other best practices in place. *Id.* at § 8-107(13)(d)(e). *See Chauca*, 30 N.Y.3d at 330 ("Employers exposed to a punitive damages charge can mitigate punitive damages based on vicarious liability where they can prove the existence of certain policies established to deter discrimination"). Accordingly, while the

---

[1] In *Zakrzewska*, the State Court of Appeals stated:

> The New York City Council adopted section 8-107(13) in 1991 as part of a major overhaul of the NYCHRL. In a side-by-side comparison of then-current law with the proposed new law, the Report of the Council's Committee on General Welfare describes new section 8-107(13) as providing for [s]trict liability in employment context for acts of managers and supervisors; also liability in employment context for acts of co-workers where employer knew of act and failed to take prompt and effective remedial action or should have known and had not exercised reasonable diligence to prevent. *Employer can mitigate liability for civil penalties and punitive damages by showing affirmative anti-discrimination steps it has taken* (1991 NY City Legis. Ann., at 187).

14 N.Y.3d at 480 (emphasis in original)

employer can *mitigate* the amount of punitive damages when a supervisor or manager commits the harassment, unlike Title VII, the statute does not get the employer "off the hook" by proving it took proper measures to prevent and correct the discrimination. The safe harbor from punitive damages only applies when management should have known that a *non-supervisory employee* discriminated against the plaintiff. That is not this case.

Quinones was undisputedly a supervisor with managerial responsibilities. Quinones was the divisional director for children's services, supervising more than 35 employees, and "provid[ing] clinical and administrative supervision to about five, six clinicians." (Tr. 204-05, 221). Quinones had extensive supervisory responsibilities, "overseeing the David Cassela Children's Services, three school-based programs attached to David Cassela Children's Services, the children adolescent and family services program and one school-based program in there." (Tr. 226). He oversaw "day operations" at a school related to DCCS as well as the daily operations at "the children adolescent and family services." (Tr. 227). As division director, he answered only to the executive director of the agency. (Tr. 230-31). Quinones also reviewed the evaluations that Arce-Tomala prepared for Plaintiff. (Tr. 212-13). Not only did Quinones interview Plaintiff for her position and recommend that Defendant hire her (Tr. 231-32), but, as demonstrated throughout trial, he chaired the regular staff and administrative meetings, which addressed clinical job performance. *Compare Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2444 (2013) (holding that an individual is a "supervisor" under *Faragher/Ellerth* "when the employer has empowered that employee to take tangible employment actions against the victim"); *Townsend v. Benjamin Enters.*, 679 F.3d 41, 52-53 (2d Cir. 2012) ("the *Faragher/Ellerth* affirmative defense is unavailable when the supervisor in question is the employer's proxy or alter ego"). Under the City law's punitive damages provision, the Hospital's

25

attempts to satisfy its policies and procedures are not relevant in determining Plaintiff's entitlement to these damages; they only relate to possible mitigation of the amount.

In arguing that Plaintiff was not entitled to punitive damages, Defendants rely on the jury charge that states that "an employer is not liable for punitive damages on an employee's wrongful conduct where the employer proves by a preponderance of the evidence" that it had policies and procedures in place to prevent and detect unlawful discrimination and it "made good faith efforts to implement and enforce these policies and procedures." (Tr. 995). As demonstrated above, however, that portion of the charge did not apply once the jury determined that Quinones and not a co-worker committed the disability harassment, even if they had appropriate policies and procedures in place.

### 2. The jury had an evidentiary basis to find that Defendant failed to properly prevent and detect discrimination.

Defendant argues that the jury had no basis to award punitive damages because it ignored "substantial evidence" that (1) the Hospital maintained appropriate policies to prevent and detect discrimination, (2) the Hospital, through frequent training, made a good faith effort to enforce its policy and (3) Plaintiff denied the Hospital the chance to resolve her complaint. (Def. Br. at 18). Even assuming the City law allows the Hospital to avoid punitive damages based on these factors (and it does not, as demonstrated above), the jury correctly found that the Hospital did not satisfy these factors. The Hospital is simply relitigating factual issues that the jury has already resolved in Plaintiff's favor. Indeed, Plaintiff complained not only to Quinones but to Arce-Tomala, who did not forward Plaintiff's complaint to Human Resources, neither of whom advised Human Resources about Plaintiff's complaints or otherwise acted upon them in any way.

Moreover, Defendant did not properly train its supervisors to handle discrimination

complaints. While she claimed to have had underwent extensive training under the policy (Tr. 318), Arce-Tomala's testimony suggests the Hospital's antidiscrimination policies were not a priority and the training was not effective. Although Arce-Tomala claimed she received this training more than 20 times during her employment with the Hospital (Tr. 318), she testified in deposition that she was "not sure" the Hospital had a procedure for reporting discrimination. (Tr. 326-27). Nor was Arce-Tomala sure the Hospital even maintained a policy for supervisors to report discrimination. (Tr. 328-29). (Arce-Tomala tried to clarify her testimony by stating she was "sure they have a procedure, but do I know it specifically is what I'm saying I'm not sure about." [Tr. 328-29]). At the time of her deposition in September 2016, Arce-Tomala also "wasn't sure" she knew about the Hospital's reporting requirements. (Tr. 328). However, at trial, Arce-Tomala testified that, if an employee complained to her about discrimination, she would have "encouraged" the employee to report it to Human Resources, and she would have reported it, as well. (Tr. 332-33).

The ineffective training is manifest in Arce-Tomala's telling Plaintiff that she had to deal with Quinones' discrimination on her own, contrary to the Hospital's own written policies. (Tr. 795-96). This is not advice that a properly-trained supervisor would provide an employee. Despite Defendant's discrimination-reporting policies, in more than 20 years at the Hospital, Arce-Tomala has never reported discrimination. (Tr. 329). Nor, Arce-Tomala claims, did she ever witness discrimination at the Hospital (even though it happened before her eyes in this case). (Tr. 329). Arce-Tomala also claims that no employee has ever reported discrimination to her. (Tr. 329, 334, 338). Arce-Tomala did not even know that any Hospital employee had complained about discrimination until Plaintiff filed this action. (Tr. 330-31).

Third, satisfying her obligation under the City law, the jury had an evidentiary basis to

27

find that Plaintiff *did* take steps to stop the disability harassment, and she did not simply complain to Quinones.  She also complained to Arce-Tomala.  Under the comparable test governing the employer's affirmative defense to sexual harassment claims under Title VII, the employer may establish "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer *or to avoid harm otherwise*." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (emphasis supplied).  Contrary to Defendant's argument (Def. Br. at 20), to preserve their rights under the antiharassment laws, plaintiffs are not required to follow the employer's written procedures to the letter; rather, the plaintiff must take action "to avoid harm." *Faragher*, 524 U.S. at 807. *Compare Gorzynski v. Jet Blue Airways, Corp.*, 596 F.3d 93, 105 (2d Cir. 2010) ("an employer is not, as a matter of law, entitled to the *Faragher/Ellerth* affirmative defense simply because an employer's sexual harassment policy provides that the plaintiff could have complained to other persons as well as the alleged harasser").  Not only did Plaintiff comply with the policy in repeatedly telling Quinones to stop ridiculing her hearing disability from 2010 through 2012 (Tr. 769, 783-86, 788-89) and reporting her grievance to Arce-Tomala in 2011 (Tr. 793-96), but she placed her objections in writing in rebutting an unfair performance discipline in November 2013.  (PX 15).  The jury had ample basis to conclude that Plaintiff met her obligation to grieve the harassment and to bring it to management's attention. Under the Hospital's complaint policy, "Any St. Barnabas supervisor or manager who receives a report or complaint of discrimination or harassment must report that alleged offense immediately" [to specified individuals] and await instruction."  (PX 7 at 28). *See also* Tr. 106, 206, 322-24. Consistent with that language, Plaintiff gave the discrimination complaint/rebuttal to Arce-Tomala. (Tr. 799-800).  As the Hospital's counsel conceded in summation (Tr. 955-56), the rebuttal was in

the Hospital's possession all the while, as Defendant produced it in discovery.  While Human

Resources must promptly and thoroughly investigate all discrimination complaints (Tr. 82, 96-97),

no one investigated Plaintiff's written complaint. (Tr. 211).  Arce-Tomala forwarded all employee

rebuttals to Human Resources (Tr. 408-09), which are then placed in the employee's file (and which

was produced to Plaintiff in discovery). (Tr. 209).  Similarly, while Arce-Tomala claimed she never

saw the discrimination complaint (Tr. 527-28), the jury was not required to accept that denial as true.

*See Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 151 (2000).  The jury was entitled to

conclude that Defendant knew about but ignored Plaintiff's discrimination complaint.  Since

management is expected to take employee rebuttals seriously and to read them all the way through,

the jury's punitive damages finding is not a "miscarriage of justice" sufficient to compel a new trial

under Rule 59.

### B. The punitive damages award is not grossly excessive as a matter of law.

Under state law, "[t]he amount of exemplary damages awarded by a jury should not be

reduced by a court unless it is so grossly excessive 'as to show by its very exorbitancy that it was

actuated by passion.'" *Nardelli v. Stamberg*, 44 N.Y.2d 500, 503 (1978) (also noting that punitive

damage awards are "not lightly to be disturbed").

Constitutional standards also govern review of punitive damages.  The Court of Appeals

has stated:

> The framework for assessing whether a punitive damages award violates due
> process is well established.  In *Gore*, the Supreme Court set down three
> "guideposts" for courts reviewing such awards: "(1) the degree of
> reprehensibility of the defendant's misconduct; (2) the disparity between the
> actual or potential harm suffered by the plaintiff and the punitive damages
> award; and (3) the difference between the punitive damages awarded by the
> jury and the civil penalties authorized or imposed in comparable cases." *State*

*Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996)). The Court has held, however, that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct," which "reflects the accepted view that some wrongs are more blameworthy than others." In assessing the reprehensibility of a defendant's conduct, the Supreme Court has instructed that courts should

> consider[] whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. Although the type of harm is surely relevant, purely economic harm can merit the imposition of a punitive damages award, and some courts have noted the relative reprehensibility of intentional discrimination as distinguished from some other forms of purely economic injury.

*Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 148 (2d Cir. 2010).

While Defendant claims that Plaintiff did not suffer reprehensible discrimination (Def. Br. at 22), the jury heard evidence that Quinones cruelly attacked Plaintiff's hearing disability over the course of eight years in the presence of her colleagues at staff meetings, causing Plaintiff to shut down during the meetings to avoid further public humiliation. While Plaintiff complained about this discriminatory treatment orally and in writing, Defendant never investigated her complaints, allowing the harassment to continue despite the Hospital's written policies prohibiting all forms of discrimination and harassment.

Putting aside the egregious nature of the continued harassment, the jury could have taken into account Quinones and Arce-Tomala's training/qualifications and their efforts to mislead the jury about what they knew about Plaintiff's disability and Quinones's harassment. Quinones has two master's degrees, one in clinical psychology and the other in social work administration. (Tr.

218).   Trained to work with vulnerable people, apply his observational skills and handle his administrative duties professionally, Quinones knew what he was doing in discriminating against Plaintiff despite her pleas for him to stop.  (Tr. 218-29).

Importantly, Quinones denied bullying Plaintiff because of her disability.  (Tr. 194-95, 274-75).  Quinones also falsely denied even knowing Plaintiff had a disability, testimony that certainly informed the jury's punitive damages determination.  He denied saying anything about Plaintiff's hearing device.  (Tr. 276).  Yet, Quinones conceded that Plaintiff "sometimes" brought an amplifier with "ear buds" to the meetings.  (Tr. 199-200).  He recalled that Plaintiff mostly wore the amplifier to meetings once or twice per month toward the end of her employment.  (Tr. 201). Amazingly, Quinones testified that the first time he understood Plaintiff was accusing him of discrimination was after she filed this action in 2016.  (Tr. 202-03).  This incredulous testimony informed the punitive damages award.

What is more, Quinones testified that he never spoke Spanish during staff meetings.  (Tr. 273).  Arce-Tomala did not recall Quinones using Spanish during these meetings.  (Tr. 396-98). As Torres testified that Quinones *did* speak Spanish at administrative/staff meetings (Tr. 566), the jury was able to conclude that, in an effort to avoid liability, Quinones and Arce-Tomala actively worked to mislead the jury even on relatively minor details.  Relatedly, Plaintiff's immediate supervisor, Arce-Tomala, recalled that no one at the staff meetings sat in a particular spot and that "everyone sat wherever there was a chair available."  (Tr. 346, 351).  She did not recall Plaintiff ever sitting next to Quinones at these meetings.  (Tr. 346-47).  That was untrue.  Quinones also denied that Plaintiff always sat next to him at meetings (Tr. 200); this testimony was simply untrue, as reflected in Rosa Torres' account.  (Tr. 570).

31

Like Quinones, Arce-Tomala is an experienced social work professional. (Tr. 314-16, 385-86, 529-30). Yet, contrary to the evidence that the jury credited, she denied that Quinones ever referenced Plaintiff's hearing impairment at administrative, staff or disciplinary meetings or on any other occasion. (Tr. 540-41). She also testified that, had Quinones done so, she would have reported it to Human Resources and told Quinones to stop making discriminatory comments. (Tr. 540, 544). Just as it rejected Quinones's testimony, the jury likely deemed Arce-Tomala's testimony disingenuous, further warranting a sizable punitive damages award.

Courts have routinely upheld comparable punitive damages awards in discrimination cases brought under the City law. *See e.g. Rivera v. United Parcel Serv., Inc.*, 148 A.D.3d 574, 575 (1st Dept. 2017) (where "supervisor repeatedly made gross and highly offensive sexually-charged remarks to plaintiff, including in front of plaintiff's subordinates, causing them to lose respect for plaintiff and fueling rumors about her proclivity to engage in workplace affairs, the Court upheld the punitive damages award of $300,000, "particularly given defendant's substantial income, and when compared with punitive damages awards for similar claims under the City HRL"); *Salemi v. Gloria's Tribeca, Inc.*, 115 A.D.3d 569, 570 (1st Dept. 2014) (upholding $1.2 million punitive damages award in religious and sexual orientation case "[g]iven the extensive evidence of defendant's discriminatory conduct"); *McIntyre v. Manhattan Ford*, 256 A.D.2d 269, 271 (1st Dept. 1998) ("In view of the egregiousness of defendant's misconduct . . . we regard $1,500,000 to be a reasonable sum that is sufficient to punish defendant and to deter future misconduct"); *Santana v. G.E.B. Med. Mgt. Inc.*, 2017 N.Y. Misc. LEXIS 4186, at **7 (Bronx Co. Sup. Ct. Oct. 20, 2017) (upholding $500,000 punitive damages award as "not grossly excessive") (citing *inter alia Zakre v. Norddeutsche Landesbank*, 541 F. Supp. 2d 555, 567 (S.D.N.Y. 2008) (remitting $1.5 punitive

32

damages award to $500,000 in light of the remedial purpose of the City Law) and *Greenbaum v. Handlesbanken*, 67 F. Supp. 2d 229, 268-69 (S.D.N.Y. 1999) (Sotomayor, J.) (where "the jury found a pattern of discriminatory activity followed by two retaliatory attacks, which together were quite egregious," the Court upheld $1.25 million in punitive damages in employment discrimination case, noting that "Defendants of SNY's size who engage in certain willful discriminatory practices thus commonly face the risk of punitive damages equaling $300,000, the amount of awardable non-exemplary damages ($320,000 in this case), or more than $1 million")); *Jordan v. Bates Advert. Holdings, Inc.*, 11 Misc. 3d 764, 778 (Sup. Ct. N.Y. Co. 2006) (although defendant had promulgated antidiscrimination policies in its employee handbook, Court upheld $500,000 in punitive damages in part where "the EEO compliance officer in this large and sophisticated national corporation, took no steps to discipline or otherwise counsel two supervisory personnel . . . whom he heard call plaintiff a 'cripple'"). The award in this case is not so grossly excessive 'as to show by its very exorbitancy that it was actuated by passion.'" *Nardelli*, 44 N.Y.2d at 503.

Finally, in assessing the punitive damages award, courts also consider the ratio between compensatory damages and punitive damages. "As a general matter, the four-to-one ratio of punitive to compensatory damages awarded is 'close to the line of constitutional impropriety.' And where, as here, the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, 'a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'" *Turley*, 774 F.3d at 165. In *Turley*, the Court stated that "a roughly 2:1 ratio of punitive damages to what, by its nature, is necessarily a largely arbitrary compensatory award, constitutes the maximum allowable in these circumstances." *Id.* at 166.

Plaintiff recovered $624,000 for pain and suffering and $750,000 in punitive damages. (Tr. 1004-05). The ratio between compensatory and punitive damages is .83:1. That ratio falls within constitutional guidelines. Defendant has no basis to challenge the punitive damages award on that basis, and this Court should affirm the award in its entirety.

## CONCLUSION

Defendant articulates no basis to upset the jury verdict. The Hospital is not entitled to a new trial on the compensatory or punitive damages awards. Nor is Defendant entitled to a remittitur.

Dated:      March 26, 2018

Respectfully submitted,

| STEPHEN BERGSTEIN | BRUCE GITLIN | GABRIELLE VINCI | MEGAN GODDARD |
|---|---|---|---|
| BERGSTEIN & ULLRICH, LLP 5 Paradies Lane New Paltz, N.Y. 12561 (845) 468-1277 | GITLIN, HORN & VAN de KIEFT, LLP 2095 Broadway, Suite 407 New York, N.Y. 10023 (212) 514-5347 | NESENOFF & MILTENBERG, LLP 363 Seventh Avenue, 5th Floor New York, N.Y. 10001 (212) 736-4500 | GODDARD LAW 39 Broadway, Suite 1540 New York, N.Y. 10006 (646) 504-8363 *Counsel for Plaintiff* |

BENNITTA JOSEPH
JOSEPH & NORINSBERG LLC
225 Broadway, Suite 2700
New York, NY 10007
(212) 227-5700

34