UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/17/18_

RUTH ROJAS DUARTE,

                    Plaintiff,

          - against -

ST. BARNABAS HOSPITAL,

                    Defendant.

**MEMORANDUM
OPINION & ORDER**

15 Civ. 6824 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiff Ruth Duarte alleges that her former employer, St. Barnabas Hospital (the

"Hospital"), discriminated against her on the basis of her hearing disability, in violation of the

New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.[1]

---

[1]  The Complaint includes claims for (1) hostile work environment and discrimination on the
basis of Plaintiff's gender, race, national origin, and disability, in violation of Title VII, the
Americans with Disabilities Act ("ADA"), the New York State Human Rights Law
("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"); (2) unpaid wages and
overtime, in violation of the Fair Labor Standards Act ("FLSA") and New York Labor Law
("NYLL"); (3) retaliation, in violation of NYLL §§ 740-41 and the NYSHRL; (4) Family
Medical Leave Act ("FMLA") interference and retaliation; and (5) failure to provide a
reasonable accommodation, in violation of the NYSHRL and the NYCHRL. (Cmplt. (Dkt. No.
5) ¶¶ 63-110)

On October 20, 2016, Plaintiff voluntarily withdrew her failure to accommodate
claims (Oct. 20, 2016 Ltr. (Dkt. No. 42) at 4), and the Court dismissed the claims on November
21, 2016. (Nov. 21, 2016 Order (Dkt. No. 45))

On January 30, 2017, the Hospital moved for summary judgment on Plaintiff's remaining claims.
(Def. Mot. (Dkt. No. 48)) On September 13, 2017, the Court granted the Hospital's motion for
summary judgment in part and denied it in part. (Sept. 13, 2017 Order (Dkt. No. 57)) The
Hospital was granted summary judgment on Plaintiff's (1) disparate treatment discrimination
claims under Title VII, the ADA, the NYSHRL, and the NYCHRL; (2) hostile work
environment claims under Title VII, the NYSHRL, and the NYCHRL, to the extent those claims
were premised on gender or race discrimination; (3) NYSHRL retaliation claim; and (4) FMLA
interference and retaliation claims. (See id. at 50) The Court also dismissed Plaintiff's claims
for unpaid wages and overtime compensation under the FLSA and the NYLL based on Plaintiff's

Following a five-day trial, the jury returned a verdict in Plaintiff's favor, awarding her $624,000 in compensatory damages for emotional distress, and $750,000 in punitive damages. (Verdict (Dkt. No. 144))

The Hospital has moved under Fed. R. Civ. P. 59 for a new trial and/or a remittitur concerning the damage awards. (Def. Mot. (Dkt. No. 163)) For the reasons stated below, the Hospital's motion for a new trial will be granted with respect to the compensatory and punitive damage awards unless Plaintiff accepts a remittitur reducing the amount of compensatory damages to $125,000, and the amount of punitive damages to $125,000.

## BACKGROUND

## I. HARASSMENT SUFFERED BY PLAINTIFF

Plaintiff Duarte was born and raised in Ecuador, and has suffered from a hearing disability since childhood. (Trial Tr. ("Tr.") at 727, 768) In the late 1970s, at the age of 19, Plaintiff immigrated to the United States and settled in the Bronx. (Id. at 727-29) Plaintiff learned English, and she obtained a bachelor's degree in public administration in 1994, and a master's degree in social work in 2007. (Id. at 731-37)

On July 9, 2007, immediately after receiving her master's degree, Plaintiff began work as a bilingual clinician at St. Barnabas Hospital's David Casella Children's Services

status as an opt-in plaintiff in a separate collective action brought under the FLSA against the Hospital. (Id.)

On January 17, 2018, the Court so ordered a stipulation dismissing Plaintiff's claims for retaliation under NYLL §§ 740-41 and the NYSHRL. (Dkt. No. 119)

On January 25, 2018 – the fourth day of trial – Plaintiff voluntarily withdrew her hostile work environment claims under Title VII, the ADA, and the NYSHRL to the extent these claims were based on disability discrimination, as well as her national origin discrimination claim under the NYCHRL. (See Dkt. No. 140) Only Plaintiff's disability discrimination claim under the NYCHRL went to the jury.

2

program ("DCCS") in the Bronx. (Id. at 194, 741-43) DCCS is a clinic that provides mental health services to children. (Id. at 223) While employed at DCCS, Plaintiff provided psychotherapy services for children and adolescents through individual, family, and group therapies. (Id. at 743) Plaintiff was employed at DCCS until August 7, 2014. (Id. at 746)

Edgardo Quinones was the divisional director for children's services throughout Plaintiff's employment at DCCS. (Id. at 204) In that role, Quinones supervised more than thirty-five employees, including four clinical supervisors, who in turn directly supervised clinicians such as Duarte. (Id.) Milagros Arce-Tomala was Plaintiff's clinical supervisor. (Id. at 535) When Arce-Tomala was on vacation, Quinones served as Plaintiff's direct supervisor. (Id. at 785)

As a clinician at DCCS, Plaintiff was required to attend two types of staff meetings, both of which occurred on Wednesdays and were conducted in a large conference room at DCCS. (Id. at 342-43, 348, 567) At administrative meetings – which took place every other Wednesday – DCCS managers discussed, inter alia, new policies, "work performance and quality and levels of service,"[2] and the timely completion of paperwork. (Id. at 342, 346-47, 353, 755-56, 765) Attendees at administrative meetings included Quinones, Arce-Tomala, an intake worker, a family support worker, an administrative assistant, seven to ten clinicians (including Plaintiff), and – on some occasions – a registration clerk and a child psychiatrist. (Id. at 340-41, 755)

Clinical team meetings took place on alternate Wednesdays. (Id. at 347) Quinones, Arce-Tomala, half of the clinicians, a clinical supervisor, and psychiatrists attended

---

[2] "Levels of service" refers to the number of "face-to-face contacts" that clinicians had with clients each week, whether in individual, group, or family therapy. (Tr. at 221)

the clinical team meetings. (Id. at 198-99, 350) Because only half the clinicians attended clinical team meetings at a time, Plaintiff was present at clinical team meetings only once a month. (Id. at 348)

Quinones presided at both the administrative and clinical team meetings (together, "staff meetings") unless he was unavailable, in which case Arce-Tomala presided. (Id. at 578, 756) When Quinones was present, he sat at the head of the table, and Arce-Tomala usually sat next to him. (Id. at 571-72) Plaintiff's hearing disability made it difficult for her to hear what was said at these meetings. (Id. at 760) Accordingly, Plaintiff generally sat next to Quinones, or Arce-Tomala, depending on who was leading the meeting, to ensure that she could hear the primary speaker. (Id. at 571, 577, 579-80, 757)

In 2007, notwithstanding her proximity to Quinones at the staff meetings, Plaintiff sometimes could not hear what he was saying, and she would ask him to repeat his remarks. (Id. at 760-61) Quinones would then call Plaintiff "deaf," or ask her if she was deaf. (Id. at 761)

In 2008, Duarte began bringing a hearing aid device to the staff meetings. (Id. at 559, 594, 762) The device was a "little rectangular box" – about two by three inches in size – with ear-bud headphones that Duarte wore during staff meetings. (Id. at 200, 389) Rosa Torres – another DCCS clinician (id. at 558, 562) – testified that, at these meetings, Plaintiff "would take out her" hearing aid device and "set it up."[3] (Id. at 560) Plaintiff "would always comment [that she] ha[d] to put [the hearing device] on, . . . so [she could] hear the speaker," and she

---

[3] Arce-Tomala testified that Plaintiff did not begin using this device at staff meetings until "[a]fter [] years of working [at DCCS]." (Tr. at 355) Plaintiff and fellow clinician Rosa Torres both testified, however, that Plaintiff began using the hearing aid at all staff meetings in 2008. (Id. at 594-95, 762-64) The Court finds the testimony of Plaintiff and Torres on this point more credible than that of Arce-Tomala.

openly adjusted the device at staff meetings. (Id. at 560, 562) Once Plaintiff started using the device, she brought it to every staff meeting. (Id. at 357)[4]

Even with her hearing aid, however, Plaintiff still had difficulty hearing at staff meetings, and she sometimes asked Quinones to repeat himself. (Id. at 763-65) Plaintiff testified that, when she made these requests, Quinones "started to make such comments as . . . you are deaf? You don't listen? Put your thing on. I want you to hear what I said. I don't want to hear later on that you say that you didn't hear me." (Id. at 766) Quinones would "sometimes add things like, I want you to hear what I'm going to say. I don't want to hear later that you didn't hear. You hear when it's convenien[t] to you." (Id.) After making these remarks, Quinones would slap the conference room table with his hands. (Id. at 766-67)

According to Duarte, Quinones's hand-slapping on the table triggered painful memories for Plaintiff, and caused her to cry and remain silent. (Id. at 766-67) During Plaintiff's childhood, her father verbally and physically abused her when she could not hear him. (Id. at 768) Plaintiff testified that her father often asked her, "are you deaf?" and hit her, because he believed she "was not obeying him." (Id.) Plaintiff told Quinones about her father's abuse. (See id. at 768-69, 784-85)

During 2009, Plaintiff continued to experience difficulty hearing during staff meetings, and continued to ask Quinones to repeat himself. (Id. at 769-70) According to Plaintiff, Quinones responded in the same fashion. (Id. at 770) Quinones made comments about Duarte's hearing at staff meetings "[t]wo or three times" in 2009 before Plaintiff took medical

---

[4] Quinones testified that he "didn't know" that Plaintiff suffered from a hearing disability. (Tr. at 199) Given Duarte's testimony about her interactions with Quinones, and Arce-Tomala and Torres's testimony that it was apparent from Duarte's hearing aid device that she had a hearing disability, the Court finds Quinones's testimony on this point not credible. (See id. at 195-95, 354-55)

leave in the fall. (Id. at 790-91) Plaintiff was on medical leave from October 16, 2009, until August 16, 2010. (Id. at 877)

When Plaintiff returned to work in 2010, she resumed attending staff meetings, and again sat next to Quinones. (Id. at 770-71) Plaintiff continued to experience difficulty hearing during staff meetings, and asked Quinones to repeat himself. (Id. at 771, 773) When Duarte asked Quinones to repeat himself, he would call her "deaf" and say, "[p]ut your things on your ear." (Id. at 773) Quinones continued to slap the conference room table at these moments, again triggering memories of Plaintiff's childhood and making her feel "guilty [for] having [her] impairment." (Id. at 774) Duarte testified that Quinones made comments about her hearing impairment on two or three occasions in 2010. (Id. at 791-92)

Plaintiff spoke with Quinones in 2010 about his remarks concerning her hearing impairment. (Id. at 783-84) According to Duarte, these conversations took place in her office when Quinones was reviewing her progress notes for patients. (Id. at 786) Plaintiff told Quinones, "I don't like when you say this. It is very hurtful to me. It hurts me. Can you please stop." (Id. at 784) Duarte reminded Quinones of the abuse she had suffered as a child, and told Quinones, "I don't like it when [you] say that I'm deaf or when [you] ma[k]e remarks to remind me of my childhood, my adolescent days." (Id.) Duarte addressed these concerns with Quinones on two or three occasions in 2010, but there was no change in his behavior. (Id. at 784-86)

Quinones's remarks concerning Duarte's disability continued through 2011. (Id. at 774) When Plaintiff told Quinones during staff meetings that she could not hear him, he ridiculed her disability. (Id.) This occurred on approximately three occasions in 2011. (Id. at 792) During 2011, Duarte had "[t]wo or three" more conversations with Quinones about his

remarks concerning her disability. (Id. at 787) According to Duarte, Quinones referred to her as "dumb" or "stupid" during one of these conversations, which left her in tears. (Id. at 788)

Plaintiff complained to Arce-Tomala about Quinones's remarks on two or three occasions in 2011. (Id. at 793-95) According to Duarte, she pleaded with Arce-Tomala not to "go on vacation. When you go on vacation, and [Quinones] reviews my [progress] notes, he tells me things that I feel bad about, such as remarks about my hearing disability." (Id. at 795) Arce-Tomala told Duarte, "You've got to speak to him, you've got to deal with him." (Id. at 796)

At staff meetings between 2011 and 2014, Quinones continued to ask Plaintiff if she was deaf. (Id. at 585, 846, 849) Plaintiff again complained to Quinones about his behavior. (Id. at 787-88) During a 2012 conversation, Duarte told Quinones that his remarks about her hearing disability upset her; that her hearing disability was "not a joke"; and that he "need[ed] to stop." (Id. at 789) Quinones's only response was to "step[] out of [P]laintiff's office." (Id.) Plaintiff eventually stopped confronting Quinones about his remarks concerning her hearing disability, because her complaints appeared to have no effect. (Id. at 796)

Plaintiff's hearing worsened during the period between 2007 and 2014. (Id. at 849) She continued to ask Quinones to repeat himself in 2014, and he would respond: "I know you're deaf. I forgot you're deaf. You had your thing on. Make sure you have your thing on . . . . I don't want you to say that you didn't hear me because you only hear when it is convenient to you." (Id. at 848)

Marcie Van Hoven-Hernandez – a union representative – testified about Quinones's treatment of Duarte at a 2014 disciplinary hearing. (Id. at 180-81) At that hearing, Quinones and Arce-Tomala criticized Plaintiff's job performance, stating, inter alia, that she was not meeting numerical targets for therapy sessions with patients. (Id. at 187) According to

Hoven-Hernandez, when Duarte tried to defend herself, Quinones raised his voice and banged his hand on the table (id. at 188), which caused Plaintiff to "shak[e] and cry[] uncontrollably" and to adjust her earpiece. (Id. at 189) Quinones then said, "What are you, deaf?" (id. at 190), and Arce-Tomala laughed at Quinones's question. (Id. at 192) Hoven-Hernandez told Quinones and Arce-Tomala that they were being "inappropriate, [and] disrespectful," but neither responded to her admonition. (Id.)

## II.   PLAINTIFF'S EMOTIONAL DISTRESS

Plaintiff testified that between 2009 and August 7, 2014 – when her employment at DCCS ended – she experienced anxiety "every week" from Tuesday night through Thursday morning. (Id. at 865-66) Plaintiff explained that Wednesdays – the day on which staff meetings were conducted – "were the days where [she] was mo[st] anxious at work." (Id. at 865) Duarte was "worried and unable to sleep [on Tuesday nights], thinking that Mr. Quinones come[s] on Wednesday[s] to the unit." (Id.)

Duarte also testified that – beginning in 2011 – Quinones's remarks about her hearing lowered her self-esteem, made her cry, and caused her to suffer from headaches, stomach aches, and "panic attacks." (Id. at 775) Plaintiff described her panic attacks as follows: "I started [] feeling anxious, shaking. . . . I couldn't sleep the night before, scared of what is going to happen or what is going to transpire in that particular staff meeting." (Id. at 775-76) Duarte's anxiety "increased" in 2014: "Tuesday, Wednesday, and sometimes Thursday the whole day I was anxious." (Id. at 866)

Duarte testified that she still feels "[a]nxious, scared, [and] angry," and that she "blam[es] herself for not doing what [she] should have done" – that is, "speak up to a . . . higher person." (Id. at 782) Duarte still experiences "depressing time[s], anxiety, [and] panic attacks"

8

(Id. at 870); has trouble sleeping; has "lower self-esteem"; and "feel[s] less or [i]ncapable [of doing] what [she] did before coming to [DCCS]." (Id. at 871) Plaintiff has not sought therapy, but has "been trying to implement coping skills that [she] encourage[s] [her] patients to implement." (Id.)

Plaintiff testified that – during her employment at DCCS – she discussed her emotional distress with her children and with four fellow DCCS clinicians – Torres, Carmen Lopez, Silva Dolman, and Janet Santa Cruz. (Id. at 775-76, 781) Plaintiffs' children were not called as witnesses at trial, however, and – other than Torres – the clinicians mentioned by Duarte were not called to testify. Torres testified as follows regarding Duarte's emotional distress:

> Before the meetings, Ms. Duarte . . . would call me to say please don't leave me alone. So I would go to her office and get her and already she was appearing, she was appearing nervous, and she would just grab my hand and say well, hopefully everything goes well.
>
> I said let's pray, let's pray that everything goes well and that there will be a miracle, Edgardo will cancel the meeting, you know, that he doesn't say any remark . . . .
>
> . . . As we were walking, we were basically reiterating everything will be okay, you'll get through it. Then we [would] go into the staff meetings. . . .

(Id. at 613-14) Torres added that she and Plaintiff would "pray[] for a miracle that Edgardo wouldn't show up, that he wouldn't come out and say those horrible things," such as "are you deaf, are you deaf." (Id. at 615)

According to Torres, when Quinones made remarks about Plaintiff's hearing disability at staff meetings, Duarte would "sigh, 'Edgardo,'" "shake her head, bring it down[,] . . . [and] shut down [for] the rest of the staff meeting." (Id. at 589) "[I]f the meeting went bad, meaning that Edgardo . . . humiliated her in front of us, the co-workers, then [Duarte] would leave crying." (Id. at 616) Plaintiff would later cry in front of Torres and say, "I don't

understand why he does this." (Id. at 617) According to Torres, Plaintiff eventually stopped speaking up at meetings out of "fear that it would trigger Mr. Quinones." (Id. at 618)

## III.   THE NOVEMBER 2013 WRITTEN WARNING AND PLAINTIFF'S REBUTTAL

In November 2013, Plaintiff received a written warning for insubordination.[5] In connection with a dispute with Arce-Tomala about whether Duarte could use a sick day for purposes of a doctor's appointment, Duarte allegedly warned Arce-Tomala, "[o]ne day you will lose your power." (Id. at 797-98; see also PX 14 (Dkt. No. 73-4)) On November 20, 2013, Plaintiff and her union representative – Kwame Shaw – met with Arce-Tomala and Quinones to discuss the warning. (Tr. at 539, 918-19, 921-22) During the meeting, Quinones said, "it is not my fault that you are deaf, [or] something [along] those lines." (Id. at 919-20) Plaintiff broke into tears during the meeting. (Id. at 920)

After the meeting, Duarte told Shaw that Quinones's remarks about her hearing disability were "very painful" and that she "want[ed] him to stop." (Id.) Shaw suggested that Duarte prepare a "rebuttal" to the written warning. (Id.) In her November 25, 2013 rebuttal, Plaintiff denied making the "lose your power" statement to Arce-Tomala. (PX 15 (Dkt. No. 73-5) at 1) Duarte also addressed Quinones's remarks about her hearing disability:

> I would like to take this opportunity to express my feelings about how many times DCCS Administrators ha[ve] continually harassed, retaliated and bullied me regarding my disability and my work ethic by making inappropriate comments about my hearing disability and calling me "Deaf" and/or embarrassing me during staff meetings.

(Id.)

---

[5]   Although the warning was in writing, for purposes of the Hospital's progressive disciplinary scheme, the warning was referred to as a "verbal warning" – the first step in the Hospital's employee discipline regime. (See PX 14 (Dkt. No. 73-4))

Plaintiff testified that she contemporaneously provided copies of her rebuttal to Arce-Tomala and union representatives Shaw and Hoven-Hernandez. (Id. at 800) At trial, however, Arce-Tomala and Quinones denied seeing Plaintiff's November 25, 2013 rebuttal at that time.[6] (Tr. at 211, 527) Moreover, it was undisputed at trial that no one from the Hospital's Human Resources Department ever investigated or addressed Plaintiff's complaint of disability discrimination. (See id. at 109-110, 331)

Arce-Tomala and Quinones acknowledged at trial that Hospital employees have the right to prepare written rebuttals to negative performance evaluations. (Id. at 209, 408-09) Such rebuttals must be read by the Hospital's human resources personnel and are maintained in the employee's personnel file. (Id. at 133, 209) However, Wayne Webb – the Hospital's vice president of human resources – distinguished between rebuttals to performance evaluations and employee responses to disciplinary warnings. (See id. at 132 ("Q. . . . A rebuttal is an employee's written response to a supervisor's evaluation, correct? A. Yes. Q. It could also be an employee's written response to a disciplinary action, right? A. No, it is not."))

Plaintiff testified that she did not submit her complaint about Quinones directly to the Hospital's Human Resources Department because she believed that either Hoven-Hernandez or Arce-Tomala would deliver Duarte's November 25, 2013 rebuttal to the Human Resources Department. (Id. at 803-04) Duarte also testified that Shaw had told her that if Duarte gave the rebuttal to Arce-Tomala, Arce-Tomala would deliver it to Human Resources. (Id. at 805) Hoven-Hernandez also told Duarte that Hoven-Hernandez would deliver the rebuttal to Human Resources. (Id. at 804)

---

[6] Quinones testified that he did not become aware of Plaintiff's November 25, 2013 rebuttal until 2016, during preparation for his deposition. (Tr. at 211)

At trial, defense counsel conceded that Duarte had provided her written rebuttal to Arce-Tomala, and that the Hospital had a copy of Plaintiff's November 25, 2013 rebuttal in its files. (Id. at 955-56)

## IV.     THE HOSPITAL'S ANTI-DISCRIMINATION POLICIES

Wayne Webb – the Hospital's vice president of human resources – testified that the Hospital is committed to creating an environment free of discrimination, and that it investigates every complaint of discrimination. (Id. at 97) The Hospital's Employee Handbook states that, "[the Hospital] is committed to creating a work environment free of discrimination or harassment. Discrimination against and/or harassment of any employee based on . . . disability . . . is illegal and strictly prohibited. Every employee is responsible for complying with this policy." (PX 7 (Dkt. No. 72-6) at 29) The Employee Handbook further provides:

> If you believe that you have been subject to discrimination or harassment, we encourage you to promptly notify the offender, particularly if such individual is a co-worker, that his or her behavior is unwelcome and inappropriate and that you want the behavior to stop immediately. However, if you are uncomfortable confronting the alleged wrongdoer for any reason, such as because (i) he or she is a supervisor or high level member of management; (ii) the severity of the conduct or (iii) informal, direct communication was unsuccessful, [the Hospital] requires that you promptly report the conduct, either verbally or in writing to management, as follows: Keith Wolf, Ext. 6500 or Deborah Schneider, Ext. 5813; however, if you are uncomfortable discussing the matter with either of these individuals for any reason, including because either of them is believed to be involved in the conduct, you must instead report the matter to the individual who runs your specific department.
>
> Any St. Barnabas supervisor or manager who receives a report or complaint of discrimination or harassment must report that alleged offense immediately to Keith Wolf, Ext. 6500 or Deborah Schneider, Ext. 5813, and await instruction.
>
> All complaints will be investigated promptly and thoroughly and, if appropriate, corrective action will be taken. . . .

(Id. at 30 (emphasis in original))

12

According to Arce-Tomala, Hospital employees receive training concerning the Hospital's anti-discrimination policy each year, and Arce-Tomala received such training during each of her twenty years at the Hospital. (Tr. at 315-18) Quinones likewise testified that, during his time as director of DCCS, he received training concerning the Hospital's harassment policy "[o]nce a year at least." (Id. at 272-73)

Arce-Tomala also testified that the annual training included sensitivity training videos that educated employees about working with people in various protected categories, including people with disabilities. (Id. at 435-38) Arce-Tomala testified that she organized the annual training for the clinicians at DCCS, and that she ensured that each clinician attended the training. (Id. at 538-539)

When Duarte began her employment at the Hospital, she read the Hospital's policy concerning discrimination and harassment, and she agreed to comply with it. (Id. at 890) Duarte acknowledged in writing at that time that she had received the Hospital's policy, confirmed that she had read and understood it, and agreed to comply with that policy. (Id. at 889-90) Plaintiff further testified that, throughout her employment at the Hospital, she was aware that if she experienced a problem in the workplace, she could seek assistance from Human Resources. (Id. at 897) Finally, Duarte testified that she was "told that [she] needed to [view the training videos] on a yearly basis" (id. at 862), and that she certified annually that she had "completed the [] annual mandatory in-service training during the last 12 months." (Id. at 878-881, 885-87)

**DISCUSSION**

**I.** **LEGAL STANDARD**

**A.** **Rule 59(a) Motion for a New Trial**

Under Fed. R. Civ. P. 59(a)(1)(A), a court may grant a motion for a new trial where "'the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice, i.e., . . . the jury's verdict [is] against the weight of the evidence.'" Bouveng v. NYG Capital LLC, 175 F. Supp. 3d 280, 311 (S.D.N.Y. 2016) (quoting Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003)). In making this determination, "'a trial judge is free to weigh the evidence himself, and need not view the evidence in the light most favorable to the verdict winner.'" Id. (quoting Manley, 337 F.3d at 244). "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious. Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998) (internal quotation marks and citations omitted).

**B.** **Motion for Remittitur**

"When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages. Alternatively, the court may grant remittitur." MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 559 (S.D.N.Y. 2012) (internal quotation marks and citations omitted). "Remittitur is the process by which a court compels a plaintiff to choose between a reduction of an excessive verdict and a new trial." Id. (internal quotation marks and citations omitted). "Remittitur is appropriate to reduce verdicts only in cases 'in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award.'" Webungs Und Commerz Union Austalt v. Collectors'

Guilt, Ltd., 930 F.2d 1021, 1027 (2d Cir. 1991) (quoting Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 50 (2d Cir. 1984)).

"While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." MacMillan, 873 F. Supp. 2d at 559 (internal quotation marks and citations omitted). "A jury has broad discretion in measuring damages, but it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." Id. (internal quotation marks and citations omitted). "Importantly, in calculating the remittitur, the court must use the least intrusive – and most faithful to the jury's verdict – method of reducing the verdict only to the maximum that would be upheld by the trial court as not excessive." Id. at 559-60 (internal quotation marks and citations omitted).

Here, Plaintiff's claim is brought under the New York City Human Rights Law. "'A federal court, in reviewing the amount of damages awarded on a state [or city] law claim, must apply New York law.'" Emamian v. Rockefeller Univ., No. 07 CIV. 3919 (DAB), 2018 WL 2849700, at *15 (S.D.N.Y. June 8, 2018) (quoting Patterson v. Balsamico, 440 F.3d 104, 119 (2d Cir. 2006)) (alterations in original). "Under New York law, a court 'shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'" Stampf v. Long Island R. Co., 761 F.3d 192, 204 (2d Cir. 2014) (quoting N.Y. C.P.L.R. § 5501(c))). "This standard requires a more exacting review than the 'shocks the conscience' standard generally applied by federal courts," and is less deferential to a jury verdict. Emamian, 2018 WL 2849700, at *15.

15

"In determining whether an award deviates materially from what would be reasonable compensation, district courts compare the jury's award to awards allowed in analogous cases involving similar types of injuries." Bouveng, 175 F. Supp. 3d at 327 (internal quotation marks and citations omitted). "While instructive, such earlier awards are not binding for [purposes of the district court's] review." Id. (internal quotation marks and citations omitted). Moreover, "[a] court should determine whether the award is within a reasonable range, not just balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." Id. at 328 (internal quotation marks and citations omitted).

## II.    COMPENSATORY DAMAGE AWARD

The Hospital contends that Plaintiff suffered no more than "garden-variety" emotional distress, and that accordingly the jury's award of $624,000 in emotional distress damages is excessive. (Def. Br. (Dkt. No. 164) at 6) According to the Hospital, the compensatory damage award should be remitted to no more than $30,000. (Id. at 21)

### A.    Applicable Law

A plaintiff who prevails on a claim of discrimination under the NYCHRL may recover compensatory damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." Bouveng, 175 F. Supp. 3d at 328 (internal quotation marks and citations omitted). "The precise amount of compensatory damages in any given case depends on a unique set of facts and circumstances." Id. (internal quotation marks and citations omitted).

In this Circuit, "'[e]motional distress awards . . . can generally be grouped into three categories of claims: garden-variety, significant, and egregious.'" Vera v. Alstom Power,

Inc., 189 F. Supp. 3d 360, 376 (D. Conn. 2016) (quoting Graham v. City of N.Y., 128 F. Supp. 3d 681, 714 (E.D.N.Y. 2015)). "'[For] "garden variety" emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury.'" Id. (quoting Olsen v. Cty. of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)). "Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration." Id. (internal quotation marks and citation omitted).

"Garden variety emotional distress claims generally merit $30,000.00 to $125,000.00 awards." Emamian, 2018 WL 2849700, at *16 (internal quotation marks and citations omitted); see also Lore v. City of Syracuse, 670 F.3d 127, 177 (2d Cir. 2012) ("This Court has . . . affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of 'testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress.' . . . [W]e [have previously] rejected [a] defendant's contention that [] damage awards[] for 'garden variety emotional distress claims,' 'should have been reduced to between $5,000 and $30,000.'") (citations omitted). "Where a plaintiff offers only sparse evidence of emotional distress, however, courts have reduced such awards to as little as $10,000." MacMillan, 873 F. Supp. 2d at 561.

"'[S]ignificant' emotional distress claims 'are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses.'" Vera, 189 F. Supp. 3d at 376 (quoting Olsen, 615 F. Supp. 2d at 46-47). For "significant" emotional distress damages, "courts in this Circuit . . . have routinely

found that awards ranging from $100,000 to $500,000 are not excessive." Thorsen v. Cty. of Nassau, 722 F. Supp. 2d 277, 293 (E.D.N.Y. 2010); see also Emamian, 2018 WL 2849700, at *18 ("Courts have, in some instances, upheld awards exceeding $200,000.00 for 'significant' emotional distress."). "[U]sually," however, the top of the range for significant emotional distress damages is $200,000. Emamian, 2018 WL 2849700, at *16-17 (collecting cases).

"Finally, 'egregious' emotional distress claims generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff." MacMillan, 873 F. Supp. 2d at 560 (citations omitted). In "egregious" cases, damage awards in excess of $500,000 have been upheld. See, e.g., Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 146, 151-52, 163 (2d Cir. 2014) (upholding award of $1.32 million for emotional distress where plaintiff had been subject to "an extraordinary and steadily intensifying drumbeat of racial insults, intimidation, and degradation over a period of more than three years," which caused post-traumatic stress disorder, short-term adjustment disorder, depression, a panic disorder, and multiple hospitalizations).

"A court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony." Bouveng, 175 F. Supp. 3d at 328 (internal quotation marks and citations omitted). "However, when a court is convinced that the jury's award is entirely out of proportion to the Plaintiff's injury, and was motivated by sympathy rather than by evidence of harm, remittitur is the appropriate remedy." Id. (internal quotation marks and citations omitted).

## B. Application

Plaintiff concedes that the evidence in this case does not establish an "egregious" emotional distress claim, but she argues that her emotional distress "falls within the 'significant' category." (Pltf. Opp. (Dkt. No. 170) at 21)

In this Circuit, "significant" emotional distress is generally found only where a plaintiff has offered medical, psychological, or therapist evidence of substantial, long-term psychological harm. See, e.g., Emamian, 2018 WL 2849700, at *17 (concluding that plaintiff's emotional distress claims "f[e]ll into the intermediate, 'significant emotional distress' category," but remitting $2 million emotional distress award to $200,000; finding "significant emotional distress" based on "[p]laintiff's own testimony regarding her mental state, her trichotillomania [– a condition characterized by a compulsion to pull out one's hair –] and physical manifestations of her emotional suffering, as well as the corroborative medical testimony she presented"); Bouveng, 175 F. Supp. 3d at 332, 334 (remitting $500,000 emotional distress award to $150,000 where "there [wa]s almost no evidence of any sort that Plaintiff ha[d] suffered any long-term emotional distress," and "Plaintiff offered no medical corroboration for her emotional distress"); Rainone v. Potter, 388 F. Supp. 2d 120, 124-126 (E.D.N.Y. 2005) (holding that emotional distress claim "f[ell] squarely in the low end of the 'significant' range" where (1) plaintiff testified that he took a six month leave because of his distress at a discriminatory non-promotion; (2) plaintiff saw a therapist for four years and was diagnosed with depression; and (3) plaintiff's wife testified that plaintiff "was depressed, had difficulty sleeping, was 'completely distraught,' 'frustrated,' and 'completely shattered'").

Here, Plaintiff testified that, between 2009 and 2014, Quinones's comments about her hearing disability made her "worried and unable to sleep" on the night before Wednesday

19

staff meetings; caused her to feel anxious the "whole day" on Wednesdays; and continued to cause her anxiety on Thursday mornings.[7] (Tr. at 865-66) Plaintiff also testified that – beginning in 2011 – she suffered feelings of lower self-esteem, headaches, stomach aches, and panic attacks. (Id. at 775) In 2014, Plaintiff's anxiety "increased," such that she would feel anxious all day on Thursdays. (Id. at 866-67) Duarte also testified that she currently experiences difficulty sleeping, "depressing time[s], anxiety, [and] panic attacks" (id. at 870), as well as decreased self-esteem. (Id. at 871)

Plaintiff's vague and subjective complaints of insomnia, lower self-esteem, depression, anxiety, and stomach aches and headaches – unsupported by medical corroboration – establish no more than "garden variety" emotional distress. See Bouveng, 175 F. Supp. 3d at 330; MacCluskey v. Univ. of Connecticut Health Ctr., No. 3:13-CV-1408 (MPS), 2017 WL 684440, at *15-16 (D. Conn. Feb. 21, 2017) (plaintiff – who had suffered "multiple incidents of sexual harassment over a sustained period" – had established only "garden variety" emotional distress where she testified that "she felt 'ashamed and embarrassed,' was 'afraid to be home alone,' 'afraid to go out in public,' and 'didn't sleep for weeks,'" and continued to suffer from the past harassment, which caused her to "panic" when she felt "somebody behind [her]"; remitting jury's $200,000 emotional distress award to $125,000); Manswell v. Heavenly Miracle Acad. Servs., Inc., No. 14 CV 7114 (MKB) (SMG), 2017 WL 9487194, at *17 (E.D.N.Y. Aug. 23, 2017) (plaintiff had established only "garden variety" emotional distress where she claimed that (1) "she experienced 'extreme anxiety,' 'dreaded going to work,' and 'was fearful at all times' as a result of the harassment she [had] encountered while employed [by defendant]"; and

---

[7] Plaintiff did not explain why she continued to feel anxiety on Thursday mornings, after the Wednesday staff meetings had concluded.

20

(2) "as a result of the hostility she experienced at work, she felt pains in her chest, fatigue, and sleeplessness," and "would cry at night because she was scared to return to [work] in the morning"), report and recommendation adopted, No. 14 CV 7114 (MKB) (SMG), 2017 WL 4075180 (E.D.N.Y. Sept. 14, 2017); Munson v. Diamond, No. 15 CV 00425 (DAB) (BCM), 2017 WL 4863096, at *8 (S.D.N.Y. June 1, 2017) ("[C]ourts in this District have awarded emotional distress damages in the [garden variety range] based on [] general testimony that [a defendant's] discriminatory conduct caused the plaintiff 'continued stress, anger, sadness and frustration,' and that the plaintiff suffered from depression, panic attacks, headaches, nausea, loss of appetite, hives, and severe bouts of insomnia, even after [the plaintiff's] employment was terminated.") (citing Jowers v. DME Interactive Holdings, Inc., No. 00 CIV. 4753 (LTS) (KNF), 2006 WL 1408671, at *12 (S.D.N.Y. May 22, 2006)), report and recommendation adopted, No. 15 CIV. 425 (DAB), 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017).[8]

Moreover, "[t]here was no evidence . . . of an inability to apply for a new position or to enjoy life in general," and "Plaintiff's failure to seek mental health treatment . . . is

---

[8] Plaintiff's testimony that Quinones's remarks about her hearing disability triggered traumatic childhood memories (Tr. at 767) does not alter this conclusion. Although evidence of "a lifetime of struggling" with a disability "could persuade the jury" that a plaintiff was "particularly susceptible to emotional harm flowing from [disability] discrimination," a plaintiff must still show that the "discrimination did in fact cause [] great suffering:" Brady v. Wal-Mart Stores, Inc., 455 F. Supp. 2d 157, 197-98 (E.D.N.Y. 2006) (remitting award of $2.5 million for emotional distress damages to $600,000 where plaintiff's parents testified that discrimination on the basis of plaintiff's cerebral palsy "adversely affected his relationship with the rest of his family," and that "their son lost interest in school, experienced a loss of appetite, cried for no apparent reason, [and] paced in his room unable to sleep at night"; plaintiff suffered what his parents called a "'total breakdown,' that prompted [them] to take their son to a hospital emergency room," after which plaintiff was treated by a psychiatrist for more than two years "with a combination of psychotherapy and [an] anti-anxiety drug"). Here, although Plaintiff linked Quinones's disparaging remarks to traumatic episodes from her childhood, Plaintiff's evidence of emotional distress does not meet the standard for "significant" emotional distress set forth in Brady and comparable cases.

21

consistent with [the] finding that Plaintiff suffered no long-term emotional distress as a result of Defendant's conduct."[9] Bouveng, 175 F. Supp. 3d at 330.

The Court concludes that Plaintiff's testimony establishes only "garden variety" emotional distress. See DeCurtis v. Upward Bound Int'l, Inc., No. 09 CIV. 5378 (RJS), 2011 WL 4549412, at *4-5 (S.D.N.Y. Sept. 27, 2011) (plaintiff established only "garden variety" emotional distress where she claimed – without corroborating medical evidence – that (1) "she felt constantly stressed, nervous and unable to sleep, dreaded going to work, and felt sick each time [her supervisor] called her into his office"; (2) "she felt like she was going to have a nervous breakdown"; and (3) "she lost her self-esteem and self-confidence, [and] . . . feared losing her job and felt humiliated") (internal citations omitted).

Although Plaintiff's fellow clinician – Rosa Torres – testified that Plaintiff "appear[ed] nervous" before staff meetings, and often cried during and after staff meetings (Tr. at 614-16), Torres's testimony is likewise insufficient to establish that Plaintiff suffered "significant" emotional distress. See Abel v. Town Sports Int'l, LLC, 2012 WL 6270919, at *5, 16 (S.D.N.Y. Dec. 18, 2012) (finding only "garden variety" emotional distress where plaintiff's claim that he was hurt, stressed, and "not himself," and had gained weight, was corroborated by other witnesses).

---

[9] Plaintiff contends that she spoke "with four other Hospital clinicians about the abusive work environment created by Quinones" and argues that these conversations were "tantamount to treating with a mental health professional," because "these clinicians are trained to address mental health issues." (Pltf. Opp. (Dkt. No. 170) at 22) There is no evidence that Plaintiff's casual conversations with co-workers constituted therapy, however, much less that Plaintiff's co-workers addressed her "mental health issues." Indeed, Plaintiff did not testify as to the substance of these conversations, but merely stated that she told her co-workers "[w]hat [she] was experiencing and what [she] was feeling at that time." (Tr. at 777)

Courts have, however, upheld significant awards for emotional distress "even absent proof of long-term psychological damage," where the "harassment [] continued for [several] years." Bouveng, 175 F. Supp. 2d at 332; see also McGrory v. City of New York, 2004 WL 2290898 (FM), at *15 (S.D.N.Y. May 7, 2004) ("[L]arge awards for emotional distress have been sustained by the state and federal courts where the discriminatory conduct was egregious or persisted for an extended period."). For example, in Quinn v. Nassau Cnty. Police Dep't, 53 F. Supp. 2d 347 (E.D.N.Y. 1999), the court upheld a $250,000 emotional distress award on a sexual harassment claim where the plaintiff testified that – for almost ten years – "he was ridiculed, humiliated, abused and singled-out because of his sexual orientation." Id. at 351. In upholding the $250,000 award, the Quinn court noted that the plaintiff's "social worker [had] corroborated [plaintiff's testimony] as to the emotional distress he suffered from years of chronic, pervasive, humiliating and severe sexual orientation harassment." Id. at 363. Similarly, in Phillips v. Bowen, 278 F.3d 103 (2d Cir. 2002), the Second Circuit upheld a $400,000 damages award where the "[p]laintiff submitted evidence of ongoing harassment by each defendant over a five-year period"; "[plaintiff] and her boyfriend testified in detail about her emotional distress, physical illness, and the effect of defendants' conduct on her lifestyle and relationships"; and "[p]laintiff's co-workers testified about the deterioration they observed in [plaintiff]," describing her as "basically a different person." Id. at 108, 111.

The evidence here is not comparable to that in Quinn and Phillips. In Phillips, plaintiff's boyfriend fully corroborated plaintiff's testimony regarding the serious physical symptoms of emotional distress she suffered, including that she "was ill in the bathroom two or three hours every night." Id. at 108. Moreover, the testimony of plaintiff and her boyfriend was confirmed by plaintiff's co-workers, who testified that – as a consequence of the years of

harassment – plaintiff became "'basically a different person'" over time. Id. at 108, 111-12. Here, by contrast, significant components of Plaintiff's testimony regarding her symptoms of emotional distress are entirely uncorroborated.

Similarly, in Quinn, the plaintiff – unlike Duarte – sought "mental health counseling with a social worker," and Quinn's testimony concerning the emotional distress he suffered as the result of ten years of "chronic, pervasive, humiliating and severe sexual orientation harassment" was corroborated by testimony from his social worker. Quinn, 53 F. Supp. 2d at 363.

The Court concludes that the evidence does not establish "significant" emotional distress. Accordingly, the jury's compensatory award of $624,000 is excessive.[10]

---

[10] The cases cited by Plaintiff (see Pltf. Opp. (Dkt. No. 170) at 23-25) are not to the contrary. Most involve corroborating evidence from a physician, psychologist, or social worker concerning plaintiff's emotional distress. See, e.g., Thorsen, 722 F. Supp. at 292 (remitting emotional distress award from $1.5 million to $500,000 where plaintiff and "his treating psychologist Dr. Bayer testified at length about [the plaintiff]'s depression and anxiety arising from the reduction in his job duties"; plaintiff saw "Dr. Bayer twice a week for approximately six months, and . . . continued to receive therapy for around a year-and-a-half until his retirement"; plaintiff was prescribed antidepressant and antianxiety medications; and Dr. Bayer "testified that [the plaintiff] suffered from what he termed a 'major stress attack' . . . that required hospitalization"); Katt v. City of New York, 151 F. Supp. 2d 313, 324, 370-71 (S.D.N.Y. 2001) (denying motion to remit an award of $400,000 for emotional distress damages where "extreme and humiliating sexual harassment" caused the plaintiff to suffer "from permanent mental disabilities," including an inability "to work," "to maintain sexual intimacy," and "even to perform household chores"; psychologist testified that plaintiff's "nonfunctional, barely functioning" state was probably "permanent"); Olsen, 615 F. Supp. 2d at 47-48 (denying a motion to remit an award of $400,000 for plaintiff, whose "physician recommended that she consult with a mental health professional to discuss her stress and anxiety," after which plaintiff saw "a clinical social worker and psychotherapist" on a "weekly basis" for almost three years; treating psychotherapist testified that plaintiff suffered from generalized anxiety disorder). Other cases cited by Plaintiff do not discuss the nature of the evidence of the plaintiff's emotional distress, and therefore offer no guidance here. See, e.g., Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc., 850 F.2d 876, 879, 883-84 (2d Cir. 1988); Sogg v. Am. Airlines, 193 A.D.2d 153, 163 (1st Dep't 1993). Finally, Osorio v. Source Enterprises, Inc., No. 05 CIV. 10029 (JSR), 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007), is clearly distinguishable, because the $4 million compensatory damage award in that case addressed both emotional distress and

The Hospital's contention that only a $30,000 award is appropriate is not persuasive, however. The Second Circuit has "affirmed awards of $125,000 [] to plaintiffs for [garden variety] emotional distress resulting from [] discrimination where the evidence of emotional distress consisted only of 'testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress,'" without evidence of "secondary physical results or consequences – 'or professional treatment.'" Lore, 670 F.3d at 177 (quoting Meacham v. Knolls Atomic Power Laboratory, 381 F.3d 56, 77 (2d Cir. 2004) (noting that New York courts have "uph[e]ld awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment" and collecting cases), vacated and remanded for further consideration on other grounds, 544 U.S. 957 (2005)); see also Patterson, 440 F.3d at 120 (upholding $100,000 emotional distress award based solely on plaintiff's "testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, stomach pains, and burning in his eyes from the use of mace").

Given Plaintiff's testimony that (1) she suffered anxiety and sleeplessness much of the time between 2009 and August 2014; (2) she suffered headaches, stomach aches, and a loss of self-esteem during the period between 2011 and August 2014; and (3) some of these symptoms persist to the present; and given Torres's limited corroborating testimony, an award of $125,000 – the top of the "garden variety" range – does not "materially deviate" from

---

reputational harm resulting from the retaliatory termination of a high-ranking employee who struggled to find new employment. Id. at *1, 5 ("[P]laintiff testified at some length about the emotional distress and damage to reputation caused by the retaliation, including how defendants' retaliation caused her to feel depressed and anxious and to feel embarrassed in front of others in the industry, as well as causing her difficulty during subsequent job interviews and professional events and the like.").

compensatory awards in comparable cases.[11] N.Y. C.P.L.R. § 5501(c) ("[A]n award is excessive or inadequate if it deviates materially from what would be reasonable compensation.").

The Hospital's motion for a new trial concerning compensatory damages will be granted unless Plaintiff agrees to a remittitur reducing the compensatory damage award from $624,000 to $125,000.

## III.    PUNITIVE DAMAGES AWARD

The Hospital argues that the Court must vacate or remit the jury's $750,000 punitive damages award because (1) the evidence does not support a punitive damages award, and (2) the award is, in any event, constitutionally excessive. (Def. Br. (Dkt. No. 164) at 21-29)

---

[11] The cases cited by Defendant in support of its arguments concerning the compensatory damage award (see Def. Br. (Dkt. No. 164) at 17-21) are all distinguishable. In MacMillan – where this Court remitted an emotional distress award from $125,000 to $30,000 – the evidence of emotional distress was far less substantial. MacMillan, 873 F. Supp. 2d at 561. There, plaintiff himself "did not offer any testimony concerning his emotional distress, testifying only that working . . . in the Engineering Department had been 'horrible.'" Id. Plaintiff's daughter offered testimony that was only "marginally more descriptive," asserting that plaintiff "was always sad," "wasn't as happy anymore," and "wasn't his same self." Id. Unlike here, there was no evidence that the plaintiff in MacMillan "had any difficulty sleeping, . . . or that his alleged emotional distress . . . disrupted other aspects of his daily life." Id.

Reiter v. Metro. Transp. Auth. of New York, No. 01 CIV. 2762 (JGK), 2003 WL 22271223 (S.D.N.Y. Sept. 30, 2003), in which the court remitted a $140,000 emotional distress award to $10,000, is likewise distinguishable. The plaintiff in that case "did not detail the . . . duration . . . of his mental suffering" and admitted that he never had trouble sleeping. Reiter, 2003 WL 22271223, at *9-11.

Similarly, in McIntosh v. Irving Tr. Co., 887 F. Supp. 662 (S.D.N.Y. 1995), in which the court remitted an emotional distress damage award from $219,428 to $20,000, there was no corroboration for plaintiff's "highly subjective feelings" of emotional distress. Id. at 664. Moreover, "McIntosh did not testify in any detail with respect to the magnitude or the duration of any mental distress." Id.

Here, Duarte testified at length about the "magnitude and duration" of her emotional distress, and Torres provided limited corroboration for Plaintiff's testimony. (Tr. at 614-15)

## A. Liability for Punitive Damages under the NYCHRL

Under the NYCHRL, "a plaintiff is entitled to punitive damages where the

wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is a

conscious disregard of the rights of others or conduct so reckless as to amount to such

disregard." Chauca v. Abraham, 30 N.Y.3d 325, 329 (2017) (internal quotation marks and

citations omitted). This standard is lower than that required to recover punitive damages under

the federal civil rights laws, and does not require a showing of "malice or awareness of the

violation of a protected right." Batten v. Glob. Contact Servs., LLC, No. 15-CV-2382 (NG)

(SJB), 2018 WL 3093968, at \*9 (E.D.N.Y. June 22, 2018).

The NYCHRL also provides for "punitive damages . . . against employers . . .

found directly or vicariously liable for discrimination." Chauca, 30 N.Y.3d at 330. Under

N.Y.C. Admin. Code § 8-107(13)(b)(1)-(3), employers can be held vicariously liable for the acts

of their employees only where

- (1) the employee or agent exercised managerial or supervisory responsibility; or

- (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

- (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

N.Y.C. Admin. Code § 8-107(13)(b)(1)-(3); see also Chauca v. Abraham, 841 F.3d 86, 90 (2d

Cir. 2016) (certifying to the New York Court of Appeals question regarding the standard

governing punitive damages under the NYCHRL), certified question answered, 30 N.Y.3d 325.

"Implicitly recognizing that an employer cannot control all actions of its employees, the law also

27

enables an employer liable for the conduct of an employee to mitigate punitive damages liability or avoid liability altogether in certain circumstances where the employer can prove it has put into place policies and procedures to educate employees, to prevent and detect unlawful discrimination, and to investigate and effectively resolve complaints of such conduct." Chauca, 841 F.3d at 90 (citing N.Y.C. Admin. Code § 8-107(13)(d)-(e)); see also id. at 92 n.3 ("Section 8-107(13)(d)-(e) enables employers to mitigate or avoid imputed punitive damages liability for the acts of their employees.").

Pursuant to these authorities, the Court instructed the jury that

Punitive damages may be awarded based on a violation of the City Human Rights Law where a plaintiff proves – by a preponderance of the evidence – that the defendant has engaged in discrimination with willful or wanton negligence, with recklessness, or with a conscious disregard of the plaintiff's rights or conduct so reckless that it amounts to such disregard. Under this standard, a defendant need not know that he or she was violating the law, and the plaintiff is not required to prove intentional or malicious conduct.

Where an employee engages in discrimination with willful or wanton negligence, recklessness, or a conscious disregard of the plaintiff's rights under the City Human Rights Law, the employer may be held liable for punitive damages where: (1) the offending employee exercised managerial or supervisory responsibility; (2) the employer knew of the offending employee's discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action; or (3) the employer should have known of the offending employee's unlawful discriminatory conduct yet failed to exercise reasonable diligence to prevent it.

However, an employer is not liable for punitive damages based on an employee's wrongful conduct where the employer proves by a preponderance of the evidence that it has (1) put into place policies and procedures to educate employees about unlawful discrimination, to prevent and detect unlawful discrimination, and to investigate and effectively resolve complaints of such conduct; and (2) has made good faith efforts to implement and enforce these policies and procedures.

(Tr. at 994-95)

The Hospital does not challenge the Court's jury instruction concerning punitive damages,[12] but argues that "[t]he jury failed to apply this instruction properly." (Def. Br. (Dkt. No. 164) at 22) According to the Hospital, the jury "assessed punitive damages against the Hospital based solely on its liability for the acts of Quinones, while ignoring the substantial evidence that the Hospital (1) maintained policies and procedures to prevent and detect unlawful

---

[12] Plaintiff now argues that the "[t]he safe harbor from punitive damages only applies when management should have known that a non-supervisory employee discriminated against the plaintiff." (Pltf. Opp. (Dkt. No. 170) at 30) Plaintiff did not object to this instruction at trial (see Tr. at 836-41), but it appears that the Court's instruction on punitive damages may have been more favorable to the Hospital than was warranted under applicable law.

As discussed above, Section 8-107(13)(b)(1)-(3) outlines three circumstances in which an employer is vicariously liable for punitive damages based on an employee's conduct: (1) where the employee exercised managerial or supervisory responsibility; (2) where the employer knew of the employee's discriminatory conduct and either acquiesced in the conduct or failed to take immediate and appropriate corrective action; and (3) where the employer should have known of the employees' discriminatory conduct but failed to exercise reasonable diligence to prevent it. N.Y.C. Admin. Code § 8-107(13)(b)(1)-(3). Section 8-107(13)(e) provides that proof of an employer's anti-discrimination policies and procedures "shall be considered . . . in mitigation of civil penalties or punitive damages which may be imposed . . . and shall be among the facts considered in determining an employer's liability under subparagraph three of paragraph b of this subdivision." N.Y.C. Admin. Code § 8-107(13)(e) (emphasis added).

Accordingly, it appears that an employer's policies and procedures only shield against liability for punitive damages for vicarious liability when "the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct." N.Y.C. Admin. Code § 8-107(13)(b)(3). Where vicarious liability arises under Section 8-107(13)(b)(1) or (2), an employer's policies and procedures only mitigate the amount of punitive damages; such policies and procedures do not provide a defense to liability for punitive damages. See Zakrzewska v. New Sch., 14 N.Y.3d 469, 480 (2010) (noting in dicta that "an employer's antidiscrimination policies and procedures . . . shield against liability, rather than merely diminish . . . punitive damages, only where an employer should have known of a non-supervisory employee's unlawful discriminatory acts").

Here, the offending employee – Quinones – clearly exercised managerial and supervisory responsibility (see Tr. at 204-05, 212-13, 226, 231-32), and the Hospital's policies and procedures were thus not a defense to Plaintiff's claim for punitive damages under Section 8-107(13)(b)(1) and (2).

discrimination, (2) through frequent training, made a good faith effort to enforce these policies and procedures, and (3) was not given a chance to investigate and effectively resolve a complaint that such conduct was occurring." (Id.)

This Court will not disturb the jury's determination that punitive damages are warranted in this case. As an initial matter, the Hospital does not dispute that a reasonable jury could have found that Quinones's conduct amounted to willful or wanton negligence, or recklessness, or demonstrated a conscious disregard of Duarte's rights or conduct so reckless as to amount to such disregard. Plaintiff testified that she complained about Quinones's discriminatory conduct on multiple occasions to both Quinones and Arce-Tomala, and that neither of these supervisors forwarded her complaints to Human Resources or acted upon them in any way. (Tr. at 787-89, 793-95) To the contrary, Plaintiff testified that Quinones ignored her complaints and that Arce-Tomala told Plaintiff that she had to "deal with" Quinones's discriminatory conduct on her own. (Id. at 795) The supervisors' failure to forward Plaintiff's complaints to Human Resources directly contravened the Hospital's written policies (see PX 7 (Dkt. No. 72-6) at 30 ("Any [] supervisor or manager who receives a report or complaint of discrimination or harassment must report that alleged offense immediately.")) and raises questions about the adequacy of the Hospital's training. Arce-Tomala's testimony that she did not know the Hospital's procedures for reporting discrimination (Tr. at 328-29) also suggests that the Hospital's anti-discrimination training programs were ineffective.

Moreover, as defense counsel conceded in closing argument, the Hospital received Plaintiff's November 25, 2013 rebuttal to her written warning (id. at 955-56), in which she explicitly complained about Quinones's discriminatory conduct (PX 15 (Dkt. No. 73-5) at 1), but never investigated Duarte's complaint. (Tr. at 211, 331) A reasonable jury could conclude

30

from this evidence that the Hospital did not make good faith efforts to implement and enforce its anti-discrimination policies and procedures.

In sum, this Court will not disturb the jury's determination that a punitive damage award is appropriate in this case.

## B.      Excessiveness Inquiry

### 1.      Applicable Law

"Regarding the magnitude of punitive damage awards, due process requires that they be "'reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.""[13]  Hill v. Airborne Freight Corp., 212 F. Supp. 2d 59, 75 (E.D.N.Y. 2002) (quoting Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992) (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21 (1991))).  In determining whether a punitive damage award is excessive, courts must consider the "guideposts" cited by the Supreme Court in BMW of North Am., Inc. v. Gore, 517 U.S. 559 (1996), including "(1) the degree of reprehensibility of the tortious conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Lee v. Edwards, 101 F.3d 805, 809 (2d Cir. 1996) (citing Gore, 517 U.S. at 575).

The Supreme Court has stated that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517 U.S. at 575.  Courts determine the reprehensibility of a defendant's conduct by considering whether, inter alia,

> the harm caused was physical as opposed to economic; the tortious conduct
> evinced an indifference to or a reckless disregard of the health or safety of others;
> the target of the conduct had financial vulnerability; the conduct involved

---

[13] No evidence was offered at trial concerning the Hospital's net worth or assets.

31

   repeated actions or was an isolated incident; and the harm was the result of
   intentional malice, trickery, or deceit, or mere accident.

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (citation omitted); see

also Norris v. New York City Coll. of Tech., No. 07-CV-853, 2009 WL 82556, at *7 (E.D.N.Y.

Jan. 14, 2009) ("Factors bearing on the degree of reprehensibility include '(1) whether a

defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted

with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has

engaged in repeated instances of misconduct.'") (quoting Lee, 101 F.3d at 809). "The existence

of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a

punitive damages award; and the absence of all of them renders any award suspect." State Farm,

538 U.S. at 419.

    In employment discrimination cases, "[c]ases upholding punitive damage awards

of $200,000 or more generally involve discriminatory or retaliatory termination resulting in

severe financial vulnerability to plaintiff, repeated incidents of misconduct over a significant

period of time, repeated failures to address complaints of discrimination, and/or deceit."

MacMillan, 873 F. Supp. 2d at 566 (collecting cases). Courts also consider whether the plaintiff

"establishe[d] a 'pattern of discrimination' that extended to [] other employees in [her] protected

group." Id. (quoting Greenbaum v. Handelsbanken, 67 F.Supp.2d 228, 269-70 (S.D.N.Y. 1999)).

    With respect to the ratio of punitive damages to compensatory damages, the

Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between

harm, or potential harm, to the plaintiff and the punitive damages award." State Farm, 538 U.S.

at 424 (citations omitted). However, the Court has noted that "[o]ur jurisprudence and the

principles it has now established demonstrate . . . that, in practice, few awards exceeding a

single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. at 425.

Separate and apart from constitutional concerns, "a federal court in a case governed by state law must apply the state law standard for appropriateness of remittitur." Payne v. Jones, 711 F.3d 85, 97 n.8 (2d Cir. 2012) (citing Gasperini, 518 U.S. at 429-30). Accordingly, this Court must apply relevant New York precedents and N.Y. C.P.L.R. § 5501(c), which – as discussed above – "provides generally that damages awards are excessive or inadequate if they 'deviate[] materially from what would be reasonable compensation.'" Id. ("While it is not clear from the language of the New York statute that it was intended to apply to punitive, as well as compensatory, damages, it is hard to imagine that the New York legislature expected its courts to exercise this supervisory responsibility only as to compensatory damages, and not as to punitive damages.").

In determining whether a punitive damages award is excessive, a court must "keep in mind the purpose of punitive damages: 'to punish the defendant and to deter him and others from similar conduct in the future.'" Lee, 101 F.3d at 809 (citation omitted). "The excessiveness inquiry for punitive damages, as with compensatory damages, 'requires comparison with awards approved in similar cases.'" Bouveng, 175 F. Supp. 3d at 346 (quoting Mathie v. Fries, 121 F.3d 808, 817 (2d Cir. 1997)).

## 2. Analysis

The Hospital argues that "virtually all of the factors in the reprehensibility analysis [are] not present here":

> [t]here was no violence or threat of violence; no physical injury; no termination of
> employment resulting in financial vulnerability; no deceit; no repeated failures to
> address claims of discrimination; no evidence of indifference or reckless disregard

for the health or safety of others; and no evidence of an established "pattern of discrimination" that extended to other employees with any type of disability.

(Def. Br. (Dkt. No. 164) at 26 (emphasis in original)) Plaintiff contends, however, that she

suffered "egregious . . . continued harassment," as "Quinones cruelly attacked Plaintiff's hearing

disability over the course of eight years in the presence of her colleagues at staff meetings,

causing Plaintiff to shut down during the meetings to avoid further public humiliation." (Pltf.

Opp. (Dkt. No. 170) at 35) Plaintiff also argues that the Hospital's failure to investigate her

complaints about Quinones's misconduct is reprehensible.[14] (Id.)

               There is evidence that at staff meetings between 2007 and August 2014 Quinones

repeatedly referred to Plaintiff as "deaf," and that he did so in a manner that was calculated to be

demeaning and humiliating to her. (Tr. at 585, 761, 848-49) Quinones also suggested at staff

meetings that Plaintiff was exaggerating her hearing disability, stating repeatedly that Plaintiff

---

[14] Plaintiff further contends that Quinones's and Arce-Tomala's "efforts to mislead the jury about what they knew about Plaintiff's disability and Quinones's harassment" demonstrate that the discriminatory conduct was reprehensible. (Pltf. Opp. (Dkt. No. 170) at 35) While the jury may have rejected the testimony of these two witnesses, the jury's credibility determination does not demonstrate that their treatment of Plaintiff at work was reprehensible. Even assuming arguendo that these managers perjured themselves, the Court is not aware of authority suggesting that, under New York law, a punitive damage award against an employer can be predicated on a manager's perjury at trial. Such an award would appear to be inconsistent with Supreme Court precedent, which instructs courts to focus on the "reprehensibility of the tortious conduct," not on a witness's conduct at trial. Gore, 517 U.S. at 575; see also Alla v. Verkay, 979 F. Supp. 2d 349, 373 n.1 (E.D.N.Y. 2013) ("There is a very real possibility that the jury thought [the defendants] were lying at trial. However, it is not clear that subsequent trial perjury can justify punitive damages. . . . Indeed, to say that a jury could award punitive damages based on trial perjury would be to authorize punitive damages in almost every case in which the jury credits the plaintiff over the defendant.") (internal citations omitted); Luken v. Edwards, No. C 10-4097-MWB, 2012 WL 5332193, at *3 (N.D. Iowa Oct. 26, 2012) ("[Plaintiff] asked for punitive damages in part based on [defendant]'s trial testimony that the jury obviously disbelieved. I, too, found her core testimony untruthful and not believable. However, [plaintiff] cites no legal authority that false testimony under oath at trial, rather than facts giving rise to a legal cause of action[,] may support punitive damages, and I know of none.").

34

could hear when it was convenient for her to hear. (Id. at 584, 766, 848) There is also evidence that Hospital managers – Quinones and Arce-Tomala – ignored Plaintiff's repeated complaints about Quinones's discriminatory misconduct. Finally, there is evidence that the Hospital failed to investigate Plaintiff's complaints about Quinones's discriminatory misconduct in November 25, 2013, when the Hospital received Plaintiff's rebuttal to her written warning.

Based on Plaintiff's testimony, however, it is clear that the vast majority of staff meetings proceeded without discriminatory ridicule. (Id. at 791-92 (testifying that Quinones ridiculed Plaintiff's disability on two or three occasions in 2009 and 2010, and three times in 2011))[15] Moreover, most of the reprehensibility factors are absent here: there was no evidence of violence or a threat of violence; physical injury; termination of employment that resulted in financial vulnerability; deceit; indifference or reckless disregard for the health or safety of others; or discriminatory misconduct extending to employees other than Duarte. See MacMillan, 873 F. Supp. 2d at 566.

Having considered "all of the circumstances of the case," the Court concludes that the Hospital's conduct "was insufficiently reprehensible to justify a punitive damages award in significant excess of [the] compensatory damages award," which this Court has remitted to $125,000. Thomas v. iStar Fin., Inc., 652 F.3d 141, 148-49 (2d Cir. 2011) (affirming remittitur of $1.6 million punitive damage award to $190,000, even though the "harm to [plaintiff] . . . occurred over a period time," and the employer "may have risked harm to other employees by failing to respond to complaints of [discriminatory conduct]," because it was "clear that [the employer]'s conduct did not result in physical injury to [the plaintiff]" or "evince an indifference

---

[15] Given Plaintiff's testimony, Torres's assertion at trial that Quinones was "constantly telling Ms. Duarte are you deaf" is not credible. (Tr. at 584)

35

to or reckless disregard for the health and safety or others"; prior to remittitur of punitive damage award, the punitive-to-compensatory-damages ratio was "approximately 5.7:1"; following remittitur, compensatory damage award was larger than punitive damage award).[16]

With respect to the ratio factor, the jury's award of $750,000 in punitive damages represents a ratio of approximately 6 to 1 when measured against the remitted compensatory

---

[16] The cases cited by Plaintiff (Pltf. Opp. (Dkt. No. 170) at 37-38) involve conduct that is far more reprehensible. See, e.g., Zakre v. Norddeutsche Landesbank Girozentrale, 541 F. Supp. 2d 555, 564-65 (S.D.N.Y. 2008) ("[When plaintiff] was terminated, she had one child in college and another approaching college, . . . and she was the sole wage earner for the family. . . . In addition, there was [] extensive evidence of discrimination against women generally[,] . . . [and] [c]omplaints about discrimination . . . were dismissed."); Greenbaum, 67 F. Supp. 2d at 269-70 ("[Plaintiff] was subjected to a six-year pattern of discrimination, which ended in [retaliation] when she finally complained. . . . Other evidence suggests that [defendant's] officials . . . tried to retaliate against her in a deceitful manner by moving her to a position that would later be phased out for seemingly extrinsic reasons. The record also suggests that this pattern of discrimination may have extended to other female employees . . . ."); Rivera v. United Parcel Serv., Inc., 148 A.D.3d 574, 574-75 (1st Dep't 2017) ("[Plaintiff's] supervisor repeatedly made gross and highly offensive sexually-charged remarks to plaintiff, including in front of plaintiff's subordinates, causing them to lose respect for plaintiff and fueling rumors about her proclivity to engage in workplace affairs. The supervisor [also] called her and followed her around after work, forcing her to give him rides and otherwise communicate with him, on pain of threats of losing her job . . . . [Additionally,] plaintiff was the subject of widespread and unfounded workplace rumors that she was having affairs with multiple coworkers, and . . . [plaintiff's] subordinates made crude and offensive remarks to each other and in plaintiff's presence."); Salemi v. Gloria's Tribeca Inc., 115 A.D.3d 569, 569–70 (1st Dep't 2014) ("[Plaintiff's employer] discriminated against her based on her religion and sexual orientation by, [inter alia], holding weekly prayer meetings at the restaurant where plaintiff worked which the staff viewed as mandatory, fearing that they would lose their jobs if they did not attend, repeatedly stating that homosexuality is 'a sin,' and that 'gay people' were 'going to go to hell,' and generally subjecting her to an incessant barrage of offensive anti-homosexual invective. . . . [Additionally], plaintiff was retaliated against for objecting to [these] offensive comments, choosing not to attend workplace prayer meetings, and refusing to fire another employee because of his sexual orientation."); McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc., 175 Misc. 2d 795, 797-98 (Sup. Ct. N.Y. Cty. 1997) (plaintiff testified that "incidents of abuse" – "often of a sexually explicit nature" – "occurred very frequently (some were daily) until the day she was terminated"; these included, inter alia, comments regarding the size of plaintiff's breasts, jokes about her using a "miscarriage as an excuse to miss work," repeated references to plaintiff as a "bitch," the taping of a sign containing the words "flush me" to her chair, and the carving of the words "blow me" into her desk; plaintiff also testified that she was attacked physically by co-workers on two occasions), aff'd in relevant part, 256 A.D.2d 269 (1st Dep't 1998).

award of $125,000. The Second Circuit has stated that, "[a]s a general matter, [a] four-to-one ratio of punitive to compensatory damages . . . is close to the line of constitutional impropriety." Turley, 774 F.3d at 165 (internal quotation marks and citations omitted). Moreover, where "the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, 'a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'" Id. A lower ratio is "particularly" appropriate "where the underlying compensation is, as it is in this case, for intangible – and therefore immeasurable – emotional damages," because "[i]mposing extensive punitive damages on top of such an award stacks one attempt to monetize highly offensive behavior, which effort is necessarily to some extent visceral, upon another." Id. at 165-66. In such circumstances, "a roughly 2:1 ratio of punitive damages to what, by its nature, is necessarily a largely arbitrary compensatory award, constitutes the maximum allowable . . . ." Id. at 166.

Given that the punitive damages award here is six times greater than the remitted compensatory award – which itself falls at the top of the range for "garden variety" mental distress – the ratio factor weighs in favor of reducing the punitive damages award.

In reviewing the punitive award, this Court has also considered civil penalties under the NYCHRL and punitive damage awards upheld in comparable cases. "[T]he civil penalty for violating the NYCHRL [is] a maximum of $250,000 for an 'unlawful discriminatory practice [that] was the result of the respondent's willful, wanton or malicious act.'" MacMillan, 873 F. Supp. 2d at 568 (quoting N.Y.C. Admin. Code § 8-126(a)). The civil penalty amount under the NYCHRL suggests that the $750,000 punitive damages award here is excessive. See id.

A survey of comparable cases likewise indicates that the punitive award here is excessive. See Thomas, 652 F.3d at 148-49 (in race discrimination and retaliation case, affirming remittitur of $1.6 million punitive damage award to $190,000, which was lower than compensatory damage award, because plaintiff suffered no physical injury, and there was no evidence of indifference to the health or safety of others); Caravantes v. 53rd St. Partners, LLC, No. 09 CIV. 7821 RPP, 2012 WL 3631276, at *26 (S.D.N.Y. Aug. 23, 2012) (in sexual harassment case, awarding $150,000 in compensatory damages for pain and suffering and $25,000 for punitive damages where, "although there was no showing that [the employer] was aware of [unwanted] sexual relationship . . . occurring between [the plaintiff] and [his supervisor for a period of more than two years], [it] was aware that sexual touching was occurring within the restaurant, and failed to take appropriate action despite the fact that it received complaints directly from employees, as well as from the [New York State Division of Human Rights]"); MacMillan, 873 F. Supp. 2d at 569 (in race discrimination case, after remitting compensatory damage award from $125,000 to $30,000, remitting $1 million punitive damage award to $100,000 because, although employer's discriminatory "conduct could be viewed as 'repeated,'" it was "clear that the [the employer's] conduct did not result in physical injury to [plaintiff], nor did it evince an indifference to or reckless disregard for the health or safety of others") (internal quotation marks and citations omitted); Chisholm v. Memorial Sloan-Kettering Cancer Ctr., 824 F.Supp.2d 573, 580 (S.D.N.Y. 2011) (remitting $1 million punitive award to $50,000 in retaliation case where defendant's conduct did not involve violence, threats, racial slurs, or other offensive language, and noting that "an award of $50,000 is more in line with the punitive damages awarded in similar cases by this Court and other courts in this Circuit"; plaintiff was awarded approximately $335,000 in compensatory damages for back pay and front pay);

DeCurtis, 2011 WL 4549412, at *5 (awarding $100,000 in compensatory damages and $75,000 in punitive damages on plaintiff's sex discrimination and retaliation claims, where supervisor "repeatedly touched [p]laintiff in a sexual manner without her consent, sent [p]laintiff sexually explicit e-mails and made sexually explicit comments, and called her late at night and on weekends to talk about sex," and owner "took no action in response" to plaintiff's complaint about the conduct; concluding that punitive damages were proper because conduct was "outrageous," repeated and deliberate," and rose above "mere negligence," but finding that an award of more than $75,000 was not justified because "[c]ourts in this Circuit ha[d] consistently favored lower awards in [comparable] circumstances," and plaintiff "did not suffer physical violence"); Norris v. New York City Coll. of Tech., No. 07-CV-853, 2009 WL 82556, at *7 (E.D.N.Y. Jan. 14, 2009) (remitting jury's $425,000 punitive damage award to $25,000 where plaintiff received $75,000 in compensatory damages on retaliation claim; noting that "[w]hile the evidence supports the conclusion that [plaintiff's supervisor] acted intentionally and with knowledge that his conduct would violate [plaintiffs] rights, no other indicia of reprehensibility are present. There was no violence or threat of violence. Nor was there any evidence of repeated misconduct. . . . Even taking the evidence in the light most favorable to [plaintiff], the Court is left with the firm conviction that [the supervisor's] decision to terminate her after learning of her complaint of discrimination was a transient outburst of pique and frustration; while such conduct warrants some amount of punishment and deterrence, it is not sufficiently reprehensible to support the jury's award of $425,000"); cf. Stampf, 761 F.3d at 210-11 (after remitting award for past emotional distress and future emotional distress, respectively, to $100,000 and $20,000, remitting an "excessive" $150,000 punitive award to $100,000 where defendant made false statements to police accusing plaintiff of touching her breast, resulting in

39

plaintiff's arrest in front of co-workers, his detention in jail overnight, and embarrassment and stress contributing to alcohol abuse problems and the end of a "long-term, committed relationship").

Having considered the reprehensibility factors, the ratio factor, civil penalties under the NYCHRL, and punitive damage awards imposed in comparable cases, the Court concludes that a punitive damages award of no more than $125,000 is appropriate in this case. The Hospital's motion for a new trial concerning punitive damages will be granted unless Plaintiff agrees to a remittitur reducing the punitive damage award from $750,000 to $125,000.

## CONCLUSION

For the reasons stated above, the Hospital's motion for a new trial is granted on the issue of damages unless Plaintiff agrees in writing by September 30, 2018, to a remittitur reducing the compensatory damage award to $125,000 and the punitive damage award to $125,000. The Clerk of Court is directed to terminate the motion. (Dkt. No. 163)

Dated: New York, New York
September 15, 2018

SO ORDERED.

Paul G. Sardephe

Paul G. Gardephe
United States District Judge